## IN THE MATTER OF THE ESTATE OF LUIGI DAMA, DECEASED.

[No. 6972; decided January 30, 1892.]

**Will—When Both Olographic and Attested.**—A testamentary document in the handwriting of the testator and having subscribing witnesses may be proved either as an olographic or as an attested will.

**Expert in Handwriting—Who Qualified as.**—One who has made a specialty in penmanship at college, who has taught it for many years and to thousands of pupils, and who gives evidence of his proficiency in the presence of the court, may be regarded as an expert in the simulation and imitation of handwriting.

**Expert Witnesses—Weight of Evidence.**—Numbers do not necessarily count in the case of expert witnesses, any more than in other cases. It is quality, rather than quantity, which the law regards, so that the mere fact that numerically the force of sheer experts is stronger on one side than on the other is not a matter of moment in itself.

**Expert in Handwriting—Counsel as.**—If the attorneys in a case involving the alleged forgery of a will show themselves possessed of science and skill in handwriting, their argument may be regarded as expert testimony, relieved of the constraint of cross-examination and free from the burden of an oath.

**Expert Testimony—Credibility—Character of the Witness.**—Where an expert on handwriting gives an opinion contrary to what he expressed before the trial, the court said: "The validity of scientific deduction is not to be tested by the tergiversation of scientist in his moral conduct outside the record; his individual deceit and duplicity in dealing with clients may be established or admitted,

but the scientific value of his evidence is dependent upon the logical connection between premises and conclusion."

**Handwriting—Evidence of Genuineness.**—The strongest evidence of the genuineness of handwriting is the testimony of the alleged writer, and next to this is the testimony of a witness who saw the instrument executed and is able to identify it. There are, however, other and different modes of proof.

**Handwriting—Evidence of Genuineness.**—In determining the question of authorship of a writing, the resemblance of characters is not the only test. The use of capitals, abbreviations, punctuation, paragraphing, erasures, interlineations, idiomatic expressions, orthography, underscoring, composition and the like, are all elements upon which to form the judgment.

**Handwriting — Genuineness—Evidence of Dissimilitude.**—Conclusions drawn from dissimilitude between disputed writings and authentic specimens are not always entitled to much consideration; such evidence is weak and deceptive, and of little weight when opposed by evidence of similitude.

**Expert in Handwriting—Value of Testimony.**—Evidence of the genuineness of an instrument, based upon a comparison of handwritings and the opinion of an expert, is of low order and of an unsatisfactory character.

**Expert Witnesses—Bias—Manner of Retaining.**—The present system of retaining expert witnesses is discussed and criticised as not tending to unbiased testimony.

**Expert Witnesses—How Should be Regarded.**—Under the present system of retaining expert witnesses, the true position for them to take is that of persons to whom a question has been presented, and who, having given a certain opinion, are retained by the parties in whose favor they have given it, to carefully prepare the opinion, with the reasons therefor, and state it before the tribunal before which the case is tried. Experts should be considered and treated as advocates, rather than as witnesses.

**Physician as Witness in Will Contest.**—It seems that in a will contest a physician who attended the testator in his last illness may testify that the testator stated that he executed the will in question.

**Letters of Administration—Proceedings to Obtain.**—The proceedings in an application for letters of special administration, which under the general practice are somewhat informal, have been modified by the court by requiring the application to be made in open court and upon notice.

**Will—Conflicting Testimony of Witnesses.**—Where there are three witnesses to a will, its probate will not be denied or revoked because one of them, against the positive testimony of the others, fails or refuses to authenticate his signature or the execution of the instrument.

**Will—Conclusiveness of Witnesses' Testimony.**—On the contest of a will the testimony of a subscribing witness is not conclusive either way, nor does the law presume that he is either more or less truthful than others, though it does not presume that he had, when he signed, full knowledge of what he was doing.

**Will—Death of Subscribing Witness.**—In case of the death of a subscribing witness to a will, his attestation, when proved, is prima facie evidence that all was done as it should have been.

**Will—Credibility of Witnesses.**—When a will is contested, the case is open for general witnesses, and when the testimony is all in, each witness is credited according to the impression he leaves of candor and intelligence, and not according to his being, or not being, an attesting witness.

**Will—Falsehood or Forgetfulness of Witness.**—Neither the failure of memory nor the corrupt or false swearing of attesting witnesses will be allowed to defeat a will, if its due execution can be shown by other testimony.

**Will—Witness Who does not Subscribe.**—In case of a will contest a person who was present at the execution of the testament, but who is not a subscribing witness, may give evidence of a valuable character.

**Will—Proof of Forgery.**—Where a will is contested on the ground of forgery, the contestant is not called upon to indicate the forger, but he is compelled to establish by a preponderance of evidence the charge laid in his complaint, while it is not incumbent on the respondent to do more than hold the balance.

**Will—Probate Sustained Against Heirs.**—The probate of a will in this case is sustained as against contesting heirs with whom the testator was not on friendly terms, he being an eccentric old music master, and having given practically his entire estate to a married woman for the cultivation of her voice, who was not related to him, but who had been his pupil.

Application to revoke probate of will.

Joseph P. Kelly and H. I. Kowalsky, for the petitioners.

Russell J. Wilson, Henry C. Hyde, R. H. Lloyd and Frank J. French, for the respondents.

Timothy J. Lyons, for certain Italian legatees.

### STATEMENT OF THE CASE.

COFFEY, J.   On January 3, 1889, Sarah Randall, by her attorneys, Joseph P. Kelly, Esq., and H. I. Kowalsky, Esq.,

filed in this court a petition praying for the revocation of the probate of the Will of Luigi Dama, in which she set forth that Luigi Dama died intestate in San Francisco on the twentieth day of January, 1888, being at that time a resident of that city and county and leaving estate. therein of real and personal property; that at the time of his death he was a widower, his wife, Wealthy B. J. Dama, having predeceased him on the sixth day of November, 1882, in the said city and county; that she left surviving her Luigi Dama, her husband, and Sarah Randall, her mother, the contestant; also brothers and sisters—Edward W. Randall, of Bath, Maine, aged fifty-eight years, Benjamin Randall, Boston, Massachusetts, aged forty-five years, Frank H. Randall, aged thirty-two years, and Jennie Forbes, Boston, Massachusetts, aged forty-six years; that at the time of the death of Luigi Dama he left property which was acquired by the joint labor of himself and his spouse, Wealthy, and that during his marriage he acquired all of the property of which he died seised; that he had no kin living at the time of his death, and that the only heir at law to his estate was the contestant, Sarah Randall; that his estate, situated in California and Massachusetts, was valued at about $35,000; that on the thirtieth day of January, 1888, an instrument was filed in this court purporting to be the last Will and Testament of said Luigi Dama, accompanied by a petition by one Sara Barker Smith, wherein it was alleged, among other things, that the said instrument was the last Will and Testament of said Luigi Dama, deceased, and praying that the same be admitted to probate as such and thereafter, on the twenty-ninth day of February, 1888, the said paper was admitted to probate; that said paper was not signed, written or executed by said Dama, nor was the same subscribed to by Jules Matthieu, No. 214 O'Farrell street, San Francisco, Henry Godard, No. 222 O'Farrell street, nor Antonio Bellini, No. 222 O'Farrell street, nor were the names that are now subscribed thereto, purporting to be the names of said witnesses, written or subscribed to by them, nor was the same signed by the said Luigi Dama, in the presence of said

witnesses, whose names are signed thereto, nor were the names of said witnesses subscribed thereto by them in the presence of said Dama or in the presence of each other; that the name "Luigi Dama" was not written by him nor subscribed thereto by some person in his presence or by his direction; that the names of the subscribing witnesses, Mathieu, Godard and Bellini, were not signed by them or subscribed thereto by some person in their presence or by their direction; that the said alleged Will was not written by the said Dama, nor at or by his direction, but that it is false, fraudulent and forged, and not his last Will and Testament; that according to said alleged Will one Sara Barker Smith, wife of Julius Smith, is named as the executrix without bonds, and also the principal devisee and legatee thereunder; and the contestant therefore prays for a revocation of the Will, because of the premises.

On January 22, 1889, a demurrer was interposed by two of the legatees in the Will, namely, the Reale Stabilimento dell' Annunziata di Napoli and Andrea Manzo, and at the same time an answer of general denial was filed on behalf of the same legatees; this demurrer was subsequently overruled; and on January 14, 1889, an answer was filed by the executrix of the Will, Sara Barker Smith, which was subsequently on the twenty-third of January, 1889, superseded by an amended answer traversing all the material allegations of the contest.

On December 17, 1890, while the trial was in progress, the death of the contestant was suggested and a continuance thereupon had until January 5, 1891, when a legal representative, James C. Pennie, administrator, was substituted and the trial resumed.

The trial began on the twentieth of November, 1890, and proceeded with many interruptions from various causes until June 23, 1891, when it was submitted for the decision of the court, a jury having been theretofore expressly waived in open court.

On September 24, 1891, the submission was by stipulation set aside and on September 25, 1891, the cause was resubmitted for judgment and decision.

(The trial occupied in all two hundred and sixty-four hours, and the argument in summing up by counsel, sixty-eight; in all, the time consumed was three hundred and thirty-two hours. The judge's notes of evidence and argument comprise two hundred and seventy-three pages of legal cap.)

On Friday, in the forenoon, January 20, 1888, Luigi Dama died at his residence, 317 Mason street, San Francisco, and on Saturday afternoon, January 21, 1888, one R. W. Burtis applied for and obtained letters of special administration upon the estate of said Dama, which estate, according to the petition filed by said Burtis, consisted of real and personal property, the value and particular character of which he was unable to state; the petition also recited that the papers and documents belonging to said deceased were supposed to be in his box in the Safe Deposit Company; and that it was necessary that some person should be immediately appointed to collect, preserve and take care of the same; that there would be considerable delay in procuring general letters of administration, and that the said estate required immediate care and attention in order to preserve the same from loss and injury; that said Dama was unmarried and left no heirs or relatives in California; that the petitioner had made due search and inquiry for the purpose of ascertaining if the deceased left a Will, and from the information received the petitioner believed a Will to be among the decedent's papers in the Safe Deposit Company. This petition was signed by R. W. Burtis, petitioner; and the name of Frank J. French, attorney for petitioner, appears subscribed to the same. On the same day an order was made, entered and filed, appointing said Burtis special administrator of the estate of Luigi Dama, deceased, and directing special letters upon his giving a bond in the sum of $1,000, which bond, signed by Frank J. French and B. F. Jellison and

executed before George T. Knox, notary public, on the same
day, was approved by the judge on that day; whereupon
special letters of administration were issued to said R. W.
Burtis and he entered upon that office.

On January 30, 1888, a petition was filed, signed by Sara
Barker Smith and Frank J. French, her attorney, which set
out that she was a resident of San Francisco, California, of
lawful age; the petition recited the facts of the death and
residence of Luigi Dama, and that the decedent left a Will
dated at San Francisco, the eighth day of May, 1887; that
said Will was left in the possession of the petitioner by the
testator after its execution, and she believed and alleged it to
be his last Will and Testament, and the same was filed simul-
taneously with the petition and presented for probate; that
the Will was an olographic Will, it being entirely written,
dated and signed by the hand of the testator himself; and
it was also attested by three subscribing witnesses, whose
names were signed at the end of the Will and under the
signature of said testator; that the names and residences of
said witnesses were as follows, namely: Jules Mathieu, No.
214 O'Farrell street, Henri Godard, No. 222 O'Farrell street,
Bellini Antonio, No. 222 O'Farrell street; that the petitioner,
Mrs. Sara Barker Smith, was named in said Will as execu-
trix thereof, without bonds, and she consented to act in that
capacity; that said Dama left him surviving no wife, children
or child, and no issue of any deceased children or child;
that he left no heirs residing in the state of California, and
that the names, ages and residences of his heirs were un-
known to the petitioner, but if there were any heirs of the
decedent, the petitioner believed that they resided in Italy;
that the legatees and devisees were as follows, namely: The
Stabilimento dell' Annunziata, Naples, Italy, to which is
given and bequeathed $2,000; Andrea Manzo del fu Simone,
Naples, Italy (age unknown to petitioner), to whom is given
$1,000, but in case of his decease this bequest to go to the
Stabilimento before named; the property contained in the

safe deposit at Boston, Massachusetts, and described in the fourth paragraph of the Will was bequeathed to Mrs. Sara Barker Smith, the petitioner, residing in San Francisco, California; the property contained in said safe deposit and described in the fifth paragraph was desired by the testator to be sold and the amount brought by it to be disposed of by the executrix for a charity purpose as she think the best; the sixth paragraph of the Will provides that the property mentioned in said paragraph and all the property and estate of the testator shall go and belong to said Mrs. Sara Barker Smith for the purpose of further study and development of her vocal organs and cultivation of the voice. The petitioner was unable at the time of filing her petition to state the probable value and character of the property of said decedent, further than that the personal property consisted of money in bank and in the hands of R. W. Burtis, special administrator, amounting to about eight hundred dollars, household furniture, piano, jewelry, and other personal effects; that the real property consisted of unimproved real estate in San Francisco, San Mateo, and Tulare counties, California, mentioned in the sixth paragraph of the Will; that decedent left personal property in Boston, Massachusetts, described in the fourth and fifth paragraphs of the Will, the value and character of which the petitioner was unable to state; that all of the estate left by decedent was separate property; that at the time of the execution of the Will, May 8, 1887, the testator was of the age of sixty-four years, or thereabouts, and was of sound and disposing mind and in all respects competent to make a Will.

The Will, which was admitted to probate by this court, after the proper preliminary procedure, on the twenty-seventh day of February, 1888, is in words and figures as follows:

"Know all men by these presents, that I Luigi Dama of San Francisco, state of California, being of sound mind, but feeling the uncertainty of life, do hereby make my last Will and Testament. After my just debts, Doctors

bills, and funeral expenses shall be paid, I give and bequeath.

### "First.

"I desire to have my body embalmed, and buried by the side of my dear lamented wife, Wealthy B. J. Dama, in *Bath, Maine,* and that to be paid out of my Estate.

### "Secondly.

"I do hereby give and bequeath two thousand dollars ($2000.00) to the *Stabilimento dell' Annunziata, Naples, Italy,* to be paid in United States gold coin.

### "Thirdly.

"I give and bequeath the sum of one thousand dollars ($1,000.00) to *Andrea Manzo del fú Simone, Naples, Italy,* but in case of his desease, the same sum to go to the *Stabilimento dell' Annunziata, Naples, Italy,* above named.

### "Fourthly.

"I desire that all the jewelry contained in the Safe Deposit in Boston, Mass. *Watch, gold chains, Diamonds studs,* (two pairs) *with solitaire diamonds each a breast pin with nine. diamonds, and three pearl studs, also eleven* (11) *Government Bonds of United States of America, Nine* of One thousand dollars each ($1,000.00) and two of Five hundred each ($500.00) and a ring with a large solitaire diamond. All those are my property, which I bequeath to Mrs. Sara Barker Smith, living at present in San Francisco, State of California.

### "Fifthly.

"In the above mentioned safe deposit in Boston, Mass., contains also a bracelet ornamented with diamonds and inside a portrait— A ring also ornamented, with diamonds and an Emerald stone in the middle of it —These two articles belong to my dear beloved wife Wealthy B. J. Dama which were bequeath to me *by her.* I desire these two articles to be sold, and the amount of what it will

bring to be dispose of, by the Executrix Mrs. Sara Barker Smith for a charity purpose, as she think the best.

### "Sixthly.

"In the safe deposit in San Francisco State and County of California, contained valuable papers, land contract between Wm. T. Cummins and myself, Luigi Dama Four deeds of land bought from R. R. Co: of one hundred and sixty acre's each paid one-fifth by myself Luigi Dama— Also the deed of the land on Jackson street, and Pacific Avenue Sixty eight feet and nine inches front on either of the streets, and two hundred fifty five feet in depth—bought from Mr. Davis for the sum of fourteen thousand and five hundred dollars ($14-500.00) paid cash on the first June one thousand eight hundred and eighty five, and also eleven shares (11) of American Watch Co: of Waltham, Mass —These and all of my property and Estate of whatever sort, or description, and where so ever situated shall go, and belong to the above mentioned Mrs. *Sara Barker Smith,* for the purpose of further study and development, of her vocal organs, and cultivation of the voice.

### "Seventhly.

"I appoint Mrs. Sara Barker Smith Executrix of this Will and Testament without bonds— Written this Sunday the day of May eight of the year One thousand eight hundred eighty seven, entirely by myself, without influece from any one.

"San Francisco May the eighth of the Year One thousand Eight Hundred and Eighty seven            LUIGI DAMA

"Witness        Jules. Mathieu.

"No. 214. O'Farrell. Street

"Henri Godard.        222. O.Farrell. Street

"Bellini Antonio.    222 O farrelle"

[This is fac-simile of original Will.]

Know all men by these presents, that
I Luigi Dama of San Francisco, state
of California being of sound mind, but
feeling the uncertainty of life, do hereby
make my last will and testament. After
my just debts, Doctors bills, and funeral
expences shall be paid, I give and bequeath.

= First =

I desire to have my body embalmed, and
buried by the side of my dear lamented
wife Wealthy B J Dama, in Bath, Maine,
and that to be paid out of my Estate. —

= Secondly =

I do hereby give and bequeath two thousand
dollars ($2000) to the Stabilimento dell'
Annunziata, Naples, Italy, to be paid
in United States gold coin.

= Thirdly =

I give and bequeath the sum of one thousand
dollars ($1000) to Andrea Manzo del fu
Simone, Naples. Italy, but in case of his
desease, the same sum to go, to the Stabilimen
to dell' Annunziata, Naples, Italy, above
named.

= Fourthly =

I desire that all the jewelry contained
in the Safe deposit in Boston, Mass.
Watch, gold chains, Diamonds studs (two)

pairs) with solitaire diamonds each, a breast pin with nine diamonds, and three pearl studs, also eleven (11) Governament Bonds of United States of America, Nine of one thousand dollars each ($1000) and two of Five Hundred each ($500) and a ring with a large solitaire diamond. All those are my property, which I bequeath to Mrs Sara Barker Smith, living at present in San Francisco State of California —

= Fifthly =

In the above mentioned safe deposit in Boston Mass — contains also a bracelet ornamented with diamonds and inside a portrait — A ring also ornamented with diamonds and an Emerald stone in the middle of it — These two articles belong to my dear beloved wife Wealthy B. J. Dama which were bequeath to me by her. I desire these two articles to be sold, and the amount of what it will bring, to be dispose of, by the Executrix Mrs Sara Barker Smith for a charity purpose, as she think the best —

= Sixthly =

In the safe deposit in San Francisco State and County of California; contained valuable papers, land contract between

Wm. C. Cummins and myself Luigi Dama
Four deeds of land bought from R. R. Co:
of one hundred and sixty acres each, paid
one fifth by myself Luigi Dama. Also
the deed of the land on Jackson street, and
Pacific Avenue Sixty eight feet and nine
inches front on either of the streets, and two
hundred fifty five feet in depth – bought
from Mr Davis for the sum of fourteen
thousand and five hundred dollars ($14500)
paid cash on the first June one thousand
eight hundred eighty five, and also eleven
shares (11) of American Watch Co: of
Waltham, Mass – These and all of my
property and Estate of whatever sort, or
description, and where so ever situated
shall go, and belong to the above mentioned
Mrs Sara Barker Smith, for the purpose
of further study and development, of her
vocal organs, and cultivation of the voice.
= Seventhly =
I appoint Mrs Sara Barker Smith
Executrix of this will and testament
without bonds – Written this Sunday
the day of May Eight of the Year One
thousand eight hundred eighty seven;
entirely by myself, without influence
from anyone.

*San Francisco May the eight of the Year One Thousand Eight Hundred and Eighty seven ====Luigi Dama*

*Witness Jules. Mathieu.*
*N° 214. O'Farrell. Street*
*Henri. Godard. 232. O. Farrell. Street*
*Beldini Contane 222 O'forell*

The order admitting this paper to probate may also be here inserted in extenso for convenience of future reference, if need be:

## Order Admitting Will to Probate.

The petition of Sara Barker Smith, heretofore filed in the above-entitled matter, praying for the admission to probate of a certain document filed herein, purporting to be the last Will and Testament of Luigi Dama, deceased, to be appointed executrix of the said last Will and Testament of said deceased, and that letters testamentary thereon be granted to said petitioner, coming on regularly to be heard on the thirteenth day of February, 1888, and due proof being then made that notice had been duly given of the time appointed for proving said Will and for hearing said petition according to law, to all parties interested, the further hearing of said application and the proofs in support thereof was regularly continued until the twenty-seventh day of February, 1888, at 2 o'clock P. M., of that day, at which time the following named witnesses were sworn and examined, viz.: William T. Cummins, R. W. Burtis, Mrs. Helen M. Cushman and Columbus Waterhouse, and the applicant, Sara Barker Smith, having also been sworn and examined; and from the testimony of said witnesses it satisfactorily appearing to this court, that said document is the last Will and Testament of said Luigi Dama, deceased; that it is an olographic Will, and was entirely written, dated and signed by the hand of the

testator himself, on the eighth day of May, 1887, the time it bears date, and that the said testator at the time of the execution of the same was of sound and disposing mind, and not acting under duress, menace, fraud or undue influence; that said testator died on the twentieth day of January, 1888, being a resident of the city and county of San Francisco, in the state of California, at the time of his death, and leaving estate of the value and character as follows: Unimproved real estate in the city and county of San Francisco of the value of about fifteen thousand dollars ($15,000), and unimproved real estate in the counties of Tulare and San Mateo, and in this state, and certain personal property in the city and county of San Francisco, the value of which is unknown, and also personal property in the city of Boston, commonwealth of Massachusetts, the value of which is unknown.

And no objection made thereto:

It is ORDERED, that the said document heretofore filed, purporting to be the last Will and Testament of said Luigi Dama, deceased, be admitted to probate as the last Will and Testament of said deceased; that said Sara Barker Smith be and she is hereby appointed executrix thereof, and that letters testamentary thereon issue to said petitioner upon taking the oath as required by law, it being expressly provided in said Will that no bonds be required of said petitioner.

Dated February 27, 1888.        J. V. COFFEY,
                                                              Judge.

### Proceedings on Original Probate, February, 1888.

This paper so probated might have been proved in either one or both of two ways: as an olographic Will (sections 1309, 1940, 1943, Code of Civil Procedure), or as an attested Will (sections 1308, 1935, Code of Civil Procedure).

It was propounded in both ways—as an olographic Will and also as an attested Will (see Contestant's Exhibit P—16); but it was proved, in the first instance, only as an olographic Will.

The matter of original probate first came on for hearing on February 13, 1888, Frank J. French appearing as

attorney for petitioner, T. J. Lyons for the Italian consul, and Joseph Naphtaly for the public administrator; ex-Judge M. A. Edmonds was also present representing heirs at law, informally, but not putting in any authenticated appearance; and there were called as witnesses, Henri Godard, Jules Mathieu and Antonio Bellini, whose names appear as subscribing witnesses to the Will, the last named of whom refused to testify that the signature "Bellini Antonio" was made by him; he then testified that he had never before seen the paper offered for probate, and that the name "Bellini Antonio" appended to the attestation clause was not written by him; he had, however, signed a paper in Dama's house, at his request, together with Godard and Mathieu, with whom he went to the house, 317 Mason street, upon the invitation of Dama for the purpose of witnessing a paper, but this propounded instrument was not the paper they witnessed; it was a paper with a stamp on it; the stamp was an impression on the paper itself; he had never signed more than one paper, and this was not that paper; and the words "Bellini Antonio 222 O farrelle" were not in his handwriting—of this he was positive; and at the request of the court he wrote his name a number of times on a sheet of legal cap paper (see Respondent's Exhibit 30); when Dama went to the witness at 222 O'Farrell street he told him that he had a paper that he wanted him and two others to sign, and afterward the witness procured the two other persons, Godard and Mathieu, and they went to Dama's house and signed as stated, on a Sunday, sometime about June or July, 1887. On the same occasion, February 13, 1888, that this testimony was taken, Henri Godard testified that he had signed the paper offered for probate, as a witness, one Sunday about half-past seven or eight o'clock in the evening, he thought it was about May, 1887 (the date of the paper was May 8, 1887); he did this at the request of Dama and in his presence and in the presence of Jules Mathieu and Bellini Antonio, who also signed at the desire of Dama, who himself first signed his own name; there was also another person present, a friend

of Bellini, whose name Godard did not recall; Dama spoke throughout the transaction in French, which was the language used at the time by all the persons present upon that occasion.

Jules Mathieu, the third subscribing witness, testified that he signed a paper at the request of Dama, and in presence of Godard and Bellini, who also signed at the same request, but he did not see Dama sign, nor did he see anything on the paper except the word "Witness" above the place where he signed; the paper was so folded and held down by Dama that Mathieu saw nothing above the place where he signed except the word "Witness." Dama held the paper down on the top of the piano until the three witnesses signed. Dama said to Mathieu, "Will you please put down your name here?" indicating the place, and said the same to Godard and Bellini; there was another person present, an Italian named Dellasanta. Dama did not say that the paper was his Will nor allude to it in any way, but Bellini told the witness after leaving the house that it was a Will and witness guessed that that was the object of their being wanted there by Dama. The witness Mathieu testified also that prior to going to Dama's house Bellini had told him that the purpose of their going there was to sign a Will.

After this testimony was taken on the thirteenth day of February, 1888, the return day for the hearing of the application for probate of the paper propounded, a continuance was had; and on February 27, 1888, at 2 o'clock P. M., the matter was again brought before the court, the counsel appearing being ex-Judge Myrick and F. J. French for the petitioner, and T. J. Lyons, for the Italian consul; at this hearing the testimony went to establish the olographic character of the instrument, the witnesses examined in that behalf being Wm. T. Cummins, R. W. Burtis, Mrs. Helen M. Cushman, Columbus Waterhouse, Sara Barker Smith, and after hearing the testimony of these witnesses the court found that the paper propounded was an olographic will, entirely written, dated, and signed by the hand of the testator Luigi Dama on the eighth day of May,

1887, the time it bears date, and admitted it as such to probate.

## What Contestant Undertook to Establish.

In his opening statement counsel for contestants claimed that he would be able to show that the names of the witnesses to the alleged Will were not written by them nor at their direction, and that he would establish by witnesses familiar with the writing of deceased that the instrument in dispute was not in his handwriting, and also by expert evidence beyond a peradventure of doubt that the alleged Will was a forgery; and that the beneficiary was a stranger to the deceased, not related by blood or connection, by consanguinity or affinity with or to him, and that the alleged object of his bequest was not such as he naturally would have designed, and contrary to his oft-repeated estimate of the legatee's capacity; the counsel asserted his ability to demonstrate by proof that this alleged Will was forged; and if he should not be able to identify the perpetrator in person, counsel claimed that the burden would rest upon those who had caused this paper to be probated.

## The Single Issue: Forgery.

There is but one issue in this case: FORGERY. This issue applies not only to the Will itself, but to certain other papers which are so connected with its fabrication that the evidence which applies to one must, for the most part, affect the others. These papers are briefly described as the "Will"; the "Altered Will"; the "Long Memorandum"; the "Draft of the Long Memorandum," and the "Short Memorandum."

These papers stand or fall together; if any one of them be false, the others cannot be true; and conversely. If a forgery were committed in this case, as alleged by the contestant, the author must have manufactured not only the paper probated as a Will, dated May 8, 1887, but also the papers denominated the "Altered Will," dated November 1, 1885 (Respondent's Exhibit 3); the "Long Memorandum" (Respondent's Exhibit 2); the "Draft of the Long Memo-

randum'' (Respondent's Exhibit 31) ; and the ''Short Memorandum'' (Respondent's Exhibit 1).

## A Fact Beyond Dispute.

One thing seems to be certain in this case: There was a paper signed by Luigi Dama in May, 1887, at his dwelling-house, 317 Mason street, San Francisco, in presence of four persons, Jules Mathieu, Henri Godard, Antonio Bellini, and Gaetano Dellasanta; the three first named signing as subscribing witnesses, and the fourth—Dellasanta—not signing for the reason stated in his testimony, which I abridge here:

Dellasanta testified that he knew Antonio Bellini who lived at 222 O'Farrell street in May, 1887, and also knew Jules Mathieu, who kept a bar at 221 in that street, and also Henri Godard, who lived at 222 in the same street; he knew also Luigi Dama, whom he first saw at Mathieu's bar; he met Bellini, Godard, and Mathieu in Dama's house, 317 Mason street, in May, 1887; Bellini asked him to go there with him, that he was to sign a Will; Dama took out of a basket a big envelope, and a paper out of it, and he said that was a Will that he called them up to sign; he took out a pen and he said, after he wrote his name, to Jules Mathieu to whom he gave the pen, to write his name; then he gave the pen to Godard and he signed, and then to Bellini, who wrote his name ''Bellini Antonio''; they wrote their addresses after their names, and Dama explained what it was, and at the same time said to Dellasanta that there was no necessity of his signing as three witnesses were enough; the Will was placed on the top of a piano when it was signed; Dellasanta was standing near the piano and looked at the paper after it was signed, but he could not read the paper the way it was folded up; after Bellini wrote, everybody made a remark, the way he signed his name; the paper here in question—the alleged and probated Will—looked to the witness Dellasanta to be the same paper that Dama signed in May, 1887, when Jules Mathieu, Henri Godard, and Antonio Bellini signed, on one Sunday even-

ing in May, 1887, at about 8 o'clock; but he would not swear that it was the same paper; it looked to him to be the same, but he was not judge enough to swear that no man could imitate the paper; this witness Dellasanta is an Italian, and a cook in the café of the Occidental Hotel (see pages 108 and 109 of the judge's manuscript notes). Dellasanta was a witness called by and for respondent, and was examined and cross-examined on Tuesday, March 17, 1890.

### The Question to be Decided.

The question then is, Was the paper admitted to probate on the 27th of February, 1888, and now sought to be revoked and annulled as false and forged, the paper executed by Luigi Dama and witnessed by Mathieu, Godard and Bellini, in the presence of Dellasanta?

### The Evidence of the Subscribing Witnesses.

Counsel for contestant first undertakes to establish that it was not the same paper, and that the names of the witnesses to the probated instrument were not written by them, nor at their direction; and in support of his case introduced Antonio Bellini, a native of Italy, fifty years of age and fifteen years a resident of San Francisco, who knew Luigi Dama, and who worked for him two or three hours every day, cleaning the house for him, a three-story brick house with a large garden in front, 317 Mason street; and in answer to the question of contestant's counsel: "Q. I will ask you to look at the fourth page of a paper marked 'Will of Luigi Dama, filed January 30, 1888,' and say if that signature 'Bellini Antonio' is yours? said: A. No, I never write that; never write my name that way. Never saw that paper before I saw it in this court here about two years ago, February, 1888."

Upon cross-examination Bellini testified that he now (November 20, 1890) lives and works at Lo Presti's restaurant, 203 Larkin street; formerly lived at 222 O'Farrell street for six years; knew Henri Godard and Jules Mathieu; on May 8, 1887, was with them in Dama's house; witness wrote his name on a paper but it was not this paper (at this point of

the examination the witness gave specimens of his writing in response to request of the court, writing the lines "Bellini Antonio 222 O'Farrell st." six times sitting at the clerk's desk, and three other lines, standing at the corner of judge's desk: See lines 3 to 11 inclusive of the judge's manuscript notes of testimony).

Witness testified, after writing these specimens, that the paper he signed in Dama's house, while he was standing up, rested on the top of a piano; Jules Mathieu and Godard were there at the time and also signed; it was a long paper, doubled, about the size of that paper (indicating the roll in which the Will, Proof and Certificate are preserved); Mr. Dama stood on one side of the piano, and Mathieu, Godard and himself, Bellini, on the other side; they could walk around the piano, Dama was behind the piano, the witnesses in front; Gaetano Dellasanta was in the room at the same time, standing at the end of the piano, to the left of Dama; Dama asked everybody to put his name down, but did not ask Dellasanta; witness Bellini was in the house often working, cleaning the house; Dama had a good many pupils, some ladies; when witness Bellini came up to this court about two years ago Godard and Mathieu were with him; witness being shown the will admitted to probate on February 27, 1888, says that he never saw that paper before this morning (i. e., the morning of November 20, 1890); he remembers being in court as a witness two years before; and remembers that the judge showed him a paper and his name was there and and he said it was *not* his writing; *but he never saw this paper* (the alleged and probated Will) *before this morning;* (witness was testifying on cross-examination in the afternoon of November 20, 1890) *he was not shown that paper;* it was a new paper, "not old rags like that"; *never saw that paper before to-day* (i. e., November 20, 1890); *that is not the paper the judge showed him;* his signature was not in the same place, it was nearer the bottom of the page, about four fingers from the bottom.

Upon his redirect examination, the witness Bellini said that it was nearly three years since he was examined in this court; this is *not* the paper shown to him then

(referring to the alleged and probated Will); it was a clean paper; *it was not that paper anyhow* (indicating the probated paper, Will admitted February 27, 1888); at this point of the witness' testimony, an interpreter, Antonio Lo Presti, was called in to assist, and through him Bellini related how he came to be a witness at the time of the hearing of the application for probate, February 13, 1888. The judge showed him a paper at that time; that is the paper, but with this one difference, that it was then fresher and newer than now. Witness indicates the probated Will.) The paper he signed in Luigi Dama's house had a stamp on it, but the color he does not remember; his name was signed near the bottom (the witness marked where—the relative position—on a blank sheet of legal cap paper). Mathieu signed first, then Godard, then Bellini; witness did not see Dama sign; he said it was a testament; he said to the three of them, "if you please sign your names," that it was a testament; after that the four, Dellasanta and the witnesses, left together; witness Bellini did not notice anything of Dama's habits, only worked there three or four months. Upon the recross-examination witness Bellini repeated that Dama said that it was his Will; the paper probated being again shown to witness, he reiterated that he had never seen that paper before; there was a stamp or seal on the paper but he could not remember the color, whether it was black or red or blue; the probated paper being again shown to witness, he said. "I do not know that paper, *never saw it before to-day;* it was a similar paper; *that is the paper."*

Upon the next morning, November 21, 1890, the services of an interpreter were again called into requisition and the contestant's counsel was permitted by the court to resume his redirect examination of the witness, Bellini, and the Will probated February 27, 1888, being again shown to witness he was asked:

"Q. Is that the paper that you signed at Professor Dama's house the night that Jules Mathieu and Henri Godard accompanied you?" And he answered:

"A. *No. That is not my signature, nor any part of it. I did not sign that."*

The witness was then examined again by respondent's counsel and admitted that he did on the day before testify that the word "Antonio" and "222 O farrelle" was in his handwriting and that he said also "I swear it"; but he was excited and he did not clearly comprehend it, but now he understands it better. Witness Bellini was at this point requested to put on his spectacles and look at the Will and signature "Bellini Antonio, 222 O farrelle"; and having done so, he said: "I see that now as plainly as I did yesterday and say, *it is not my signature.*"

### GODARD.

On the same day, November 21, 1890, the surviving subscribing witness, Henri Godard, was called by consent, out of the regular order, for respondent and testified that at the time of testifying he resided in Dallas, Texas; he was a married man, an instrument maker and musician; formerly lived in San Francisco for about three years; was in San Francisco about three years ago; lived at 222 O'Farrell street; knew Luigi Dama; also knew Jules Mathieu, who was a musician; also knew Antonio Bellini; went to Dama's house at his request with Mathieu and Bellini to sign a Will as witnesses; the paper shown to witness, Will admitted to probate February 27, 1888, he says was the paper which he signed as a witness at Luigi Dama's request; it was signed on the top of a piano, a square piano; Dama had his hand on the paper and he asked the witnesses to sign; Godard saw Mathieu sign and Antonio Bellini; Dama asked the witnesses to put their addresses after their names; there was another person in the room, an Italian, whose name Godard did not then know, but afterward ascertained to be Dellasanta; the witnesses were all facing the piano; Dama was of sound mind; Dama spoke to Godard on the street in French telling him he was going to make his testament; Godard wrote his name all at once and only once, he was sure of that; he saw Luigi Dama sign his name. (Witness at request of cross-examining counsel took the paper—the alleged and probated Will—to the light of the courtroom window and after scrutinizing it said:) "I am sure that that is the paper." Witness then by request gave several specimens of his handwriting seated at

a table and desk, and also standing at side of judge's desk in same relative position as when signing as witness to Will on top of piano. (See judge's notes of testimony, pages 8 and 9, also Contestant's Exhibits "K," "L," and "M.")

At the time witness Godard was requested to go and sign the Will he was in an Italian restaurant with Bellini and Mathieu, and Dama came in; after a while Bellini and Dama spoke Italian with each other at 222 O'Farrell street and then Dama came over to witness Godard and said, "I am getting old and want to make a donation to some one and want to make a Will," and requested Godard to act as a witness; then they all proceeded to the house, Dama and Godard in advance of the others; they entered the house, 317 Mason street, and Jules Mathieu sat down at the piano and after playing a while and trying his voice they shut up the piano and Dama took a bunch of keys and opened a closet and took out some papers from it; the Will in probate being shown to witness, he said that there (pointing to signature) was his name; he knew that and that was all he had to say; he could not remember what Dama said; Dama was talking all the time; Dama was very careful, and after putting the paper down on the top of the piano he requested the witnesses to sign; Dama handed the pen first to Jules Mathieu and then to the others, and after signing the professor asked each to put after his name the address; the witness Godard was sure that Bellini wrote his name "Bellini" before "Antonio."

## Evidence of the Waterhouses and the Randalls as to Handwriting of Dama.

Among the witnesses on the hearing of this contest called in behalf of contestant was Columbus Waterhouse, who is described by counsel, without controversion, as a pioneer of California, a Mason, whose character is equal to that of the highest in the fraternity, a man who in the commercial community and in society is the peer of the most exalted (see page 252 of the judge's manuscript notes), president of the People's Home Savings Bank, trustee in Pacific Bank, dealer in carriage and wagon materials on a most extensive wholesale scale, resident here, where he has reared his family, from the earliest days.

Columbus Waterhouse knew Luigi Dama well; their acquaintance began in 1884 or 1885; Mr. Waterhouse made the acquaintance of Professor Dama through his daughter, now Mrs. D. S. Dorn, having been a pupil of the professor; he also became a pupil in the professor's system of voice development or vocal culture; Professor Dama considered that system as the only one of any account, others being valueless; Mr. Columbus Waterhouse knew the handwriting of Professor Dama from having seen him write—the Will admitted to probate February 27, 1888, being shown to the witness, he said he had very grave doubts of it; in the opinion of Mr. Waterhouse it was *not* the handwriting of Mr. Dama; Professor Luigi Dama was a careful, punctilious man, of perfectly sound mind, very close in money matters; the witness was a member of the Mission Lodge, Free and Accepted Masons; also of the Golden Gate Commandery, Knights Templar, in both of which the witness Waterhouse presented Dama's petition for membership, he was already a Master Mason; the witness Waterhouse knew whether Dama felt kindly toward his family in the east, the Randalls; Dama was very bitter toward them and had been for three months before he left for the east; upon his return he declared himself more kindly toward them; the witness Waterhouse saw Dama for the last time about the middle of December, 1887, before the witness left for Mexico, which was on the 21st of that month; the family of witness and Dama interchanged visits; they were on mutually very friendly terms; Dama visited the Waterhouses a great many times; when the professor went east with his wife in 1884 or 1885 he left with witness Waterhouse a bundle of papers, but witness had no knowledge whether his safe deposit key was in them or not; a paper shown to witness, Petitioner's Exhibit No. 1, "Short Memorandum," the witness expresses his opinion that it is *not* in the handwriting of the deceased Dama; this paper the witness never saw before the time of testifying (November 28, 1890, at 12 o'clock meridian). Dama told witness Waterhouse that he had some bonds but had disposed of them; Professor Dama told him that Mrs. Smith had no chest power whatever and would never make much of a singer; Dama said that as the result of her

taking lessons that she had improved considerably and also she had improved in health; witness Waterhouse thought that Professor Dama went east in the fall of 1884, but was not sure; when Dama returned he took portions of the papers from the witness' safe; the witness was not present at the time the professor took the papers from the safe; upon cross-examination the witness being shown the Respondent's Exhibit No. 31, "Draft of Long Memorandum," said that the side opposite the file-mark was in the handwriting of Dama; as to the other side, witness said that was written at a different time and with a different pen, but the witness thought it was in the handwriting of Dama; he thought, also, that Respondent's Exhibit No. 2, the "Long Memorandum," was Dama's writing. The witness at a later date in his examination (Monday, December 1, 1890, 11 A. M.) corrected an error into which he had fallen at an earlier stage of his examination, as to the date of the beginning of his acquaintance with Dama; the correct date was in 1880, and Dama's first visit to the east with his wife was in 1881. A paper shown to witness, Respondent's Exhibit No. 23, he identified as a Will written by Dama, or at least a copy made by him of the olographic Will of his wife which was refused probate on account of the omission of a date. The witness said that he should not call Respondent's Exhibit 3, the "Altered Will," the handwriting of Dama nor any part of it; but the witness had not offered himself as an expert, and did not consider that anything he should say would be a test. He thought that Respondent's Exhibit No. 4, the blank form of Will, had many features of Dama's handwriting, but if it were his it must have been copied from some other article; he thought, however, that it was the handwriting of Dama; the paper shown to witness, attached to the Randall deposition, marked "Comm'rs Ex. A-a," was written by Dama without a doubt. The witness Waterhouse was friendly with Dama up to the time of his death; witness thought that Dama went east in May and returned in August, 1887; that was the time when Dama told witness that he had sold his bonds; Dama simply said, "I've sold my bonds"; the friendship of witness for Dama continued until his death, and it was reciprocated to

all appearances, but witness could not say that he respected Dama's memory as a friend and as a gentleman, from reports of his remarks related to him, and witness had assumed the truth of the reports; the deceased professor made no statement about his making a Will, except that he said he had made a Will; this remark was made in 1886; this was after the Dorn visit; witness Waterhouse started for Mexico on January 15, 1887, then he had ceased taking lessons from the professor, after his return he began again taking lessons in 1887, witness went to Mexico again in December, 1887, and did not subsequently take any lessons, witness returned from his first trip February 18th and within a week resumed lessons with the professor and continued until Dama went east in August, 1887; witness did not as a fact cease on March 19, 1887; there were three or four weeks of interruption, but he resumed again; the first trip of witness to Mexico was begun December 15, 1886, not January 15, 1887, this last date was an error of witness. Witness Waterhouse began taking lessons in vocal culture not to become a singer, but because of his health; he was troubled with asthma and thought the lessons would benefit his ailment; his hour of instruction was very often 11 o'clock in the morning; it was sometimes after Mrs. Smith's hour, sometimes after Mrs. Cummins'; most of Dama's pupils were there for their health, some went there for their voice, to learn singing. Witness, on being examined as to what he testified to at the time of the probate of the Will (February 27, 1888), said that he had at that time said, "I think the signature is his, the other looks rather strained"; but the witness now (December 1, 1890) believed that it was *not* Dama's writing, from examinations he has since made of the writings of the deceased, among them letters in evidence to his brother Ben Randall; several papers presented to witness (Respondent's Exhibit 33, 34, and 35) he pronounced to be in the handwriting of the deceased Dama. (See judge's manuscript notes of evidence, pages 16–23.)

The Boston depositions of the Randalls, so far as they touch the handwriting of the alleged Will, affirm as matter of opinion that it is not that of Luigi Dama, although Jennie Forbes says that "it is *a very good representation*," and

Benjamin Randall detects in the photograph "*a standard resemblance* but *it is not the same.*" (See judge's manuscript notes of evidence, page 23.)

Frederick A. Waterhouse, a brother of the witness Columbus Waterhouse, connected with the establishment of "Waterhouse & Lester," of which firm his brother is sole constituent, was acquainted with Luigi Dama; first met him in 1880 and took lessons in vocal music from him; Dama was a very careful man in his habits; sometimes Dama seemed to be very liberal and sometimes close; Dama claimed that his was the only true method of teaching vocal music, and all other systems were wrong; witness Frederick A. Waterhouse was familiar with the handwriting of Dama, and from his remembrance of his writing he pronounced the alleged Will to be. *not* in the handwriting of the deceased Luigi Dama. Witness Frederick A. Waterhouse was administrator of the estate of Wealthy B. J. Dama, deceased wife of the professor; he had not seen the alleged Will since it was admitted to probate.

## The Evidence of the "Experts."

### PROFESSOR F. O. YOUNG.

If any man deserves to be classified as an expert in handwriting that man is Frederick Osborne Young, and with reference to his history and qualifications it may be well to note briefly an epitome of the history of his evolution as an expert penman, as told in his testimony: Professor Young describes himself as a teacher and executer of penmanship since 1873; he was born in Maine, and was graduated at Bryant's Business College, Manchester, New Hampshire, the college of Gaskell, the celebrated calligrapher. Young's object in going to school was to make a teacher of himself in all common school branches, and since 1873 he has made a specialty of penmanship; it was his ambition to excel in writing; being left-handed, having no right hand, it was difficult for him to become expert, but he succeeded in excelling in writing and also in drawing; he became a teacher and taught thousands, he could not say how many he had had, perhaps from fifteen to twenty thousand pupils under instruction in the course of years, and he had opportunities abundant to sup-

plement by observation and experience his scientific and theoretical attainments; in the art of penmanship he has given unusual proofs of proficiency in the presence of the court; and in capacity of imitation and simulation he is undoubtedly an adept. So much for his qualifications. He is an expert in his profession; "a person instructed by experience": Lawson's Expert and Opinion Evidence, 426. "A person who, by virtue of special acquired knowledge or experience on a subject presumably not within the knowledge of men generally, may testify in a court of justice thereon, as distinguished from ordinary witnesses, who can in general testify only to facts": Century Dictionary.

Professor Young says that there are certain habits that persons take on in writing, such as position, lifting the pen, making letters and combinations, and slope; "slope" is one of the professor's strong points, "the main thing in writing is the slope"; in this case Professor Young had submitted to him several writings for his examination, and had had them for say a month for purpose of comparison and test; he had fully and carefully examined all the papers submitted to him that he was informed were the genuine writings of Luigi Dama, and from that examination he had formed an opinion as to the genuineness of the alleged Will; and after examining that instrument and also the Respondent's Exhibit 1, "Short Memorandum," his opinion was that they were *not* in the handwriting of Luigi Dama, basing that opinion upon an examination and comparison with fourteen writings represented to him as Dama's authentic compositions; the first feature in the formation of his opinion was the difference in the slope of the writing; "slope" is not an accident; it is a habit almost impossible to change; the slope was in this case enough to determine that the alleged Will was not genuine, but it was not the only point; in reference to the paper Respondent's Exhibit 2, "Long Memorandum," he could not say in whose handwriting it was; he did not think it was in Dama's; in his opinion it was copied from an original; but he had a doubt about it; and classed it in the same handwriting as the Will; as to the paper marked Respondent's Exhibit 31, "Draft of Long Memorandum," Professor Young thought it was genuine, except the word "Memorandum" on the second page

seemed odd to him, and he did not think it had Dama's slope; as to the paper called the "Copy of the Wealthy B. J. Dama Will," he had never seen it before it was presented to him on cross-examination (December 4, 1890), but he should say it was in the handwriting of Luigi Dama; there was one letter there which he had not found elsewhere, the small letter "p" in the words "presents" and "page"; those resemble the writing in the alleged Will; this paper ("Copy of Wealthy B. J. Dama Will") does not in general resemble the alleged Will more than other papers he had seen; usually the more a man writes the more cramped his hand becomes, but with an expert it is different; an expert's muscles become more relaxed as he proceeds, so that on the third page of the Will the fact of the writing being a little freer than on the preceding page convinced the professor that it was not written by Dama, but by a better writer. Witness gave a number of interesting illustrations to support his opinion that the alleged Will was not the emanation of the mind and hand of Luigi Dama.

The professor said that in his examination of the alleged Will and Respondent's Exhibit No. 1 and the genuine writings, he had noted or noticed some resemblances, but he was principally concerned in detecting the differences; his engagement as an expert in this case was not dependent on the result of the trial; he would not have it that way, but he was paid according to the time consumed in the employment. A summary of the notes made by Professor Young on the handwritings examined by him in connection with his testimony in this contest is here appended, as furnished by him at the time of the trial:

### Professor Young's Summarized Statement.

"After a long and careful examination of Mr. Dama's admitted genuine handwriting covering a period of about fifteen years, and especially letters written by him just before and after the date of the Will, and finding no material differences in the slope and general character, formation, style, and habits of his writing, and on the contrary finding the Will, a copy of the Will, and a memorandum exhibited to prove the genuineness of the Will, were in a much less sloping hand, and had many and material differences in character, forma-

tion, style, and habits, I feel convinced that Mr. Dama did not write the Will, copy of Will, or memorandum. The writing shows on the face of it the character of imitation, instead of a natural hand. In tracing the two handwritings I notice many points of difference that can hardly be explained. I seem to feel two different identities, and some good observers see the same thing in the character of the writing when comparing the two. Mr. Dama had one way of holding his pen and one position of his hand in relation to the paper and letter or letters which he was making; as his slope and habit of lifting the pen shows it inclined him to write downhill; as shown by the beginning of his letters when the name of the place was not written on the top line but above, he usually wrote downhill; also shown in his signature at the end many times. The forger shows an opposite result; his slope shows the hand to be on the paper a little to the right of Mr. Dama's, hence his inclination to slope less and write uphill, as shown in 'Bellini' in signature of Will, and his habit of lifting the pen oftener, also shown in slope of first two strokes of L and D in signatures to Will, copy, and memorandum, these strokes slope less than Mr. Dama's.

"The following are some of the many differences I made note of, viz.:

· In Exhibits 1, 2, 6, 7, 8, 9, 11, and '76 Will, Dama's writing, there are 1062 loops (l h k b & f) above the

line, and 100 of them are open at the top thus, $\ell$, the

remainder are closed like t, thus $l$.

| | | | |
|---|---|---|---|
| In the Will, | 280 are open in | 315. | |
| In the copy of Will, | 338 are open in | 361. | |
| In the Mem., | 38 are open in | 38. | |
| Total........... | 656 are open in | 714. | |
| Dama's, | 100 are open in | 1062. | |

." In the above Exhibits and Mrs. Dama's Will there

are 330 h's and all closed at base, thus $h$, but one which

is made by lifting the pen thus $h$, pg. 4.

In the Will,     12 h's open in 116 *h* (remainder, h.)

In copy of Will, 58 h's open in 122 *h*.     "     "

In Mem.     5 h's open in 12 *h*     "     "

    75 h's open in 250 *h*     "     "

In Dama's,    1 h    open in 330 *h* (remainder, h) closed.

I also looked over nine pages of Dama's manuscript, & 4 pages of the same recopied, and two pages of the old Will form, also catalogue of music, and did not find it made thus, *h*, with the habit of lifting the pen and separating the base.

. "In the same Exhibits that I looked for h, I also looked for p and never found it open, thus, *p*, but always closed thus, *p*, i. e. made without lifting pen.

In the Will     12 were open ( *p* ) in 30.

In the copy of Will 11 were open ( *p* ) in 37.

In the Mem.   .    3 were open ( *p* ) in 5.

    Total...... ...26 were open ( *p* ) in 72.

I did not count Dama's but there were hundreds all closed. In connection with the p and h it is well to speak of the small letter a, the last part of which is similar to the last part of p and h. In the copy of the Will it is disconnected 5 times in the following words, viz, California, Maine, nine, nine, and think, thus, *n* and in the Will in Godard's first name, Henri, it occurs. Neither of these habits were Dama's; if it occurred with him it was accident, not the result of *habit*.

"It was Dama's habit to connect the combination 'am,' wherever it occurred in a word. In 44 cases where he used 'am,' 42 were connected, and 1 of those disconnected was a skip of the pen evidently. In the copy of the Will there are 13 disconnected in 20, and

evidently from habit. In the Will they are all connected, and now the question, why this sudden change of an established habit?

"In Dama's letters, the letters th when used together in a word were generally connected or made without raising the pen thus, *th*   In 156 used, 18 were disconnected thus, *t h.*

"In the Will 57 were disconnected in 63, and in copy of Will 55 were disconnected in 61.

"If I may be allowed the illustration, I should say that the small letter "s" in the forgeries is generally well made like a plump dame, the fullness extending well up to a short neck,—while Dama's are inclined to be "long necked," "slab-sided" and when fullness occurs it prevails in the abdominal regions.

"Small "s" is a difficult letter to make right, owing to the short curve of the down stroke, and right there is where the difference occurs in the two writings.

"The first part of the small letters d, g, and q, together with the "a," as a principle, are made in the forgeries more like the small letter "u," i. e., cut off the top of the first line thus, *a* ; while in Dama's writing this principle is more like the form of the small letter o, the first down stroke slopes more and the principle is not so wide.

The small letter d in the forgeries has too much sameness; I refer to the stem or finishing stroke. It has the appearance of being traced, or copied. This fact occurs in many other cases.

"The small letter "z" is made twice in the '85 Will, thus, *z* , and in his letters it was made without the last stroke or cross, thus, *z*

"SHORT MEMORANDUM."

"The general slope is less than in Dama's. There are 38 loops above the line and all are open. Dama would have made them nearly all closed.

"There are 12 h's and five are disconnected at the base, thus, *h* ,—Dama would have connected them. There are 5 p's and 3 are disconnected thus, *p* ,— Dama would have connected all thus, *p* . Small

"i" is not dotted in the word Will,— a mistake a forger would make, Dama would have dotted it. Influence is spelled "enfluence." Dama spelled it *influece* at times but I never noticed it "en." There are 5 th's all discon-

nected thus, *th* ,—Dama would have connected 4 at least. The pen was lifted in first down stroke of g (Compare with Gumpel's "a" in California, Judge's notes;) in the word 'signed' (6th line) Dama never would have done it. Capital G in the word "God" is unlike Dama's and pen was also raised which indicates forgery. Dama made

his thus, *G* , and never raised pen.)

"The capitals " *S* " and " *F* " in San Francisco are *new styles* of letters introduced. I found such an " *S* " used once. It was written on Dama's general memoranda of his pupil's time for lessons, and was used in the name Mrs. Sara Barker Smith. It was written *above the headlines* or on the top margin, and a very significant fact is that it runs uphill at about the same degree that 'Bellini' does. The F should be compared with the same letters in 'Farrell street' in signatures of Godard and Mathieu and the 'G' with Godard's initial.

"The signature to this memoranda is unlike Dama's, especially in style and shade of capitals L and D.

"Compare small t's with same in 'street' in Godard's address. 1st t: It starts high up, and while doing this compare r in same word with r's in Will, etc. Also compare 'r' in Mathieu's address in the word 'street' with r in Godard's name; now compare the crossing of

the first in Godard's street with crossing of last in Mathieu's, then compare these with same in the word "presents," 1st line of Will, after 5th line, and "Street," 2nd page.

Look at 1st stroke in small g in "Luigi;" pen was lifted thus, , but the connection was made so that it appears one stroke.

The capital "L" starts with hesitation and too high and the first stroke of it & "D" do not slope enough and the appendage at the end is connected with less slope than Dama's. Compare it with the same on Godard's name.

"The general expression of these signatures is of one handwriting."

### The Expert Doctor R. U. Piper.

Dr. R. U. Piper is an expert whose methods of reaching results in the ascertainment of authenticity and the discovery of forgery are different from those of Professor Young. His methods are best explained in his own diction, after premising a statement of his claims to be considered an expert in this branch of science: Doctor Piper is a physician by profession, for twenty years, however, engaged as an expert in handwriting; he has used the microscope since he began practice as a physician over twenty years; he is a man over seventy years of age and has been called as an expert perhaps hundreds of times in cases in court in many of the United States and in Canada; his method of examination is the "Baconian" or inductive; he had seen the alleged Will several times and had made examinations of it in the courtroom and also examined photographs of it; he made copies and diagrams of letters (chirographic characters) and compared them letter by letter and point by point from what is called "Short Memorandum," Respondent's Exhibit 1, and did the same with other documents, letters purporting to emanate from Luigi Dama, which he used as genuine handwritings in order to compare them with the alleged Will and as a result of this examination and comparison came to the conclusion that the alleged Will and

the "Short Memorandum" were *not* in Luigi Dama's hand-writing; this opinion resulted from his examination of those papers and comparison from his materials and *according to his methods;* Dr. Piper thought that the imitation on the Will *was a very good one;* the letter "d" seemed to be a type in the disputed documents. After giving numerous details, Dr. Piper read a mathematical résumé or recapitulation of his reasons for the conclusion that the alleged Will was a forged paper, which is here inserted in connection with the foregoing and following abbreviation of his testimony: ·

### Dr. Piper's Mathematical Résumé.

"The Will purports to have been written by the testator himself, and I have therefore used the body of the paper as well as the signature for the purpose of this examination.

"The question involved is, as to the genuineness of the document, it being claimed by one party to be genuine, while the other claims it to be fraudulent.

"For the purpose of making an investigation of the question involved in the case, that is, as to the genuineness of the document, I have made enlarged copies of some of the letters and also of some of the dots over and after the letters, which go to make up the Will, as also the signature. I have further made enlarged copies of letters and of dots, over and after letters from documents, used as standards for comparison in this examination, these documents being in the handwriting of the said Luigi Dama. These enlarged copies of letters and dots from the two sources I have placed side by side with each other so that they can be compared, and thus a correct deduction be made in the premises. Without such enlargement, and side-by-side arrangement of the letters and other characters which go to make up written documents, I hold it impossible to come to a just conclusion in many of such cases. It is certainly impossible to carry in the mind the characteristics of letter-forms which constitute them the property of different individuals; at least to carry in the mind the characteristics of a sufficient number of these forms through the comparison of which we should be warranted in coming to any conclusion in a given case. I have made over three hundred (300) of these letters and characters in the

present case, nor do I deem these any more than sufficient data on which to base my conclusions. Think of them in their true size scattered through the documents from which they have been gathered, and how certainly it will be seen that no one possessing an ordinary memory could carry one-tenth of them in his mind so as to make such a comparison as would warrant any sort of a conclusion whatever.

"I have made the diagrams containing the enlarged written forms—TABLES—and refer to them under this name in my exposition. Table 1 contains an enlarged copy of the signature to the disputed Will, as also a like enlarged copy of a genuine signature to a letter to 'Miss Harris' dated July 14, 1887, written just two months and six days after the Will purports to have been written. Here the *fraudulent signature*, as I am warranted in calling it from proof already obtained and which I shall adduce hereafter, is a pretty good imitation of the genuine; so much so that I do not notice any essential difference, with the exception of one fact, which would certainly seem to be very significant, that is, that in the name 'Luigi' in all of the genuine ones that I have seen, the first 'i' after the 'l–u' is separated from the 'g,' while in the one on the Will and Altered Will (second name on the Table) it is indistinctly joined to the 'g.' The principal object of this table was to show difference in slope. Differences remaining being in favor of respondents.

"In the genuine documents I have numbered marked 'E. S. 1' up to 'E. S. 11,' as in all the others in my possession containing the name, the first 'i' is separated from the 'g.' This being the case, one would hardly fail to be convinced that that fact of separating the letters of his name at this point was a fixed habit with the writer. Especially is this significant as in the letter already alluded to dated July 14, 1887, so near the date of the Will, it is as marked a fact as in all the others which I have examined.

"The letter 'd': It will be seen that there exists a marked distinction between the genuine and the disputed 'd's' which can be seen without magnification. I have, however, taken a number of them from various parts of the original Will as well as from some six genuine documents, and have brought

them together in an enlarged form on Tables 2, 3, 4, in order that they might be seen together, and thus be in a proper position to be fairly compared with each other. There are some one hundred and thirty of these letters (d) in the disputed Will, all without exception made after one type with scarcely any marked variation. All of them terminate in a thickened end which only varies from a distinct rounded and blunted form to one somewhat more elongated and pointed. The letters are remarkably alike in size with two or three exceptions, and the length and thickness of both the upper and lower curves or hooks are remarkably uniform. I have copied on the Tables twenty-six (26) of these letters from the Will, and fifty-four (54) from genuine letters; these last have been taken from six different documents so as to get at the average facts in this respect.

"It will be seen how widely they differ in almost every respect from these same letters in the Will.

"They vary very much in actual thickness and length of line constituting the inkstroke, this last being more than twice the length in some cases than in others, on the same document—e. g., figures 10–11, Table 2, and figures 13–14 on Table 4. The final ends of the genuine letters terminate in various directions, in contradistinction to the disputed ones, which always look downward. In some cases in the genuine letters, the terminal end forms almost a right angle with the ascending stroke; in others this part of the letter turns directly upon itself and crosses the ascending stroke. Further, with the exception of a few instances, the genuine letter tapers into an elongated point at the terminal end. On Table 3, figure 14, is a marked exception to this, and also figure 21, Table 4. It would almost seem that this letter in the Will might have been copied from some genuine letter like one of these. What is very strange about the whole matter and what of itself alone separates the Will from the genuine documents is the striking uniformity of these letters in the Will, one hundred and thirty in number (130) compared with the great variety in this respect in the genuine letters. There are twenty-two (22) of these letters (d) in the document marked 'E. S. 1,' letter to Miss Harris dated July 14, 1887, which

I have alluded to before. This letter, it will be remembered, was written two months and six days previous to the date of the Will. Every one of the twenty-two 'd's' in this are made after the forms of those seen on Table 4, second line.

"It certainly seems to me preposterous to claim that a party could (not to say would) so entirely change their handwriting in so short a space of time as is here seen to exist between the letter *d* in the Will and the same letter as seen in the genuine document.

"And the same idea may of course be repeated in regard to this letter as seen in the other ten documents (genuine) which I have used as standards in this examination.

"The second line of those letters on Table 4 was written within two months and six days of the alleged time of writing the Will, and here without any conceivable motive or reason, is seen an entire change in the formation of this letter.

"And here, too, is seen an entire change of the habit of a lifetime as we may suppose, exhibited in the (documents) letters I have copied from, covering some four years of time. Such an immediate change of habit in this respect I think may be set down at once as being almost, if not quite, impossible. And then again, what could be the motive of such change on the part of one writing an honest paper? We could easily see why this uniformity of style in this letter, as well as of others in this document, might be adopted by an imitator, as it would not be difficult for an expert to copy and follow a single form so as perhaps to defy detection, but to follow the great variety of forms of the various letters seen in the genuine documents so as to prevent discovery would seem to be impossible.

"It should be remembered that in all cases of this kind, where an attempt has been made to imitate another's handwriting that there is likely to be more or less likeness of some of the letter forms, as in this single letter and in the signature in this case, whose only radical difference would seem to be in the connection of the first 'i' with the 'g.'

"TABLE 5. THE LETTER 'H.'—There are some over one hundred of these letters in the Will, all made with an open or closed loop, with the exception of one or two; the only

clearly seen example, analogous to most of the genuine letters of this sort, I have copied from a section of the Will, marked 'Sixthly.' It is shown enlarged at figure 7, Table 5. There are thirty-four of these letters in the document before alluded to as having been written within two months and six days of the date of the Will; and here, too, is seen the strange discrepancy of an entire departure from a lifetime habit in the formation of a single letter.

"There seems to be no possible reason for this being done, even if it could be done. As the work of an imitator, as I have said before, it seems reasonable enough that one form of letter should be used on account of its being much easier to copy one form than a variety of forms, such as are seen in the genuine documents.

"The looped forms of the shaft of the 'h' occur much less frequently in the genuine documents, it will be noticed, than the other forms; still this form has been chosen for some occult reason as the one for imitation.

"There is another curious and significant fact in this connection. It is the habit of this writer, as seen in the genuine documents, frequently to connect this letter with either the preceding or succeeding letter, or both, in words in which it forms a part. Thus, in document marked 'E. S. 1,' there are some thirty-four of these letters (h), twenty or more of which are so connected with other letters. In the document marked 'E. S. 2' there are some fifty-five *h's*, forty-five of which are joined with one or two letters each. 'E. S. 3' has seventy-five of these letters, sixty-five of which at least are joined to other letters. In looking over the Will, it will be seen that not one in ten of the *h's* are joined to other letters.

"Here is a very essential and important difference which separates the Will very far from the genuine document. This habit of joining or not joining letters in the making of written words is an unconscious habit, and, as we see, exists in all the genuine documents in the case and would certainly be found to exist to some analogous extent in the Will, if it had any claim to be recognized as a genuine document. Here again comes in the pertinent question: Why did the writer of the Will, provided we admit that he could have done so, change his usual habit in the production of this document?

"Certainly the difference between the letters from the two sources, which I have figured and described, and which constitutes them two styles of writing, does exist, and it seems as positively certain that they must be the work of two different persons.

"TABLE 6. On this table I figure thirty-eight specimens of the letter $l$, twelve from the Will and sixteen from genuine documents. I have counted one hundred of these letters in the Will, nearly or quite all made as shown with the looped shaft and with, in most cases, a slightly hooked base. In the genuine documents, there are three distinct varieties of the letter with open and closed loops, and with a single downstroke starting from the tip of an upstroke and thickening somewhat as it proceeds to the line. In the document E. S. 1, written as we have before noticed, within some two months of the date of the Will, there is not a single open-looped letter, and in all the eleven genuine documents on which this examination is based, we find these three forms of this letter in contradistinction to the single form seen in the Will, and here again we find two distinct styles of writing as far as this single letter goes, claimed to be written by one and the same hand. Perhaps this looped form of this letter was chosen as the one for imitation in the case on account of the analogy between it and the other looped forms—e. g., the 'b' and the 'h' and the top of the 'f,' all of which are fashioned on a similar form. This certainly simplifies the matter, and renders it much easier to repeat these few forms than the variety which are found in the genuine documents.

"TABLE 7. On this Table I have figured a number of these letters ($t$) from the two sources; the first line from the Will, the other two lines from genuine documents. I have counted over two hundred of these letters in the Will, and it will be seen by the example on the Table how uniform they appear, and how they compare in this respect with those from the genuine documents.

"Then, again, these letters in the Will are rarely connected at all with the other letters near them, and never, as in the case in the genuine, with the terminal upstroke being carried up to the top of the following letter, as the 'h,' for instance.

Here is a radical difference, which of itself alone separates this letter in the genuine documents from those in the Will.

"Next come TABLES 8, 9, 10, which are made up of the magnified forms of the dots over and after letters and words; those on Tables 8 and 9 are magnified fourteen diameters—that is, one hundred and. ninety-six areas or times—while those on Table 8 are magnified twenty diameters—forty areas or times.

"On Table 8 there are twelve forms—the first two lines from the Will; the lower two lines show twenty-three magnified forms from two genuine documents; the first being the letter to Miss Harris (E. S. 1), dated July 14, 1887, within two months and six days of the date of the Will; the other, the lower line being from a genuine letter dated July 8, 1885 (marked E. S. 3).

"Table 9 contains four rows of these magnified dots from the two sources; the first, the Will, the second, third and fourth from genuine letters of Luigi Dama, the decedent in the case. There are twelve of these dots in the first line of the Will and forty-seven (47) from six genuine documents.

"Table 10 contains twenty-two of these enlarged dots from the Will (lines 1 and 3), while lines 2 and 4 contain twenty-eight of these magnified dots from two genuine letters.

"There is perhaps no evidence so certain, so positive, in connection with this line of investigation as is furnished by the comparison of these characters. In the first place, they are the results of absolutely unconscious habits of manipulation so far as their form is concerned. No one is ever taught to observe any form in making these dots, when being first initiated into the practice of shaping written letters, and they are of so small size in most cases as to render the fact of form inappreciable to the eye, and further, this fact of form is of no sort of consequence as regards the accuracy of the writing, or the construction or meaning of the sentences.

"The location of stops or marks (as all know) is of vital importance in the construction and meaning of sentences, but the fact of size has no relation whatever to such question.

"There are 158 of these enlarged dots shown on the three Tables 8, 9, 10; 60 from the Will, 98 from ten genuine docu-

ments, consisting of ten letters written by the alleged author of said Will. These dots (as is recorded on the diagram) have been taken with no idea of selection from various parts of the genuine documents. Upon comparing the two sets of forms, it will be seen at once, I think, that under the conditions of their formations they could not have been the work of one and the same hand. The genuine forms cover over a space of a number of years as the constant practice and habit of the writer. Any single group would be recognized at once as coming from the same source as all the rest. Thus, those on Table 8, line 3, from the letter of July 14, 1887, were certainly made by the same hand as the one that made those on line 4 on the same table, from the letter to another party, dated July 8, 1885. And so of those on Table 9 from six different genuine documents, there could be no question but that they are all from one and the same source. The same fact of individual likeness is seen in those copied from the Will, which as surely connects them with each other as the work of one and the same person, and as clearly and positively separates them from the author or writer of those from the genuine documents.

"The form and position of the genuine dots are curiously various; elongated, shortened almost to a point, sometimes quite straight, then again turned in opposite directions— pitched both to the right and left, sometimes horizontal, sometimes bent in a semi-lunar form, and in two or three instances they seem to have been made by a mere dot of the pen. It would seem impossible to get up a much greater variety of these forms, were one to do so, and were they to be made large enough so that one could see his work during its performance, as is the case in the diagrams.

"Upon comparing these forms from the Will, we shall see these last (from the Will) were all made with a single simple motion of the hand, involving but little muscular action, while in the genuine quite a variety of motions of the hand and of the fingers also must have been employed in the construction of these curiously varied forms.

"It will be seen that I have based this investigation mainly upon a few of the letters and the dots constituting the docu-

ments. This has been from the fact that the comparison of these forms so fully, so clearly, establish the fact that the Will and the genuine writings of the alleged writer of the Will were by two distinct parties, and consequently the said Will is a forgery, that further illustration would add nothing to such proof.

"As regards the general appearance of the document, the Will, I may say that is much more evenly written as a whole (like the letters I have) enlarged than the genuine documents. These last have a scratchy appearance, as compared with the Will. There are a great many more ascending hair lines, such as those joining the 'h' with the preceding letter in the words 'the,' 'that,' etc., which tends, with other causes, to produce this effect. The words, too, are much more broken into syllables and single letters in the Will than is the case in the genuine documents. In the first fifty words in (apen. 2) from the Will, there are 160 of these breaks consisting of syllables and single letters in the Will than is the case in E. S. 3, July 8, 1885, there are eighty-three (83) in fifty words. In section 'Sixthly' of the Will, beginning at line 4, the first fifty words show (150) breaks, while the second fifty words in E. S. 1 show (85). The second 50 words after the above of section Sixthly of the Will contains 190 breaks, in E. S. 6 the genuine letters the first fifty words show 90 of these breaks. Here, too, is a curious and, as I think, an important distinction between the documents, showing very clearly that they could not be the production of one and the same hand. I have made these counts as carefully as possible, so they may be relied on as practically correct.

"In looking back over the whole ground, I think I am warranted in coming to the conclusion that, as a scientific fact it is clearly proven from the data presented that the alleged Will of Luigi Dama is not in his handwriting, as therein claimed, and is, therefore, a forged document.

"All the materials I have collected and which I show on my diagrams can be seen by the unaided eye, and as I have referred to each one in its order, so that the Tables may be used as indexes to find the letters, a comparison can at once be made, so as to test the fairness of my work. The points which I have made, all of which may be seen by the unaided eye, are

as follows: 1st, the signature to the Will, the first 'i' joined to the following 'g,' which is never the fact in the genuine signatures.

"2d. The (d) Tables 2, 3, 4, in the Will terminal, and always, thickened and more or less blunted, and pretty uniform in length and direction. Genuine rarely blunt in the terminal ends, or if so, continuously so, on account of the general thickening of the line of the whole letter, terminal end often very much elongated, varying greatly in direction.

"3rd. Table 5, the letter 'h' very uniform in size in the Will and in almost every case made with a looped top, mostly open, sometimes closed.

"The genuine 'h' has rarely a looped top and is quite variable in form, which is mostly in marked contrast with those on the Will.

"In clause 'Sixthly' of the Will, beginning at the fourth line to the next clause 'Seventhly' there are twenty lines containing thirty-three of these letters (h), three of which only are connected with other letters in words which go to make up the document. In E. S. 1, letter of July 14, 1887, written, as will be remembered, within two months and six days of the date of the Will, there are 21 lines, showing 36 letters (h); of these 25 are united with other letters, while eleven stand alone, not being joined with their fellows.

" This joining or non-joining of certain letters in written words must be an unconscious habit on the part of the writer; how then shall we account for the entire change of habit on the part of this writer, and in so short a time too, provided for one moment we admit the claim of the genuineness of the Will. In the genuine, two-thirds of the h's are joined with other letters; in the other, the Will, only one-tenth are so joined.

"The claimants as to the validity of the Will are certainly bound to account for this strange and sudden discrepancy, between the genuine documents and the Will in this respect.

"4th. TABLE 6. The letter ( $l$ ) here almost every one of these letters which occur in the Will are looped,

while in the genuine but a small percentage are looped letters, thus separating the two documents a wide distance from each other. The claim for the genuineness of the Will becomes still more absurd when we remember that such a marked change of habit in respect to the formation of these letters, must have taken place in so short a space of time.

"5th. The letter 't'; the principal and marked difference in these letters as they exist in the Will and the genuine documents, consists in this connection with other letters in the words which go to make up the said documents. In the Will, taking the 20 lines following 'Sixthly' from the 4th line, I find 45 of these letters (t) eight (8) only connected with other letters, while in the letter of July 14, 1887, there are 49 of these letters, forty of which are connected with their neighbors. Here, too, as we see, the same fact is confirmed of an entire change of habit in the short time of two months, provided we claim that the two kinds of documents were written by one and the same person.

"6th. The dots over and after letters.

"Tables 8, 9, 10. These are fully gone over elsewhere.

"In view of the great and marked distinction between those on the genuine documents and those on the disputed (the Will), and the fact that first these must have been habitual with the writer; that he could not have thought of their forms at all, and the fact that these on the Will are so entirely different in every respect, it seems to me from this evidence alone, we should be warranted in coming to the conclusion that the two kinds of papers were, without question, the work of two distinct individuals." (The foregoing résumé is indorsed "Brief R. U. Piper.")

## Dr. Piper's "Method."

Dr. Piper testified that he took the enlargements on his tables with the *camera lucida,* and afterward filled in with ink; he explained his method of producing the illustrations upon his tablets; he had taken, as already stated, certain letters or characters from the photograph of the alleged Will and examined and enlarged them on these tables; a dash or dashes may or may not be characteristics in writing and also the

formation of the numerals; one cannot tell by the appearance of writing whether it was written fast or slow; the doctor explained his mode of examining the paper, Respondent's Exhibit No. 3, the "Altered Will," of November 1, 1885, and stated his conclusion that the document was false and fraudulent; he had used the microscope to make his examinations; he had examined also the Respondent's Exhibit No. 31, the "Draft of Long Memorandum" and pronounced it *not* false; he had not examined the paper marked Respondent's Exhibit No. 2; the Respondent's Exhibit 31, "Draft of Long Memorandum," he pronounced *true* and *genuine; he had examined it with a microscope;* he examined Respondent's Exhibit No. 3, "Altered Will," and Respondent's Exhibit No. 31, "Draft of Long Memorandum," with a microscope and compared them with certain tables prepared by him of illustrations from other writings offered to him as examples of genuine writing; a single individual writing sometimes shows as well as twenty; he had no question but that the two papers, the Alleged Will of May 8, 1887, and the "Short Memorandum" were forgeries; to him they had enforced a demonstration. No testimony could be more positive and precise than that of Dr. R. U. Piper, expert witness for the contestant.

### Experts of a Contrary Opinion.

Experts cannot err. In matters of science and art they are infallible, in their own opinion. But opinions differ.

### GUMPEL—HICKOX—HOPKINS—HORTON—HYDE.

Numbers do not necessarily count in the case of expert witnesses, any more than in other cases. We are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in our mind, against a less number or against a presumption or other evidence satisfying our mind: Code Civ. Proc., sec. 2061, subd. 2.

It is *quality* rather than *quantity* that the law regards; so that the mere fact that numerically the force of sheer experts is stronger on one side than the other in this case is not a

matter of moment in itself. We shall try to determine the effect of this evidence by its aggregate value on either side by weight and not by number.

### GUMPEL.

'A' lithographer, forty-five years old, who has made a special study of handwriting for many years, a frequent witness as expert in court trials; he had first examined some of the papers in this case at request of one of the counsel for the contestant; he had conversations with him in German about the case and Gumpel told the counsel that he did not like the appearance of one of the papers—the alleged Will—the writing looked "too stiff"; Gumpel had also examined a number of other papers at the request of the attorneys for Respondent; they are all Respondent's exhibits, except one, which is marked Contestant's Exhibit H—60. Upon being shown the alleged Will, the "Short Memorandum," the "Long Memorandum," the "Altered Will," the Respondent's Exhibit 29, a large white envelope, and Respondent's Exhibit 28, a large yellow envelope, the witness Gumpel pronounced them, in his opinion, in the handwriting of Dama; the four disputed papers first specified (Alleged Will, "Short Memorandum," "Long Memorandum," "Altered Will") are written slowly and distinctly in every letter; Gumpel found that every characteristic in all the letters of the alphabet in the genuine writings are preserved and repeated in the disputed documents, same misspellings and use of apostrophe, and other coincidences, and Gumpel gave upon the blackboard a series of illustrations expository of his opinion and reproduced some of them in fac-simile on page 162 of the judge's manuscript notes of testimony (Thursday, April 30, 1891, 12 meridian). Gumpel says that an imitated script will always betray a stereotyped form, reproducing habits in the same style, whereas a genuine composition will vary in style of formation of characters. (See judge's manuscript notes of testimony, pages 161–163, 176.)

HICKOX.

George C. Hickox has given special study to handwriting for over thirty years with a view to testing genuineness; has testified hundred of times in all the courts; examined some of the papers here in dispute, first at the instance of counsel for contestants and afterward upon request of Mr. J. P. Smith (husband of executrix) and of Mr. Samuel M. Wilson, the lawyer, and after having made that examination he came to the conclusion that the alleged Will (except the signatures of subscribing witnesses) was written entirely by Luigi Dama and he said the same of Respondent's Exhibit No. 1, the "Short Memorandum"; Exhibit 2, "Long Memorandum"; Exhibit 3, "Altered Will"; Exhibit 4, "First and Second Draft Will"; and Exhibits 28 and 29, large envelopes. Expert Hickox gave reasons illustrated on the blackboard in detail for his opinion as to the genuineness of the papers in dispute. He also, with the aid of the microscope, examined the signature "Bellini Antonio" on the alleged Will to discover whether it was written over or under the final stroke of the name "Henri Godard," and Hickox declared that the result of the microscopical examination showed that "Bellini" was written over the stroke, and he produced on page 156 of the judge's manuscript notes an example of the manner in which this was done. Upon this point Professor Young had expressed a contrary opinion; that the downstroke in the flourish to the signature "Henri Godard" had the appearance of being written over the name "Bellini"; the professor was not positive; but he could and did give reasons for this opinion; the peculiar way in which the person wrote who signed the name "Bellini" showed this; Professor Young made some experiments with the purpose of testing this and proved his premises by deductive demonstration; see page 34, judge's manuscript notes of testimony. Counsel Kelly in discussing this feature of the evidence said that no one after considering the testimony of Professor Young could question his ability as an expert in chirography and a professional

penman; the professor showed in the presence of the court his capacity not only to judge scientifically of the authenticity of autography, but to imitate and produce simulations with rare rapidity; the counsel thought the professor's opinion was entitled to a great weight as a whole, and that in the details of his evidence he had given unanswerable reasons for his conclusion and had shown that the name of "Henri Godard" as a witness to the alleged Will *must* have been written after the name "Bellini Antonio"; and Counsel Kelly showed himself to be possessed of talent as an expert by personally elucidating and illustrating this theory on the blackboard. (See judge's manuscript notes, page 200.)

### HORTON.

Peter Davis Horton, a teacher of writing, sixty-four years of age, for over forty years almost continuously engaged in the profession of penmanship; often employed as expert in court; had a system of his own, "Horton's Pen Guides"; had some original methods and an adaptation of the Spencerian system; had examined the papers submitted to him—a series of the Respondent's Exhibits—and he pronounced them genuine, that is, all written by the same hand; he had examined the papers assumed to be authentic and had used photographs of the alleged Will, the "Altered Will," the "Long Memorandum," the "Short Memorandum," the "Long Draft" and the "Short Draft" and the copy of Mrs. Dama's Will, and the E. S. series of papers and he had made comparisons, the results of which he set forth with great minuteness and literal detail. Horton had discovered a cause which was satisfactory to him why there were more loops in some of the writings than in others: One of the papers is the "Short Memorandum," Respondent's Exhibit No. 1 (characterized by counsel for contestants in his argument as "the most vicious forgery of them all"). Witness Horton illustrated on the blackboard the process and result of his discovery. In the alleged Will a finer pen was used than in many of the undisputed writ-

ings; had Dama used a coarser pen fewer loops would have occurred; "it is the simplest thing in the world, just an accident," said expert witness Horton; he discovered also in that most difficult thing to make, the rubric under Dama's name, a striking similarity in the shades and in the movement, the hardest thing for a forger to handle; in comparing the general styles of the two sets of writing Horton found that the correlations fit together like that of the warp and woof in a piece of cloth; the witness Horton went through all the letters of the alphabet as they appear in different documents, pointing out resemblances between the characters in the disputed papers and those assumed to be authentic; in his opinion the writing on the large yellow envelope was genuine. Expert Horton furnished to the court a table of references to similarities between disputed and admitted writings, which is somewhat in the nature of a brief in support of his theory.

### HOPKINS.

R. C. Hopkins, aged seventy-five years, a resident of San Francisco for forty-one years, formerly employed in the United States surveyor general's office as keeper of the Spanish archives; had been employed to examine papers in the archives for the purpose of giving testimony concerning land grants, was so employed from 1855 to 1879, in which latter year he was sent as special agent of the Treasury to Mexico to examine papers with reference to land grants in the territory of Arizona, and afterward was engaged in the office of the surveyor general of Arizona until 1885, then came back to San Francisco and was about a year more in the United States land office in San Francisco; testified often in the United States district court as to handwriting and had also testified in this probate department before the present judge in a contest over an alleged forged Will; the expert Hopkins was first spoken to about this case by Mr. Samuel M. Wilson, the attorney, in 1889, and made some examination of photographic copies of papers shown him by Mr. Wilson at that time; since then within a few months before date of testify-

ing (Monday, April 13, 1891), he had examined the alleged
Will and the "Short Memorandum," the "Long Memoran-
dum," and formed an opinion that they were genuine writ-
ings of the deceased Dama. Expert Hopkins gave, among
other reasons for his opinion, the disconnection or want of
connection of certain letters; the connection of certain letters;
it appeared to Hopkins that Dama had a prevailing habit of
connecting certain letters such as "a m" in "Dama," "same,"
"testament," and "diam ond"; in "testament" it is un-
connected in several instances, but Hopkins alluded to the
prevailing habit; of course there were exceptions; in every
example of his name this expert witness found the letters
"a m" connected "D *am* a"; the same persistency of habit
appears in the letters "an," "em," "en"; another charac-
teristic was the spelling of certain words, for example, the
word "influence" is spelled "influece," omitting the second
"n"; also similarity of language in the disputed and undis-
puted documents, and there were other examples of persistent
peculiarities of habits. In his cross-examination the witness
Hopkins said that he did not exactly comprehend what an
"expert" is; he did not profess to be infallible as an expert
nor did he see how there could be anything akin to infalli-
bility outside of the exact sciences; "in handwriting there
can be no such thing as exactitude or demonstration"; he
was the same person who examined the so-called "Markham
letter" and pronounced it genuine and he had heard that
expert Hyde (one of the counsel in this case) and expert
Hickox expressed a contrary opinion, but expert Hopkins said
and continued to believe that the "Markham letter" was an
authentic emanation, he had examined what purported to be
an original paper written in pencil and he understood that
experts Hyde and Hickox examined a photographic copy of
that letter. Mr. Samuel M. Wilson, whom witness Hopkins
had known for forty years, and for whom he entertained re-
gard as a man of high principle and honor, asked him to ex-
amine these papers, and he did so without prepossession and
with a view solely to discover the truth; the witness said that

his respect for Mr. Wilson's character might have exerted a moral influence, but certainly had he found the fact of forgery Hopkins would have so declared without hesitation; he was concerned in ascertaining the bona fides of the documents and learning the truth; Dama's hand would not be a hard one to simulate; the handwriting of the alleged Will was written with the care befitting the solemnity of the occasion; it was evidently copied from some document of similar import and done with deliberation and less freedom of movement than his ordinary writing. Witness being shown the Respondent's Exhibit No. 3, the "Altered Will," said that from the apparent care with which it was written he should say it was originally written as a Will; each letter is distinctly and carefully made. (See page 141, judge's manuscript notes of evidence.)

### HYDE.

While Mr. Henry C. Hyde appears in this case as counsel, his argument is of such a character that I feel justified in treating it in the category of expert testimony, for such it is essentially, relieved of the constraint of cross-examination and free from the burden of an oath. Mr. Hyde has made a specialty of the study of handwriting for thirty years or more, and had used the microscope in his examination of manuscripts for above twenty years, and had frequently been called upon to employ and exhibit his talents in court in judicial inquiries in controversies over disputed writings, and had been so engaged in noted cases in probate. Mr. Hyde in his expository statement undertook to confine himself entirely to the facts connected with the charge of forgery and to the scientific proofs demonstrated; he assumed to elucidate the elementary principles that underlie proof of handwriting, and said that the handwriting of a man is as distinctive as any other phase of personality or individual character; the qualities and habits of writers are as various and distinct as the writers themselves; there are definite limits and possibilities to the capacity of a forger and the difficulty of the task of a

forger is the reason why so few forgers have been successful; the forger only sees effects to imitate, but he does not see how those effects are produced; it has been argued that if a small number of characteristics can be simulated an indefinite number may be imitated, provided time be given—the answer to this is, that the smaller the number of items to be imitated the easier the task of the forger and the more difficult detection; in the case at bar, Mr. Hyde asked, what was the necessity of simulating and manufacturing so many documents as are in dispute? Why should the forger act so recklessly? He must have had a sublime confidence in his own ability to fabricate and to deceive by his fabrication. It is difficult to imagine the magnitude of the task set to himself by the forger of this alleged forged Will; it must have involved his perfect transformation into Dama himself; he must not only have acquired his habits of hand but have become possessed of his spirit; it would have been impossible for a forger to have accomplished all these forgeries unless he were in the possession of facts and gifted with powers not given to any other man than Dama himself; no other man could possibly have executed all these manuscripts in dispute; the difficulties in the path of the alleged forger rendered his success practically impossible; the excess of loops in the Will may be accounted for by the manifest desire of Dama to make every letter perfect and distinct—this is plain from an inspection of that instrument, and the expert counsel undertook to show the proportion of loops, blind loops, and mended loops in the various documents under examination. The expert, Doctor Piper, had set great store by the dots over the letter "i," which, in his opinion, were enough to amount to a mathematical demonstration that the Will was a forgery, and expert Counsel Hyde engaged in an analysis of the exhibits of undisputed papers to offset and overthrow the opinion of Dr. Piper; upon an examination of the Exhibits E. S. 2, 8, 6, 5, 7, 9, respectively designated in evidence as Contestant's Exhibit C—3, letter signed "Luigi" and addressed to "My Dear Jennie," dated "San Francisco,

March 28/86''; Contestant's Exhibit I—9, letter signed "Luigi," beginning "Brot Benj," dated "San Francisco, Decr. 25/86''; Contestant's Exhibit F—6, signed "Luigi," beginning "My Dear Sister Jennie" and dated "San Francisco, Decr. 9/83''; Contestant's Exhibit E—5, letter signed "Luigi Dama," beginning "Bro Ben," dated "San Francisco, Octr. 6th, /85''; Contestant's Exhibit H—8, letter signed "Luigi Dama," beginning "Captn. E. W. Randall, Dear Sir," dated "San Francisco, Feby. 24/84''; Contestant's Exhibit J—10, letter signed "Luigi Dama," beginning "Dear Brother" and dated "San Francisco, Decr. 15/84''; it appears that in very few of these sample letters are there not dots over the "i," angular or rounded mixed, that is to say, examples of each kind of dot; expert Counsel Hyde thought that it looked as if expert Doctor Piper had purposely selected his standards to support his theory. Expert Counsel Hyde claims to have shown that there are rounded "i" dots and angular "i" dots scattered promiscuously in the documents disputed and undisputed; in the word "buried," in line 10 of the alleged Will, there is a light dot over the "i," a light stroke or touch of the pen, and there is a prevalence in Dama's writings to this form of dot, and the conical dot, or the dot with the point sharp downward, is often met with; there are in the alleged Will numerous examples corresponding to the "i" dots in the undisputed papers. Another point adverted to by the expert Doctor Piper and illustrated on his Tables is as to the form of the small "a." Expert Counsel Hyde says that there are certainly differences between the forms of the "a" small letter, but they are all made on the same principle, they are all begun with the curl on the inside, " $\mathit{a}$ " see

Respdts Ex. 123, these are counterparts in all respects of the " $a/$ " in Dr. Piper's Tables and absolutely negative his deductions, " $a/$ " " $a/$ " " $a/$ ," these are shown in the Altered Will, a paper drawn with more care even than the Will itself, they are characteristic of Dama's writing in his more slowly and carefully composed papers, such as the superscriptions on envelopes and the Will and Altered Will: As to the joinder and disjoinder of the " t " with other letters in words: The very motive of the writer of the Will, that is, the precise formation of the letters, will account for the disjunction : The capital "$\mathcal{S}$ "

$\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ in the Randall Will, Contestant's Exhibit M—13, and in the alleged Will; the " $\mathcal{S}$ " on line 54 of the alleged Will is the only example of that form in the Will and that is the prevailing form of Dama's " $\mathcal{S}$ ", and it is curious, if Dama were not the writer of this Will, that there should be a variation throughout from the common form of this letter, and that it should be used in one place only: In the "Short Memorandum" there is another and very peculiar form of the capital letter " $\mathcal{S}$ " " $\mathcal{S}$ " " $\mathcal{S}$ " $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ $\mathcal{S}$ see the Buhne letter, Respondent's Exhibit 89, the envelope addressed " Mrs. J. P. Smith," Respondent's Exhibit 97 and 98: The variations or discrepancies which expert Doctor Piper adduced as proofs of the falsity of the Will do not exist: It was a remarkable habit of Dama to repeat similar forms in a single writing; this is shown in the "Randall" Will, which is certainly a document that cannot be and is not disputed : It was manifestly his object to make his Will with the utmost care : In writing his more careful compositions his habit of disjoining letters is apparent;

this is shown in the Will and the Altered Will, in the Randall Will, in his superscriptions on envelopes and endorsements on documents; it should seem that this feature of disjoined letters which is relied upon by expert Doctor Piper as a proof of forgery is evidence to the contrary: Professor Young's accounting for the apparent lapsing of the writer of the Will in line 72 is very ingenious, that the forger had by this time become so practiced in imitating Dama's hand as to become less careful, but expert counsel Hyde argued the contrary that the writer having become fatigued from the exercise of unusual care relaxed the rigidity of writing and resumed his normal habit, wrote in his usual style: Every capital letter in the alleged Will has its exemplar in the undisputed documents and letters: Counsel illustrated his argument on blackboard: Five

forms of the letter $\mathcal{A}$ $\mathcal{A}$ $\mathcal{A}$ $\mathcal{A}$ $\mathcal{C}$ , the last

enlarged small $\mathcal{A}$: $\mathcal{B}$ , found in the Will, $\mathcal{B}$ $\mathcal{B}$ in

Randall Will, $\mathcal{B}$ in the letter addressed, "Miss $\mathcal{B}$

Harris;" E. S. 3, presents a sample in "Dear $\mathcal{B}$ rother

$\mathcal{B}$ en," the "$\mathcal{B}$" in "$\mathcal{B}$ en;" another form with

one stroke: "$\mathcal{B}$:" There are two forms "$\mathcal{C}$" "$\mathcal{C}$,"

see the "$\mathcal{C}$" in " $\mathcal{C}$ alifornia," third line of Will and

compare with the "$\mathcal{C}$" in " $\mathcal{C}$ hase" in Respondent's

Exhibit 73: The other form of his capital $\mathcal{C}$ $\mathcal{C}$ $\mathcal{C}$ , only one example in the Will, but many in the standards:

The forms of capital $\mathcal{D}$ $\mathcal{D}$ $\mathcal{D}$: The prevailing form is

found in the "Long Memorandum." The letter $\mathcal{E}$ $\mathcal{E}$, first form found in lines 12 and 71 of the Will and 18 or

20 found in standards *E* : other form six times in the Will: *E E E E*   In the will there is but one form of the letter *F* and in Respondents Exhibit 27, *F*; this is used in other parts of his writing as a part of his capital *K F* ; his usual form was *F* as found in the "Long·Memorandum."

There is but one example of ·*G* in the Will, in line 31, in word "Governament," its exemplars are to be found in Respondent's Exhibit 23, the "Blue Will," twelfth line, *G* in "Gas;" and in Respondent's Exhibit 34, in the address "*G* ibbons;" the other form of the *G* "*G*" in "*G* as Stock" is found in the Randall Will, i. e., Contestant's Exhibit M—13, one example in Will, three in standards, the second is the more common form, *G*, in shape of letter *E* : The capital letter *Fe*, he makes the *F* and then he proceeds to add to it the common form of small "*e*," thus "*Fe* ;" "*Fe* ;" in Randall Will, line 58, and 30, and 8, are congeners of the second form of the *Fe Fe Fe* : The capital *F* has three prevailing forms, compare line 40 of the Will and E. S. 1, the Belle Harris letter, "*F* ," "*F* ," "*F* ;" the next form *F F F* is found in line 9 of Will and in line 8 of E. S. 7, "*F* " "*F* " and in E. S. line 15,

E. S. 3; " *J* " In line 61 of Randall Will and in line 47 of alleged Will compare the *JJ*; this is important in connection with other matters,—if isolated it might not have so much force—the " *J* " in Respondent's Exhibit No. 89, note the thickened termination with a slight suggestion of a tick to the right; " *J* :" There are two forms of the capital letter " *J* ," but they are so alike to the letter " *J* " in principle that he gave no illustration. The capital " *K* " in Randall Will is not characteristic of Dama; his ordinary form of capital " *K* " was a small *k* enlarged, thus " *k* " " *k* " compare *K* in " *K* " Randall Will and same letter in same word in alleged Will: Now we come to " *L* " (Expert Counsel Hyde continued illustrations on blackboard:) Proceeding with the capital letters, expert Counsel Hyde put upon the blackboard three forms of the letter *L L L*, the first form is in line 2 and 60 of Will and 3 and 12 of Short Memorandum, the second form is found but once in Will in line 57 ; the third form is found only in signature; the last form is the prevalent one in Dama's usual writing, there are found no less than 18 examples of it in the standards: Next the capital *M* —

*M M M M M* : there are five different varieties of this letter, it would be of no consequence to separate them, if they were not common to all his·

writings,—a typical example of the first form is line

27 of Will, " *Mass* ;" in the groupings of expert Counsel Hyde it has been sometimes difficult to separate the first and second forms, examples of the second are in

line 11 and 36 of Will, " *Maine*" and " *Mrs* :" see standards Respondent's Exhibit 73, envelope address,

" *M artha*," and Contestant's Exhibit L—12, line 36,

" *M2* ;" third form in line 50 of Will and in enve-

lope to E. S. 6,—in envelope on Randall Will in word

" *Monmouth*," only no hook at end, and in E. S. 6, ad-

dress, " *My* dear Sister *Jennie* :" there is very little

difference between the fourth and fifth forms : on Photo Plate 23 are very good representations of the different forms and their analogies : As to the N, expert counsel Hyde made no table, finding but one form throughout, it

is made with but one stroke of the pen : The letter *O*

is a very characteristic letter of Dama : *O O O O* : in the Will ; two noticeable examples in standards, one in

the Buhne letter, Exhibit 89, in the word " *O'Clock*"

and in Contestant's Exhibit D—14 in word " *O*maha ;" Photograph Plate No. 24 contains good analogies : The

capital *P P P P P* : there are some modifica- tions to the terminal loop ; another form is one stroke

*P* , not found in the Will but in the standard: a remark- able uniformity in Dama's writing is in the terminations :

see Photograph Plate 25; see the words

"*Private Paper*" , line 7 Short Memoran-

dum: The capital *R* cannot be better illustrated than by reference to expert Gumpel's Tables, photographed from blackboard ; the remarkable feature is that they

begin from bottom like the *P* and then go on like the

*B* ; note line 58 of the Will and in one of the envelopes addressed to Benjamin Randall in. Randall deposition :

" *RR* " in line 58 of the Will : The capital letter

*S* has three forms in Dama's writings: *SSS* : there are 23 examples of the first form in Will ; but that is not the prevailing form in his usual writings : expert counsel Hyde says he has referred to but six

" *S* " in the standards ; the second sample *S* is the prevailing form, forty-eight instances counsel has taken from standards : In Respondent's Exhibit No. 73, are found both the first and second forms ; three times in envelope, is the first form, and the second form occurs twice in the letter ; the reason is manifest, writing in his customary manner with ordinary rapidity and fluency he

used the second form: As to the letter " *L*," *J*, there is but one general form, the European script

*L L* : Photo Plate No. 28 contains a series of par- allel examples; closer resemblances it would be difficult to conceive of, allowing for slowness of writing and use of

pen: *L L L L L L L* Coming down

to the capital *W*, omitting U and V,—there are five

forms found in Will: _SW SW SW SW SW_ : the same series of variations is found in the standards ; it is inconceivable that a forger could have discovered these slight variations and reproduced them in the indiscriminate manner found in the Will: E. S. 11, line 36, the

_SW_ in the word " _SW_ aterhouse" corresponds to fourth form; there is but one example of the fifth form in the Will, line 69, " _SW_ " in " _SW_ atch:" Observe Photograph Plate No. 29 for remarkable resemblances as to general form and character; grouped because of resemblance:

The letter Y is found in two instances only in Will: _Y_, almost like print, the second more like writing, _Y_, line 86; compare second form with _Y_ in _Y_ ork in blue letter, Respondent's No. 25: E. S. 8, Contestant's Exhibit I—9, on lines 19 and 22 are examples not quite as good however as the other standard. The next point is the abbreviated character _&_, thus: _&c &c &c_ _&c_ this is frequent in the standards, see line 9, E. S. 1; there are 15 in E. S. 6; in E. S. line 8, _&c_, E. S. 9, and in E. S. 11, line 47, _&c_ : In Respondent's Exhibit 43, draft pencil letter, there is one, there seems to be no upstroke, but that is of slight importance, the general resemblance being such as to preclude possibility of forgery: Now as to the small letters: Photograph Plate No. 21 exhibits a large variety, " _a_ " " _a_," these are the same that are produced on the Piper Table 13, " _a_ " " _a_ " " _a_ :" There are several forms of the terminal " _a_," the first example is in "Californi _a_,"

there is a slight tick to the left: " *Cl* ," " *Cl* ," " *Cl* ;" in the standards these characteristics are common,—in E. S. 10, alone. they are very numerous, " *Me ia cara sorella Jennie* ;" all through this letter are found these examples,—this characteristic tick terminal appears in other letters, such

as " *ho* " in E. S. 1, and also in E. S. 11, and in the letter " *n* " we find a marked example in envelope to Randall letter in the word " Bosto *n* " see also Photograph Plate No. 42: there are also examples of the same kind in " *t* ," and in the Long Draft see the terminal in " *O* " in " devise:" The small letter

" *b* " is written by Dama in three forms, thus: (the expert counsel illustrated on blackboard:) indeed there are four: *b b b b* : the Will, line 80, illustrates this: the same or a similar form is found in the Randall

Will, line 36, in word " *be* ;" also "business" in line 48: Expert counsel Hyde has made complete tables of

the small " *d* " " *d* " " *d* " " *d* " " *d* "

*d d d d d d d d*

In the Will on the third page on line 64, one sample of the first form, and on others, lines 72, 73, 74, 75, and 76, and in the standards the expert counsel enumerated in his Tables seventy-five examples, showing that it was

Dama's common and prevalent forms of his *d* , first

form as in "depth," " *d* epth " on third page of Will; this is a very important point not touched by other experts: The expert counsel proceeded to illustrate the

different " *𝒟* " forms, not touched by contestant's experts, because they were looking for differences and not for resemblances : Photo Plate 53 shows good examples of those found in Will and equally good examples from standards: the clubshaped form is seen in Photo. Plate

50: " *𝒟* ;" Photo. Plate 49 shows the "shaded curl," as expert counsel Hyde called it: note the general construction of the word " *and* ," parallelisms such as never could have occurred in a simulated script; a coincidence marvelous to a degree: there is a demonstration that these words at least were written by the same hand; also see for the same purpose Photo. Plates 51 and 52: The expert counsel proceeded with the examples of the other

forms of " *𝒟* ": The next is the letter " *f* ," counsel having no table of that letter, used Photo. Plate No. 33; the forms are taken from the Long Memorandum and

from various standards; see " *f* " in "formation" in

Altered Will, line 82, and compare almost a counterpart

in E. S. 1, line 15, Belle Harris letter, word " *f* or; "

this is a resemblance impossible to be accidental: Now we turn to the small " *g* ,"—note the commencement

of the " *g* " in the signature to the Will, and compare

with the " *a* " in Dama in the second line of the "Blue Will," Respondent's Exhibit 23; the counsel says he does not claim exact similarity but there is resemblance:

The small letter " *h* ," the expert counsel presented

some peculiarities on the blackboard: " *h* " " *h* "

*h* " "*h* " "*h* ,"—see Photo. Plate 35,—there is an unusual form, loop in the main shaft, "*h* ," both in the disputed documents and in the standards : As to "*h* ," see Photograph Plate 38, simply a letter "*h*" with a third stroke to make the "*h* ," "*k* ," "*k* ;" "*k* :" these identities are marked : The small "l" is of considerable importance : see Photo. Plate 39: expert counsel Hyde went over this plate pointing out important

peculiarities : note the double "*ll* ;" these are photographs of actual letters used in Piper Table 6: Photo. Plate 56 has some examples of "*ll* " in combination, and expert counsel Hyde asked the Court to compare "all" in line 70, of Will, and "all" in "Randall" in Randall Will; the resemblances in termination of the "l s" in double "*ll* " counterbalances the apparent discrepancies alluded to by other experts; Expert counsel Hyde said he would not spend much time on the small "m" because the experts Horton and Gumpel had so fully treated this letter : The letter "n" has some remarkable peculiarities, one feature is the wide separation between the first upstroke and the second: Passing the "o," which Professor Horton dealt with, the Expert Counsel Hyde took up Photo. Plate 41, containing illustrations of the letter "*p* ;" in "*p* " of "development" in line

75 of the Will is found Dama's common form as may be seen on Photo. Plate 41. There is no significance in the "*y* ," and expert counsel Hyde passed it

by and went to the small "r," of which there are two forms: *r, r* ; *r r* ; there are 46 open "*r* " forms in the Will against 65 closed "*r* "

forms ; approximately like ratios in all the writings ; the
Photo. Plate 42 shows correspondences as to tops and
also terminals, a very important point. The word

"Barker" in line 78 of the Will " *Barker* "
and the mate to this in E. S. 11, line 10, in word "per-
fect," this is a point worthy of particular attention: A
point which has escaped argumentative attention may
be alluded to here, Respondent's Exhibit 24, line 14,
" which he think benefit." The small letter "s" was

made in various forms: *s s ss es ;* but the prevail-
ing form is not common to the Will, yet there are exam-
ples in the Altered Will, if there are any in the Will they
are rare ; but in the undisputed papers they are frequent;
the ordinary form is occasionally found in the disputed
documents ; it is found so often in Dama's admitted
writings that it cannot be deemed to be a mere accident;
see "satisfied " and " expression " in Respondent's Ex-
hibit 128, marked examples of the Will form, and the
word "singers ; " in E. S. 6, line 19, " s " in " rooms."
is a type of the Will ; in E. S. 2, line 10, " s " in
" friends ; " Photo. Plate 43, figure 20, shows an " *P* "
found in Will, compare Exhibit 89, line 13, same form,
even to the small upper oval loop, " *f* ; " fig. 23,
" *f* ," in Altered Will and in Chase letter, Exhibit 73:
other examples on Photo. Plate 43: Respondent's Ex-
hibit 33, " *s* " in " Mrs.": There are two forms of
" *x* " " *x* : *x, x* : first example in " Executri*x* "
in line 50 of Will, second form *x* on line 59 of Will ; E.
S. 9, line 18, "E *x* press, " see Photo. Plate 44 in which
are examples of both, *x* and *x*, latter in first Draft Will,
on line 10, " *ux* " or " *trix*; " curiously enough both
of these forms are found in the Will: Now the numerals:
Mr. Gumpel has shown some of the characteristics, as
illustrated on the photographic plates: See Will, line
15, figure 2, counterpart, in Brother Ben letter, April
20th, 1835.; another in Exhibit 100, line 5: the

numeral 4 presents a very marked resemblance on line 66 of Will and line 4 of Belle Harris letter,

E. S. 1: the figure $\mathcal{S}$ has a marked peculiarity, the final curve like the bottom of his $\mathcal{B}$: The numeral 6 is alike all through; in the 8 the feature is the smallness of the lower loop, compare Long Memorandum and E. S. 2; the cipher 0 shows similarities, note the cent ciphers on line 34 of the Will: ($500. ) and line 35 Altered Will ($500. ), and line 28 Draft Long Memorandum ($500. ): these are three sets of combinations, the brackets, the dollar marks, the figure 5, the large ciphers, the cent ciphers and the dashes under these last; the manner of uniting the ciphers: Now there is a point hitherto untouched of considerable importance, the dashes═ : any one will do as an example, take e. g.: on line 8 of Will ═ *First*═ : compare with Respondent's Exhibit 120, envelope adressed to Forbes, the word ═*Mass*═, Respondent's Exhibit 124, and 119, identical characteristics; it is a persistent habit, in all respects the type of the writing of the Will; and here again referring to the Belle Harris letter, which has given the expert counsel so many examples of similarities: The dashes are remarkable as exemplifications of persistency of habit; where the dash is long it is a waving line, see the Will, lines 24 and 52, see the Story Receipts, Exhibit 68, 69, 70, 71, 72; these occur only in formal documents, not in the letters: his habit of dividing a word at end of line is peculiar, almost uniform habit, thus in E. S. 3, line 20, pla═ at end, and tran═ on line 27: numerous examples exist: The orthography of Dama is an item that should influence the mind of the Court in coming to a conclusion; it is very important.

After this exposition expert counsel Hyde undertook to examine to some extent the evidence of the expert

Doctor Piper and to point out errors in his examples and inferences: The Doctor was asked a very important

question about the loops of the double 1, " *ll* ," and the terminals: the loops are conscious characteristics and they appear to have been .put in *ex industria* by the writer of the Will in his careful construction of the instrument. Dr. Piper said that the dots on the "i" were enough to amount to a demonstration to his mind that the alleged Will was a forgery. How could it possibly be maintained that such a circumstance would be sufficient predicate for such a conclusion, especially when it is shown that there are different kinds of dots running through the papers? No genuine document would be safe if such evidence or opinion were accepted as enough to condemn it. Much stress was laid upon the repetition of forms in the Will as indicating imitation, but the same general feature may be seen in exhibits that have come from contestant's undisputed writings, the "Randall Will," among them, and the E. S. Exhibits. Professor Young is undoubtedly an expert penman, very clever as a teacher of penmanship, but certainly not an expert in detection of handwriting, and his observations were of the crudest character; his statement as to "slope" being sufficient basis for opinion is in itself enough to impair the value of judgment pronounced upon such premises. "Slope" is by no means a test of authenticity; it is a very variable attribute of a writer, as we all know from our own experience, and dependent upon a variety of accidental circumstances, such as temporary position of penman or other transient cause. Professor Young's opinion is not amenable to analysis. Professor Young says he was looking only for analysis of differences, that he was not searching for resemblances; but the true expert makes an examination of the entire instrument with a view to finding out the preponderance of probabilities; it is nothing but a balancing of probabilities, a question of circumstantial evidence, and no expert can pronounce a judgment or opinion worthy of respect unless he have first thoroughly and impartially examined the paper with an eye single to the ascertainment of exact truth. There

are over 7,000 letters in these disputed documents, and the court can recognize the comparative value of the evidence of the experts for respondents when they have shown so many precise parallelisms in undisputed documents with those ·in dispute. The experts on respondent's side have made a most elaborate examination and found all of these remarkable resemblances and the extraordinary identities, and in addition the attorneys have made for themselves examination fortifying and amplifying the conclusions of the experts. No matter how counsel may denounce these experts, their reasons stand; let their reasons be assailed, for those reasons, being the basis of their opinion, should alone be the object of assailment, and those reasons are as repellant of assault as the great wall of China; they are impenetrable to any attack that may be made upon the witnesses personally; there is no value in expert testimony except as it is supported by good and sufficient reasons; there must be a substratum of facts supporting the superstructure of opinion. Now, assuming this as the rule of reasoning and the canon of criticism, let us weigh the testimony of contestant's experts. The principal witness for contestant was the expert Doctor Piper. His object was to show that the Will was a forgery and he selected his examples in subordination to this object; and in his drawings on his Tables these examples are enlarged with the evident intention of emphasizing his purpose by the exaggeration of differences not originally existing in the disputed documents; this was Dr. Piper's "method," so much relied upon by contestant. These Tables do show difference, but how has that difference been produced? That is the question to which the court's attention is drawn. By selecting samples of letters as standards and then doctoring them in the process of enlarged drawings on his Tables to lead to the demonstration which, "according to the method" of Dr. Piper, was

that of forgery. This phrase, "according to his method," was the favorite phrase of this expert, Dr. Piper, to justify his opinion: a curious "method" which prevented the cross-examination of the witness and compelled the acceptance of his ex cathedra judgments. It would be a monstrous "method" which would permit so grave an issue to depend for determination upon such testimony. The claim that Godard or Mrs. Fannie Johnson may have forged this Will, or had the capacity to write it, is not worthy of serious consideration; neither could have done it. Even if it were not abundantly established by affirmative evidence that this Will was the authentic emanation of the mind and hand of Luigi Dama, it cannot be maintained that it was *not*, and this negative proposition the contestant was bound to enforce and he has not done so.

As the court has treated the argument of Mr. Hyde in the nature of expert testimony, it may be well to consider, in this immediate connection, the comments upon the same subject by opposing counsel, who has shown himself to be possessed of science and skill in this peculiar province. Counsel for respondents having undertaken to show that the paper upon which the alleged will was written was the same as the ordinary "legal cap" to be found in any stationer's shop and used for a score or more of years in the courts and law offices, counsel for contestants called attention to the watermark "Niantic" in the sample of common and ordinary legal cap introduced to show the identity of the quality or kind of paper, whereas in the "Altered Will" and in the alleged Will there is no watermark at all; hold up to the light and examine and compare both and observe the difference; it is remarkable that Dama should have departed from his usual habit of using foolscap when the "Altered Will" of November, 1885, and the alleged Will of May 8, 1887, were

written—in only two instances have we examples of his using legal cap. It is not believable that Dama ever laid hands or eyes upon either of these feigned papers; it would have been more adroit in the fabricator of these documents to have omitted the mention of Mrs. Sara Barker Smith in the "Altered Will" of 1885; this paper was concocted coincidentally with the alleged Will of 1887. (See judge's manuscript notes of argument, page 266, lines 3–19.)

According to this counsel, and notwithstanding the exposition of the opposing experts, the signature of Jules Mathieu was proved by competent witnesses to his handwriting to have been simulated; his brother Gaston so testified and his testimony was free and unpurchased, unlike that of the other brother Alphonse. What occurred when this Will was originally presented for probate? The witness Antonio Bellini refused to swear that his name as appended to the alleged Will was ever written by him; he swore then that he never signed the paper, but that the paper he signed then near the bottom of the page had a *red seal* upon it near the bottom corner. Bellini said so on February 13, 1888, and he has said so ever since; this one fact alone would be sufficient, when it is shown that Bellini never wrote his name in that way, as will appear from the samples of his writing on page 3 of the judge's notes given on November 20, 1890, at the request of the court.

Counsel for contestants, after the manner of an expert, gave blackboard illustrations to enforce his claim that Bellini never wrote the signature "Bellini Antonio" on the alleged Will, and compared page 3 of the judge's manuscript notes with the specimens written in court by Bellini, February 13, 1888.

This counsel animadverted strongly on the testimony of the expert Gumpel and alluded to the circumstance that

contestant was prevented by technical objections from show-
ing what was the original opinion of this expert in regard to
the disputed writings and why Gumpel came to abandon his
first opinion and turn over to the respondent when he could
not succeed in blackmailing the contestant. There seems to
be no doubt that Gumpel originally expressed an opinion
against the genuineness of the alleged Will, which largely
influenced counsel in instituting proceedings to revoke the
probate of the disputed document and the strictures of coun-
sel, however severe, are not without warrant; but the validity
of scientific deduction is not to be tested by the tergiversation
of the scientist in his moral conduct outside the record. His
individual deceit and duplicity in dealing with clients may
be established or admitted, but the scientific value of his evi-
dence is dependent upon the logical connection between
premises and conclusion; if it have any value at all, it is
nothing if not scientific. How far such testimony or evi-
dence deserves to be dignified by the term "scientific" is at
best a moot question, and remains for further consideration.

The court having propounded to counsel for contestants a
question, in the course of the argument, as to a peculi-
arity in the signature "Bellini Antonio" in the alleged
Will,

the counsel said the query was of great advantage to him, as it had caused him to examine particularly the reason for the remarkable departure from the habit of

the witness in the signature " "

appended to the Will: Where did he get the pattern for

" ?" And counsel undertook

with rare ingenuity to account for and illustrate how this departure came about in the act of the imitator. Counsel had a theory about the last page of the alleged Will which to his mind was equal to demonstration ; it could be observed that all the way through the alleged Will the lines are adhered to, but when we come to the last page there is a significant departure from the line first and the line second; it is written down and across in the first, second, and third lines; this points to the proposition that it is evidently written to meet something ; "Bellini" was written first and "Antonio, 222 O farrelle," then "214 O'Farrell street" and after that "Jules Mathieu," then "Luigi Dama;" and the counsel very cleverly illustrated and "demonstrated" the correctness of his theory, showing that the last lines were written

first and the upper clause to fit in; note the " " in

"Jules Mathieu" and observe the way in which the

" " fits into the bowl of the " " and

other features of great significance; this shows that the last lines were written first and the upper clause

written to fit in; the peculiar " *Z* " in the address " *222 O'farrelle* ",no where is there an " *Z* " like that in Bellini's specimens of writing and no where does he add a terminal " *en* to "O'Farrell;" the " rs" in "O'Farrell" have many features common to Godard's examples in the writing made in Court, this is very remarkable, and is seen throughout his writings: the formation of the " *O* " in " *No* i" and the " *O* " in " *O. farrelle* " in the Godard specimens and in the subscription to the Will are an index finger to the perpetrator of the forgery; these things taken in connection with the other circumstances amount to a demonstration; the dots on the " *J* " in " *Jules* ;" no single signature of Dama like that on line 87 of Will and no rubric like that: The " *rr* " " *O farrelle* " in the signature on the Will, in the addition to Bellini's supposititious signature without a break, different in his real signatures, *e. g.*, Respondent's Exhibit 30 and page 3 of Judge's notes of testimony.: Counsel Kowalsky proceeded to point out chirographic characteristics in the genuine' writings of Dama and in the alleged Will and in the Altered Will ; Dama's real writing had a persistent downward tendency or slope to the right, whereas in the feigned papers the inclination is upward and the same habitude is perceptible in the handwriting of Godard ; invariably upward in the latter and downward in the former : Note the signature " Luigi Dama," the

" " in " ," the tick to the left in

the upper bowl of this " " must have been

added after the letter was formed, and the " "

in " " the worst ever made,

if by Dama, and yet we are told that this was Dama's " dress-parade " handwriting : Counsel Kowalsky commented on the evidence of the witnesses for the respondent on the question of general handwriting, Mrs. Chase, Mrs. Cushman, Mr. Cummins, and Mr. Thomas R. Knox, all of whom showed then themselves signal failures as they picked out the crudest fabrications, made hastily, as genuine and pronounced papers admittedly authentic to be false, of course such testimony is not worth consideration : Counsel contrasted the quality of the experts opposed to those on his own side, claiming that they could not compare with Doctor Piper who stands at the head and front of his profession and who had demonstrated by the most accurate processes and the true scientific methods the falsity of the disputed documents ; Doctor Piper's analysis here proves to a demonstration that the alleged Will was a forgery ; his testimony is entitled to the highest respect. Counsel proceeded to consider the internal evidence in the Will of its falsity and to show how utterly impossible it is that the decedent Dama ever had a hand in the construction of it : After a partial analysis of the alleged Will down to the letter " " in the word " papers," counsel took

up the " Blue " Will and noticed the formation of the

small " " and ventured to declare that there could not be found a single disconnection in the " h's " of that

document,—on further examination he found just one,—
this proved to him that Dama's habit was to write with-
out lifting the pen ; the forger of the Will tried to follow
Dama's habits but at times he naturally fell into his own;
in the Contestant's Exhibit M–13, the "Randall" Will,
like characteristics of Dama's true writing are shown ;
now take the "Short Memorandum" and attention should

be paid to the small letters " *h* " " *h* : "

(This is a crude tracing of the "Short Memorandum.")

San Francisco May eighth of the year one thousand eight hundred eighty seven I Luigi Dama made my last will and testament by myself without influence of any one, and in presence of three witnesses I signed it. After I sealed it, in a large envelope and marked it as Private Papers. and handed it to Mrs Sara B. Smith of San Francisco. California to keep for me, in whose care it will be found. So help me God. Amen.

Luigi Dama

Almost **every** one of the other letters has been tacked on afterwards; observe also the forms of " *h* : " In the " Altered Will " note the " *h* ;" counsel claimed that in all the "hs" that he pointed out are observed the habit of Godard as is shown by his specimens on page 3 and 4 of Contestant's Exhibit G, also on pages 5, 6; the same habit prevails as to the small letter " *p* " of same Exhibit; Dama's habit is never to lift the pen, and Contestant has shown that Godard's habit in these letters is to lift the pen: Counsel next considered Gumpel's blackboard illustrations and particularly the parentheses or brackets

( ) upon which he laid so much stress as demonstrative of Dama's authorship of the Will, if these examples are compared with the Godard specimens it will be seen that his ( ) brackets are similar: Mr. Hyde contended that the assertion made by expert Professor Young that the more a forger writes the better he writes, is not correct, but that the contrary is the truth, to wit, that the more he writes the less does he retain ability to imitate, thus denying the validity of the principle that practice makes perfect. Counsel Kowalsky contends that the principle is valid. The court's attention was called by respondents to the genuine handwriting of Dama on the envelopes as showing the care with which he wrote at times and as evidencing the "dress-parade" argument of respondent's counsel—contestant's counsel also desired to dwell upon this theme and asked the court to compare the envelope superscriptions with the writing of the disputed documents; a mere superficial glance at the disputed papers is enough to condemn them; when Dama wrote he sat with his glasses on leaning over and close to the paper upon which he was writ-

ing, so that it was impossible for Dama to have executed this Will: The dots on the " ," which are considered very important, and of which Dr. Piper has given more than a hundred examples, making to his mind positive proof that the paper was false: Compare the top of the capital " " in the word " " in the Short Memorandum with the top of the " " in " " in the specimens of Godard's writing and note also particularly the signature of Godard in the band books of the Park Band: Counsel proceeded to illustrate on the blackboard the comparative peculiarities of the forger and of Dama: The capital " " in the alleged Will and in the Altered Will have no counterpart in the admittedly authentic papers, it is entirely unlike the capital in the documents that have come from a pure source, such as the "Randall" Will or the "Blue" Will: This is remarkable, if the papers in dispute be honest: The "Story receipts" Contestant never admitted, always viewed with suspicion, they came into the case at a very late day, like others that respondents used as standards:" The two documents, the alleged Will and the "Altered Will," were in date nearly two years apart and yet there are identities in caligraphic execution of a most extraordinary character if one be not taken as the fabricated model for the other; tracings show by exact measurements that some of the words are studiously copied the one from the other; compare the name "Sara Barker Smith" in each, and see the name "Smith" as he wrote it in a letter to Mrs. J. P. Smith, an exhibit from respondent's side. See other exhibits in same connection: Counsel Kowalsky adverted to the religious

style of the termination of the Short Memorandum, "*the most vicious forgery of them all*"; and compare with the formal style of the alleged Will and the Altered Will, and then note the manner in which he wrote the First Draft Will and the Second Draft Will, Respondent's Exhibit 4.

### Witnesses as to Handwriting Other than Experts.

Richard Emerson, secretary of the Park Band (page 22, judge's notes), as to signature of Mathieu, did not think it was genuine.

Isaac Clinton Coggin, general manager of Park Band, "do not think that is Mathieu's writing *or Godard's;* it looks too finished."

Frank Merlet, shoemaker, 222 O'Farrell street, saw Mathieu write often; the name on the Will is not in Mathieu's hand, in his opinion; he never saw that paper before testifying.

Mrs. Ida M. Cummins, wife of Wm. T. Cummins, knew Luigi Dama very well; took music lessons from him, three or four times a week; was most decidedly a friend of his; he was very careful in business matters, most conscientious in his work, punctual to a dot in time; he was not much given to talk; her sister, Miss Belle Harris, was also a pupil; a most strong friendship existed between the professor and the witness; she saw him write several times; she attended school fourteen years and had made a careful study of penmanship; had seen the professor write friendly letters and also receipts; *he was always standing when writing;* she did not think the signatures attached to the papers shown to her (Respondent's Exhibit No. 1 and the alleged Will) were in the professor's handwriting; she remembered when he died, January 20, 1888; she heard of his death at 4 o'clock in the afternoon of that day and she went there the next morning at half-past 9; there were several ladies there, among others her sister Miss Belle Harris, Mrs. Adley H. Cummins, and Mrs. Sara Barker Smith came after she arrived; witness had no unkindly feeling toward Mrs. Smith, had heard the professor say she was a great worker but had little voice; the professor was a peculiar combination of man, he was exceedingly enthusiastic at times and then excessively passive—she had seen the professor write about from five to eight times and then he was

standing and writing either on top of the piano or on the mantel-piece. (See judge's manuscript notes, pages 26, 27.)

Wm. T. Cummins, the husband of the last-named witness, knew Luigi Dama for just four years from January 20, 1884, to January 20, 1888, four years to a day, the date of Dama's death; took lessons in vocal culture from him; had many business transactions with him; saw him write; saw him sign his name to Respondent's Exhibits 37, 38, contracts in respect to land between Dama and Cummins; this witness believed the alleged Will to be genuine; but he had stated in his own house that the fact that four deeds of land which Dama did not own were included in the Will was sufficient evidence to his mind that it was a forgery, but he explained why he had made such a statement; it was because for the last three years he was almost a pariah in his own household because he was honestly convinced that the Will probated was genuine and had been accused of aiding to cheat his sister in law, Miss Belle Harris, out of a fortune and he had honestly striven to convince himself to the contrary, and had come out to the court to examine the Will, and the result was to indelibly impress his mind with the conviction that it was genuine. (See judge's manuscript notes, pages 70, 72, 73, 74, 75, 78, 79, 80.)

Miss Martha Belle Harris, a sister of Mrs. Ida M. Cummins, had been a pupil of the deceased professor in vocal music and voice culture; she had studied as a specialty drawing; had been fully and thoroughly instructed in that art; often saw Professor Dama write, perhaps thirty to fifty times; had witnessed his signature before a notary; had received letters from him; had seen a great deal of his writings; had been to the courthouse often and had examined the paper probated February 27, 1888, and the paper found in the safe deposit box, "the Short Memorandum, Respondent's Exhibit No. 1," and they are not in Professor Dama's handwriting; the professor was rather careful in business, careless about the house; she took lessons for four years of him, at first once a week, then twice and finally three times a week; did many things for him; took money for him to the bank; he told her he was a poor man when he married; she saw the alleged Will on February 27, 1888, the day it was probated;

she came to the court and examined the paper because she
thought there was something wrong; she had had a conver-
sation with the professor in which he told her that those
people who expected to get his money would be disappointed
and that he was now a poor man and would have to depend on
her as he had left her all his fortune. (See judge's manu-
script notes, pages 28, 31, 32.)

Mrs. Amelia A. Waterhouse, wife of Columbus Waterhouse,
had seen the professor write ten or twelve times and had
seen several of his letters; she did not think the Will or the
Short Memorandum were in his writing. (Page 37, judge's
notes.)

David Milton Ramsay, a former secretary and treasurer
of the Second Regiment Band from 1883 to 1886, knew Jules
Mathieu, who was a member of that band, and had seen him
write his name as many as two hundred times, and was
familiar with his signature, and he said, "as a matter of fact,"
that the name attached to the Will was not the signature of
Jules Mathieu; Mathieu's manner in writing was slow and
labored; he was positive that it was not Mathieu's signature
appended as a witness to the alleged Will; his opinion was
based upon the comparison of handwriting with the signatures
he saw Mathieu make. (Page 41, judge's notes.)

D. S. Dorn, an attorney at law, an intimate friend and,
to some extent, a legal adviser of the deceased, had seen Dama
write very frequently, more than twenty times surely, and
was well acquainted with his handwriting; Mr. Dorn had
examined the alleged Will very carefully before; the hand-
writing was very similar to that of Professor Dama, but in
Mr. Dorn's opinion it was not his handwriting; "it is a for-
gery"; it was very plain to Mr. Dorn that it was not written
by Dama; and the "Short Memorandum," Respondent's Ex-
hibit No. 1, Mr. Dorn declared was most decidedly *not* the
handwriting of Professor Dama, "it is a strained imitation
of his style of writing and of composition." (See judge's
manuscript notes testimony, 45–47, 50–53.) Further and
fuller reference to Mr. Dorn's testimony will be made herein-
after.

Albert M. Whittle, paying teller of the San Francisco Savings Union, testified that Luigi Dama opened an account there October 4, 1876; the witness believed from comparison with bank "token book" signatures that the name signed to the alleged Will was the genuine signature of Luigi Dama. (Page 71, judge's notes.)

Alphonse Mathieu, a brother of Jules Mathieu, deceased, testified that the signature to the alleged Will was that of his brother "Jules Mathieu"; he had often seen him write, was familiar with his handwriting; went to school with him for five years.

Louisianna Mathieu, wife of the witness Alphonse, knew the late Jules for thirteen years and had had much correspondence with him; saw him actually write several times; knew his handwriting, and the signature and address

were in his handwriting.

Gustav Folte, paying teller of the German Savings and Loan Society, testified that deceased Dama was a depositor in that bank and believed from his acquaintance with the signature in the depositor's book that the name "Luigi Dama" signed to the alleged Will and also to the "Short Memorandum" were written by the deceased.

Clara E. Story, wife of D. W. C. Story, had lived in the house of Professor Luigi Dama and rented rooms of him; this witness produced receipts given by the professor for room rent, marked Respondent's Exhibits 67-72; she paid the rent herself; the Storys lived there in 1884; the receipts indicate the time.

The testimony of the Reverend Joseph Worcester should be considered as a whole, in another connection, for upon the question of handwriting it lacks preciseness and positiveness; he says that he does not think that his opinion is of any value, "the resemblance creates the impression that it is Dama's signature" on the alleged Will.

Martha E. Chase is a witness from away back, and her testimony was objected to by contestant because of the remoteness of her acquaintance with the handwriting of Dama; but the objection was overruled. This lady identified two documents, Respondent's Exhibit 43 and Respondent's Exhibit 73; the first comprised a letter written by her to Professor Dama with his draft of answer on the blank back of same, and the second was the answer dated February 21, 1884, received by her in the envelope addressed "Miss Martha E. Chase, Santa Rosa Seminary, Santa Rosa, Cal.," of which seminary the witness was principal; she believed the disputed writings to be genuine; she had known the deceased Professor prior to 1867 and afterward; first knew him in Stamford, Connecticut; had seen him write, sometimes when she was taking music lessons; did not remember ever to have seen him write a letter; he had tried her voice here, but she did not take music lessons from him in California.

A. H. R. Schmidt, cashier of the German Savings and Loan Society, formerly assistant cashier, knew Luigi Dama as a depositor in that institution, and was prepared to say from what he had seen of his signature that the name "Luigi Dama" signed to the alleged Will was the genuine handwriting of the decedent Dama. (See pages 100, 101, judge's notes.)

Sophie Buhne knew Professor Dama and took lessons from him from 1881 to 1885, every day except during her vacation, which was usually in June, and when the professor paid a visit to the east; she recognized a paper presented to her (Respondent's Exhibit 44) as a letter from her to him, dated at San Francisco, Sept. 3, 1883, and his draft reply dated Boston, Sept. 18, 1883; when Miss Buhne began taking lessons from him she had lost her voice and under his instructions she regained it entirely; she knew Sara Barker Smith, who took lessons of the professor and she had a high soprano voice; she identified Respondent's Exhibit 88, a receipt of Luigi Dama to Miss S. Buhne, November 3, 1884, and Respondent's Exhibit 89, a letter of L. Dama to Miss Buhne, August 29, 1885, as in the handwriting of the deceased professor; all the letters received by her from him had been destroyed; she identified Respondent's Exhibit 4, draft Will

in which "Miss S. B." is mentioned, as Professor Dama's handwriting; the Respondent's Exhibit 18, Mem. to Miss Sophie Buhne, was to her knowledge written by the professor; the envelope to Exhibit 89 was destroyed, for what reason she could not recall, but she retained the letter, which she found a few months before date of testifying (March 13, 1891), because after Professor Dama's death she thought more of it, as she was very much attached to him on account of his being her teacher; she thought the body of the alleged Will and the signature were in the handwriting of Dama. (See pages 105 and 106, judge's manuscript notes.)

Frank Davey, a photographer, explained how he took a photograph of the Altered Will; it was taken January, 1889 (the "Altered Will," Respondent's Exhibit No. 3); the pinholes were made by pinning it against the wall for purpose of photographing; to his memory there were no pinholes in it when he photographed it; if there were any other pinholes in the paper they would be shown in the negative; when the paper was turned over to be photographed on the other side it had to be repinned. (See page 109, judge's notes.)

This pinhole evidence is esteemed of great importance by the counsel for contestants, and it may be well in this place to note his comments upon the significance of these minute perforations. He insisted in his summing up, that there were pinholes in that paper before it went to the photographers, as is shown by the paper itself, and they were *not* all made by the artist in photographing the paper; he thinks it no wonder that respondent's counsel squirmed and floundered in striving to explain away these phenomena, these little pinholes, that speak with mute eloquence, with tongues of fire that like living flames let in lurid light upon the iniquitous nature of the whole business, like molten lead poured through the corporal structure it exposed the entire nefarious transaction; these little pinholes, counsel for contestant contended, were of great significance and it was beyond the ingenuity of the most ingenious and skillful counsel to destroy the effect of such momentous evidence; these little pinholes are there to stay with all their consequences.

Thomas R. Knox, a shorthand reporter, officially connected with the courts, a pupil for a time of the deceased, who had frequently seen him write, was of opinion that the disputed documents were in the handwriting of Dama. (See pages 126–131 of judge's notes.) It may be worth while hereafter to deal with other portions of this witness' testimony than his opinion upon the handwriting, but in this place I do not care to more than indicate a possible future allusion to the abridgment of Knox's cross-examination on page 130, lines 3–18, judge's manuscript notes.

### The Views of the Court upon Expert Evidence.

I have striven to exhibit, in the foregoing epitome of expert evidence and counsel comment, the variant and opposing views entertained upon the same subject matter. There is an amusing, if aggravating, arrogation of absoluteness in judgment upon a proposition of which certainty is not predicable. Expert Hopkins is the only witness of his class who acknowledges himself liable to err in process or result. He, alone, thinks that he *may* be mistaken. Each of the others is cock-sure of the correctness of his conclusion. But all, differing as they do, cannot be right; and it is worth while to "consult the authorities" upon this vexed question of expert and opinion evidence as to handwriting. In Lawson's Work on Expert and Opinion Evidence, page 277, it is said that the strongest evidence of the genuineness of handwriting is the testimony of the alleged writer himself, and next to this comes the testimony of a witness who saw the very instrument executed ·and is able to identify it. The competency of such evidence is never disputed. But it is obvious that there must be other and different modes of proof—modes which must of necessity be resorted to when the former are not attainable and likewise whenever it is sought to contradict the testimony of the alleged writer, or that of the actual witness. By nature and habit individuals contract a system of forming letters which gives a character to their writing as distinct as that of the human face. In handwriting, as in other arts and in literature, "the style is the man"; and yet there are curious contrarieties. In determining the question of authorship of a writing, the resemblance of characters is by no means the

only test. The use of capitals, abbreviations, punctuation, mode of division into paragraphs, making erasures and inter-lineations, idiomatic expressions, orthography, underscoring, style of composition, and the like, are all elements upon which to form the judgment: See Taylor's Ev., sec. 1669 (sec. 1871); The Handwriting of Junius (Twistleton & Chabot's ed.); The Tichborne Trial, Charge of Chief Justice Cockburn (London ed.), vol. 2, pp. 762, 768, 774, 779, 783; Da Costa v. Pym, Peake's Additional Cases, 144; 2 Stark. Ev. (Metcalf's ed.) 515; Cowper's Works (letters), vol. 5, p. 217 (ed. 1836); United States v. Chamberlain, 12 Blatchf. 390, Fed. Cas. No. 14,778; Brooke v. Tichborne, 2 Eng. L. & Eq. 374, 5 Exch. 929; Reid v. State, 20 Ga. 681, 682, 683; 1 Whart. Ev., p. 656, note, and sec. 706; 1 Greenl. Evidence, sec. 58a. But see Waddington v. Cousins, 7 Car. & P. 595. For quotation from Cowper's letters, see Ram on Facts, 4th ed. (edition of 1890 is the copy I use for reference), page 69. "Manifold as are the points of difference in the infinite variety of nature in which one man differs from another, there is nothing in which men differ more than in handwriting; and when a man comes forward and says, 'you believe that such a person is dead and gone, he is not, I am the man,' if I knew the handwriting of the person supposed to be dead, the first thing I would do would be to say, 'sit down and write, that I may judge whether your handwriting is that of the man you assert yourself to be'; if I had writing of the man with whom identity is claimed, I should proceed at once to compare with it the handwriting of the party claiming it. For that reason I shall ask you carefully to look and consider the handwriting of the defendant, and to compare it with that of the undoubted Roger Tichborne, and with that of Arthur Orton": Tichborne Trial (Rex v. Castro), Charge of Chief Justice Cockburn (London ed.), p. 762; Buller's Nisi Prius, 326; Peake's Ev. 102; 2 Evan's Pothier on Obligations (3d Am. ed.), 156; Cowper's Works (letters), vol. V, p. 217 (ed. 1836). "Men are distinguished by their handwriting as well as by their faces; for it is seldom that the shape of their letters agree, any more than the shape of their bodies. Therefore the likeness produces the presumption that they are the same": Buller's

Nisi Prius, 236; 2 Evan's Pothier on Obligations, 3d Am. ed., 156. ''The general rule which admits of proof of handwriting of a party is founded on the reason that in every person's manner of handwriting there is a peculiar prevailing character which distinguishes it from the handwriting of every other person'': Strong v. Brewer, 17 Ala. 706, 710. ''The handwriting of every man has something peculiar and distinct from that of every other man, and is easily shown by those who have been accustomed to see it'': Peake's Ev. 102. ''Hours and hours and hours have I spent in endeavors, altogether fruitless, to trace the writer of the letter that I send, by a minute examination of the characters, and never did it strike me until this moment that your father wrote it. In the style I discover him—in the scoring of the emphatical words—his never-failing practice—in the formation of many of the letters, and in the adieu, at the bottom—so plainly that I could hardly be more convinced had I seen him write it'': Cowper's Works (letters), vol. V, p. 217 (ed. 1836). Conclusions drawn from dissimilitude between the disputed writing and authentic specimens are not always entitled to much consideration; such evidence is weak and deceptive, and is of little weight when opposed by evidence of similitude. The reason why dissimilitude is evidence inferior to similitude is that it requires great skill to imitate handwriting, especially for several lines, so as to deceive persons well acquainted with the genuine character, and who give the disputed writing a careful inspection; while, on the other hand, dissimilitude may be occasioned by a variety of circumstances—by the state of the health and spirits of the writer, by his position, by his hurry or care, by his materials, by the presence of a hair in the nib of the pen, or the more or less free discharge of ink from the pen, which frequently varies the turn of the letters—circumstances which deserve still more consideration when witnesses rest their opinion on a fancied dissimilarity of individual letters: Young v. Brown, 1 Hagg. Ecc. Rep. 556, 569, 571; Constable v. Seibel, 1 Hagg. Ecc. Rep. 56, 60, 61; Murphy v. Hagerman, Wright (Ohio), 293, 298; 2 Phillips on Ev. (Cow. & Hill's Notes), 608, note 482; Taylor Will Case, 10 Abb. Pr., N. S., 300, 312; Tome v. Parkersburg R. Co., 39 Md. 38, 93, 17 Am. Rep. 540.

It is held in Texas that the fact that comparison of handwriting has been permitted by statute does not make it any the less a feeble and unsafe kind of proof.

In a Michigan case it was said: "Everyone knows how unsafe it is to rely upon anyone's opinion concerning the niceties of penmanship. The introduction of professional experts has only added to the mischief instead of palliating it, and the results of litigation have shown that these are often the merest pretenders to knowledge whose notions are pure speculation. Opinions are necessarily received, and may be valuable, but at best this kind of testimony is a necessary evil. Those who have had personal acquaintance with the handwriting of a person are not always reliable in their views, and single signatures, apart from some known surroundings, are not always recognized by the one who made them. Every degree of removal beyond personal knowledge into the domain of what is sometimes called, with great liberality, scientific opinion, is a step toward greater uncertainty, and the science which is so generally diffused is of very moderate value." In another case, Mr. Justice Grier said: "Opinions with regard to handwriting are the weakest and least reliable of all evidence as against direct proof of the execution of an instrument. Generally, when the jury have acknowledged signatures for comparison, they can judge as well of the character of the disputed signature as if they had seen the party write a hundred or a thousand times. It is but an opinion formed from comparison simply. The witness compares with his remembered original —the juror has actual original before his eye. Tell a man that a person's name, with which he is acquainted, has been forged, and nine cases out of ten he will be astute enough to fancy he discovers some marks of it. If it be a good forgery, very few men are able to detect it; and hence other witnesses, not prepared beforehand to pronounce it such, will very truly say they would take it to be his signature. But there may possibly be such glaring marks of forgery on the face of an instrument as to condemn it, especially if proved by witnesses of doubtful character, and connected with other suspicious circumstances as to the persons and place where it had its origin, and these marks may be so strong and circumstances so convincing that a paper may be pronounced a forgery in

the face of the testimony of witnesses whose previous character cannot be otherwise impeached'': Turner v. Hand, 3 Wall. Jr. 115, Fed. Cas. No. 14,257. ''The evidence of the genuineness of the signature based upon the comparison of handwriting and of the opinion of experts is entitled to proper consideration and weight. It must be confessed, however, that it is of the lowest order of evidence and of the most unsatisfactory character'': Borland v. Walrath, 33 Iowa, 131. ''We believe that in this opinion experienced laymen unite with members of the legal profession'': Whitaker v. Parker, 42 Iowa, 585. ''It is so weak and decrepit as scarcely to deserve a place in our system of jurisprudence'': Cowan v. Beall, 1 McA. 221.

In the American Law Review (the old quarterly) for July, 1870, volume IV, pages 641-655, is an interesting article upon the Howland Will Case, which contains so much that is concurrent with my own independently formed views and experience that I refer to it.

It is for the extraordinary conflict of expert testimony demonstrating how completely scientific opinions may differ, that this case, after the interest awakened by the magnitude of the struggle has died away, will be most famous in the annals of the law. Here were three signatures of Sylvia Ann Howland: one to her will of 1862, Exhibit 1; one to each duplicate second page, Exhibits 10 and 15. That to the will was confessedly genuine. But it appeared upon superposing the other two over this that the covering was so exact, letter for letter, stroke for stroke—''10'' (duplicate ''second page'' given to the niece) somewhat closer than ''15'' (that kept by the aunt, and found in the trunk)—and that not merely this covering existing, together with identity of all the spaces between the letters and the words, but that the locality on the paper and the distance from the margins of the signatures so nearly coincided, that the defendants, supported by the opinion of some of the best experts in the country, were led to bring forward the theory that this extraordinary coincidence was not the result of chance, but of design. They claimed that these signatures had been forged to these papers by the complainant, by tracing upon the original signature to the will.

It was, a priori, beyond the bounds of probability, they argued, that this coincidence of precise covering could occur, in short, practically an impossibility; but infinitely incredible, that just the signature the plaintiff wanted should match the only one she had. They claimed that the signatures 10 and 15 bore in themselves marks of tracing, and produced a large number of bills of lading signed by the deceased, none of which, they claimed, bore the characteristics of the disputed signatures. This issue was fully and squarely met by the complainant's counsel. They answered that the idea that no two signatures could cover was false in theory and in fact, and they produced signatures of many well-known persons which they claimed covered better than the signatures of the deceased lady. They met expert by expert. Wall street and State street furnished their most eminent judges of handwriting to the one side or to the other. The rival "commercial colleges" sent presidents and representatives, each equally positive, and ready to support by oath the truth of their several opinions. The Coast Survey sent on from Washington one of its most eminent members, Professor Benjamin Peirce. The science of photography was exhausted in the variety and number of pictures of the disputed signatures. Recourse was had to the magnifying glass. Numberless exaggerated images of the words "Sylvia Ann Howland" were manufactured, and appear upon the files of the court in immense books of exhibits; and not merely of these signatures, but of the many which are claimed to cover as well as the disputed signatures, and of other signatures of the testatrix of the will itself, of the papers 10 and 15. Learned chemists were called, who gave their judgment of the ink. Skilled engravers, habituated in the art of tracing, pored over the strokes and curves of the letters. Harvard University contributes to the list of witnesses three of its most distinguished names. The most celebrated mathematician of the country is invoked, who states the doctrine of chances with a precision and solemnity that astounds the uneducated understanding. The learned physician, Oliver Wendell Holmes, so famed both in poetry and science, applies his microscope and gives his opinion. The naturalist, Agassiz, whose name on both continents is second only to Humboldt's, who, as he testified, began natural his-

tory as a child, and was still (1870) a student, gave his analysis with characteristic zeal and earnestness. The testimony of witnesses developed weeks of laborious preparation. Before they came on the stand many of these witnesses passed months in the closet, working sometimes ten hours a day, comparing, analyzing, photographing, magnifying, doing everything that science and experience could suggest to fit themselves to give a correct opinion. They produced the result of their labors in the elaborate magnified exhibits, which, bound in large volumes, are lasting proofs of their diligence and ingenuity. Not a curve in a letter, not a downstroke or an upstroke of the pen, not a dot of an "i," or a cross of a "t," or a waver of the hand, but what was subjected to the most searching examination under powerful microscopes; while essays were read upon the philosophy of handwriting in theory and practice. Page follows page of minute criticism of hair-lines, loops, curves, turns, body strokes, and so on, to utter weariness. Yet, after all, with what result?

No slur could be cast upon the integrity of any of these gentlemen. They had no interest in the result of the suit; their characters were above suspicion; truth was primarily their object. Did that old woman beyond the grave sign those two papers? On this side of the grave the niece alone knows. The niece says she did. But for this, if an untruth, she is to have millions. Can science give her the lie? So scientific men pore over these nine little words for many months. They apply to them the many instruments that the laboring brains of former scientific men have invented; and the scientific data of past years. Yet, with all this, they stand ranged on one side and the other, differing from and contradicting one another, not only on the main question of the forgery, but in a thousand more minute but still important particulars; equally confident of adverse opinions, until the brain of the unprejudiced reader of this mass of conflicting opinions swims with confusion, and he asks, What is truth? Thus the result of so much labor of experts—their skill, their ingenuity, their patience, their anxiety, simply demonstrates to the profession their inutility as witnesses in a court of justice. Fact is untrustworthy enough. Of a single occurrence, a hundred different accounts may be given in good faith by honest spectators.

But when we come to opinion, who shall state the limit of discrepancy, or dare to name the number of conflicting theories? Let it not be understood that it is desired to cast reflections upon science, nor upon the curious and ingenious means which it supplied—unhappily not for the elucidation of this case. Let anyone take the testimony of either one or the other side to this controversy, and he will marvel at the precision with which it was possible, by the resources of science, to supply the conclusions which were wanting to facts. Let anyone read only the evidence of the contestants, and, however little prone to moralize, he will wonder at the appliances of modern art which has detected, both by mathematical demonstration, and by an analysis of handwriting and chemical investigation very nearly amounting to mathematical demonstration, a hidden crime, and made it as patent as the daylight. This, he will say, is providential. No link is wanting. The discovery of the footprint, the trace of blood, bears no comparison to this. Hereafter, the curious stories of Poe will be thought the paltriest imitations, when real life affords such an instance of the detection of guilt by the unanimous testimony, not of eye-witnesses, but of bankers, photographers, writing-masters, mathematicians and naturalists. So positive is their testimony, so exact in its details, so nicely does one fact fit the other, and so curiously is each explained and reconciled, that the eye will almost see the forger holding to the window the genuine document, folding over it the spurious paper, wetting her pencil, and tracing the words, and then covering the pencil tracings with ink. But let the testimony of the respondent's experts alone be read, and the picture is wholly changed. The providential detections of science become unjustifiable slanders; it is the old woman who has traced, with trembling fingers, her fixed and formal autograph. The genuineness is beyond a doubt, and is patent upon a comparison with the aunt's former undisputed signatures. The signs of tracing are but the nervous trembling of old age; the curious covering, the not unusual result of writing from the wrist, in a cramped position, by an aged woman, unused for many years to write more than her signature.

Who, then, shall decide when such doctors disagree, or do more than review their testimony, and wonder, on the one hand, at its ingenuity, its research, and its elaboration; on the other hand, at its curious discrepancies, its multifold and manifold contradictions? (See, also, on same subject the American Law Register, Sept. 1890, pp. 553, 562.)

The system, as it now stands, of retaining an expert, is much the same as retaining a lawyer. Neither is under any obligation to devote his time, as is every eye-witness, to the party requiring his services. Both lawyers and experts have knowledge, skill and experience, which must be bought and paid for. It is in both cases their property, their capital, their means of earning a livelihood. A litigant, approaching the trial of a cause where expert testimony is required, secures the service of his experts much as he does his counsel. He takes their opinion, and if it is favorable to him (and what is most remarkable, it is almost always favorable to him), the experts are almost, if not quite, as much in his employ as his counsel. Honorable men, whether of the legal or other professions, go only to a certain mark in identifying themselves with the interests of their clients. But the expert not infrequently goes further than the lawyer. He is familiar with the preparation of the case; he is present at consultations; his own evidence is carefully prepared, and noted; his sympathies are enlisted; he acquires a belief in the justice of the side upon which he is called, and of the injustice of the other. Upon taking the stand, the counsel for his employer becomes his personal protector, that of the adversary his personal assailant; and the assailant of what are dearer to him, his favorite scientific theories. His opinions are turned and twisted, and subjected to a searching cross-examination. Perhaps covert imputations are cast upon his motives. He is unwilling to recognize the fact that he is to receive pay for his services. It seems to degrade him to acknowledge that anything but a love of truth induces him to testify; while, as a matter of fact, if truth only—or the reward of virtue, which the proverb gives—should be held out to him as an inducement to appear on the witness-stand, he would decline to be a witness. Properly enough, too, for he has a right to be paid for his time and skill. In short, he is in a false position. He wishes to appear

a judge. Circumstances have made him a partisan. No one can read the cross-examination of some of the experts without feeling keenly the defects of the present system. One of the witnesses, doubtless a perfectly fair-minded man, says, with a sort of shame (false it is thought), when pressed about the compensation that is honestly due him, that the "responsibilities of his situation forbid his giving his mind to it." The compensation of another witness has reached $1,000 in one case, and $500 in a second. (Howland Will Case.) But throughout the experts, when questioned, generally evade the question of pay, instead of frankly acknowledging that this is an element, and a legitimate element, in their services under the present system. As long as this lasts, the only true position for them to take is that of persons to whom a question of opinion has been presented, and who, having given a certain opinion, are retained by the parties in whose favor they have given it, to carefully prepare that opinion, with its reasons, and state it to the tribunal before which the case is tried, with as much freedom from prejudice in favor of their employers on other points of the case as poor human nature will permit. These remarks fit right into the body of expert and opinion evidence in this case. Experts should be considered and treated as advocates rather than as witnesses, and dealt with as I have undertaken to deal with expert Counsel Hyde in condensing his argument.

### Internal Evidences of Character of the Will.

In judging the internal evidence of the authenticity or falsity of the document in dispute, it is important to consider the property possessed by testator at the date of the Will and the disposition made of it and the purpose and object of the testamentary design. What property did Dama possess and own when he made the Will?

### Diodemus Dorn's Description of Dama.

Before proceeding in the attempt to answer this question, it may be well to take a view of the composite character of the man himself, as furnished by the evidence, and perhaps best stated in the description of the witness, Diodemus S. Dorn.

Mr. Dorn knew Luigi Dama very well, was intimate and friendly with him; had innumerable conversations with him on every variety of subject from the North Pole down; Dama spoke to Dorn about his family and property; Dama was by nature a miser; he was formerly an opera singer; when he came to America he taught vocal music; he wanted to marry one of his pupils, the lady whom he did afterward marry, but she married someone else, as they often do, a wealthy man in the south; her husband died, and Dama renewed his attentions, and she, having had more experience, accepted him; Dama often went over his affairs to Dorn and liked to dwell on the details of his property; she was the financial member of the firm; Dorn drew several Wills for Dama, who was a kind of a crank on the subject of Wills; Dorn drew one for him in 1885; it took them about a year to draw that Will; Dorn could not recollect when the second Will was drawn, but it was about the time Dama went east; the last conversation Dorn had with Dama was a week or two before he died; Dama sent for Dorn, who used to joke a good deal with him about his pupils, and on this last occasion Dama spoke of Mrs. Smith; Dama was a very sarcastic man, and he compared her voice to that of a cow in a cornfield; he also spoke of Miss Belle Harris' voice; on another occasion when Dorn called again subsequently Dama spoke of the Will that Dorn had drawn and said that it was in the Safe Deposit Company; Dama asked Dorn if it was all right, and Dorn replied that it was if it had been properly executed and duly attested; all the Wills were pretty much the same; an institution in Italy, the "Stabilimento dell' Annunziata, Naples," was the beneficiary of the bulk of his property; this was a musical institute, as Dorn understood; Dama often said that he was a Catholic, and the man that was born a Catholic always died a Catholic, and although he did not share in the prejudices of the church against secret societies, yet he left something to a friend in Italy, an intimate Italian friend, who would make provision for masses for the repose of his soul; in the Wills drawn by Dorn the Reverend Joseph Worcester and Columbus Waterhouse were named as executors; Dama was very much attached to the memory of his wife; he always kept fresh flowers under her picture; he left two lots in Red-

wood to Reverend Mr. Worcester for the benefit of his church, of which decedent's deceased wife had been a member; Dorn made four drafts of Will for Dama; two about 1885, which he submitted to Dama; this was before he went east; afterward, when Dama returned, he felt more kindly toward his wife's family in the east, and Dorn drew another Will in which Dama made a small bequest to them, and also to Miss Harris; each time Dorn drew a Will for Dama the latter went over everything he had and very frequently at other times. Dama was a man who was very cynical—not cynical but sarcastic—and made many remarks concerning his pupils and their powers and capacities; he spoke of Mrs. Smith as having no vocal power or capacity.

### What Property did Dama Own at Date of Will?

To return now to the question of the property possessed and owned by Luigi Dama at the date of the alleged Will, May 8, 1887. It is asserted by counsel for contestants that Dama never owned exactly eleven government bonds; at the time of making the Will only $5,000 in bonds and before he had thirteen $1,000 bonds; it is claimed by contestants that the person who forged the Will slipped up on this point, as he did on some others; the forger knew he had bonds of this kind, but did not know the exact figures. Is it possible, queries counsel for contestants, that a man of Dama's intelligence would attempt to dispose of property he did not own? Or that a man of integrity would write down a deliberate lie in so solemn a document? This is a very important factor in determining this issue of forgery. This provision of the alleged Will challenged attention by reason of its inaccuracy and nonexistence, wherein he undertook to give what he did not possess; it is inexplicable, contends the counsel for the contestants, why he should have attempted to bequeath what he did not own, upon any hypothesis consistent with his mental competency. Dama knew very well, no man better, what he owned and what he did not own, and this vain bequest cannot be explained away on the ground of the testator's idiosyncratic character. Was it a vain bequest. Did he possess or own on May 8, 1887, eleven (11) government bonds

of the United States of America, nine of one thousand dollars each ($1,000) and two of five hundred each ($500), as described in clause Fourthly of the alleged Will, and in clause Fourthly of the "Altered Will," November 1, 1885, in the same terms? These are described in the same way in the "Long Memorandum," Respondent's Exhibit No. 2.

Let us trace the history of these bonds, deemed of determinative influence in this controversy by the contestant's counsel.

### The History of Dama's Bonds.

According to the evidence of the Boston Maverick National Bank officers, as developed in their depositions, there were sold to Benjamin Randall United States bonds of the par value of $11,000, as follows:

> $2,000, April 22, 1880;
> 2,000, October 30, 1880;
> 2,000, March 2, 1881;
> 1,000, March 12, 1881;
> 4,000, May 12, 1882.

These bonds were in denomination and number as follows: Nine $1,000 bonds, numbered 41,767, 59,792, 84,021, 56,282, 95,947, 88,901, 2,838, 8,777, 107,255, and four $500 bonds numbered 14,525, 1,875, 16,111, 14,737. These bonds are the same numbers purchased by the bank from Luigi Dama May 18, 1885, as appears from the original entries of the transactions on the books of the Maverick National Bank, in payment for which the bank gave its check in favor of Dama No. 7,237 for $13,500, payable at Anglo-Californian Bank, San Francisco.

It appears also from the same source that on May 29, 1885, the Maverick Bank purchased of Luigi Dama $6,000 par value N. O. Jackson and Great Northern R. R. bonds, numbered 565, 566, 567, 568, 569, 570, six bonds; and on the same last-mentioned date he bought of the bank $6,000 par value United States bonds five $1,000 each, numbered 67,167, 85,942, 69,581, 7,711, 6,522, and two $500 bonds numbered 14,524, and 25; on the 10th of June, 1887, Dama sold to the same bank one $1,000 United States bond, numbered 85,942, of the same lot purchased by him May 29, 1885; these constituted all the transactions between Luigi Dama and the Maverick National Bank,

according to the depositions of Starr and Kelsey, officers of the said bank, witnesses examined on behalf of the respondent. Now, let us examine the evidence of Benjamin Randall, a witness for contestant, in his answer to the twelfth, thirteenth and fourteenth direct interrogatories, as to the contents of the box of Luigi Dama in the Safe Deposit Company of Boston in 1887. Benjamin Randall says that he "knew exactly," because everything that was put into the box was put in in his presence by Dama, and Dama never went to the safe deposit vaults except in Randall's presence; Dama came to Boston in 1885 and returned to California in the fall of that year, came back to Boston in 1887 and returned west in the summer of 1887; the contents of the safe deposit box in 1887, depones Benjamin Randall, were $5,000 in government bonds, four of $1,000 each and two of five hundred dollars ($500) each, two bonds of the Burlington and Missouri Railroad, one N. O. Jackson and Great Northern R. R. bond; two articles of jewelry which Dama had obtained permission to keep from his wife's sisters, the gift to his deceased wife by her former husband, a ring and a bracelet with portrait of her first husband, Mr. Haynie; a locket of Mr. Dama's, and some diamond studs, and some other articles of jewelry; these were the principal part of what was contained in the safe deposit; there were *not* nine bonds of $1,000 each and two of $500 each; there were four $1,000 each and two $500 each; but on May 1, 1885, there were nine government bonds of $1,000 each and two of $500 each; Dama was not the owner of those bonds in 1887, there were *not* then nine $1,000 bonds, he was the owner of four; in 1885, 1884, and 1883, he was the owner of the nine; on May 18, 1885, Benjamin Randall with Mr. Dama, at his direction and in his presence, sold *five* of those bonds to the Maverick National Bank, together with six of the New Orleans, Jackson, and Great Northern Railroad bonds, each of a thousand dollars denomination, for which they received $12,600, to which Randall depones that he added personally about $900, making $13,500 received for those; Randall received for that a check number 7237, signed by J. Work, cashier, payable to Luigi Dama, which Dama indorsed to Joseph Worcester and Randall inclosed it in a letter and sent it by registered letter to Worcester; $990, was the

amount of cash Randall gave; in 1885, Randall testifies, that Dama was possessed of seven N. O., Jackson and Great Northern R. R. bonds, of $1,000 value each; also of nine government bonds of $1,000 each and two of $500 each in addition to the Burlington and Missouri.

Now, if Randall be right, and he certainly is precise and positive, Dama retained six United States bonds in 1885, having sold five of $1,000 each to the bank, leaving four of $1,000 each, two of $500 each, equal to six bonds, and these were in the safe deposit box in 1887.

It is difficult to square this testimony so as to make out Luigi Dama the owner of eleven bonds, or $11,000 in bonds, on November 1, 1885, or on May 8, 1887.

It is certain that Dama possessed on the 18th of May, 1885, thirteen United States bonds aggregating in par value $11,000, which on that day he sold across the counter to the Maverick National Bank of Boston for $12,395.62, aggregate market value.

This evidence comes straight from the books of the bank. The bank officers say they gave a check numbered 7237 for $13,500 in payment; but it does not appear from their testimony how the difference between $12,395.62, and the amount of the check was made up. This difference would be $1,-104.38.

Benjamin Randall testifies that on that day he sold in the presence and by direction of Dama five United States bonds of the par value of $1,000 each, $5,000, and six R. R. bonds of $1,000 each, $6,000; for which they received $12,600, and that he, Randall, made up the difference, represented by the check numbered 7237 of $13,500, which was transmitted to San Francisco to Rev. Joseph Worcester and the proceeds invested in the Jackson street property.

The books of the bank show that the R. R. bonds were sold by Dama on May 29, 1885, and that on the same day he bought from the same $6,000 in United States bonds in seven pieces, five of $1,000 each and two of $500 each.

These R. R. bonds are those that Benjamin Randall testifies were sold on May 18, 1885. Randall knew "*exactly* everything that was put into the box because it was done in his presence by Dama, who never went to the safe deposit

vaults except in his presence." Dama left Boston for California in the fall of 1885. The "Altered Will" and the "Long Memorandum" are dated at San Francisco, November 1, 1885, after his return from Boston. At that date, according to the depositions of the bank officers, he had disposed of all of the government bonds which he owned on May 1, 1885.

According to Randall, who knew everything "exactly," Dama had at that date four $1,000 bonds and two $500 bonds of the original acquisition still in the safe deposit box. According to the books of the bank he did not sell the R. R. bonds until May 29, 1885, which Benjamin Randall states were sold on May 18, 1885. According to the books of the bank Dama bought $6,000 in U. S. bonds on May 29, 1885, in seven pieces, five of $1,000 and two of $500 each, of which transaction Benjamin Randall appears to have known nothing, nor of the subsequent sale back to the bank on June 10, 1887, of one $1,000 bond.

It is clear that on November 1, 1885, and on May 1, 1887, Dama did not own either $11,000 in par value of government bonds nor eleven bonds, nine of $1,000 each and two of $500 each; but he did own at those dates seven government bonds, five of $1,000 each and two of $500 each. It is plain that, as between the entries on the bank books and the testimony of Benjamin Randall, we must accept the evidence of the former and conclude that Randall errs in recollection as to the transaction of May 18, 1885.

At the date of making the alleged Will, May 8, 1887, he held only the bonds purchased on May 29, 1885, described in the depositions of the National Bank officers, one of which bonds for $1,000 he subsequently, on June 10, 1887, sold back to the bank, leaving at his death in the safe deposit box six bonds, four of $1,000 and two of $500 each, all bought by him on May 29, 1885; he had none of those acquired in 1882, all of which he sold in 1885.

It does *not* appear clearly that he ever owned precisely eleven bonds; of the first lot there were thirteen in number, $11,000 in par value; and yet Randall says that Dama owned in 1885, 1884, and 1883, eleven bonds, just as they are de-

scribed in the "Altered Will" and "Long Memorandum" of November 1, 1885, and the alleged Will of May 8, 1887.

Whatever may be the effect upon the general result, the fact would seem to be at variance with the statement in the disputed documents, that at their respective dates there were in the safe deposit at Boston eleven government bonds, nine of $1,000 each and two of $500 each. Dama had some bonds, but not the amount described in the disputed documents. It was not entirely a "vain bequest," but it was a singular misdescription of what he had, as well as an omission to note the railroad bonds that were remaining in the box.

### Dama's R. R. Land Transactions.

Turning now to the provision in clause Sixthly of the alleged Will, in which the testator undertakes to dispose of the railroad land: "Four deeds of land bought from R. R. Co. of one hundred and sixty acre's each paid one-fifth by myself Luigi Dama." It appears by the evidence of Jerome Madden, land agent of the Southern Pacific Railroad Co., that on February 5, 1885, Dama purchased 640 acres; February 24, 1885, 80 acres in Fresno; he paid twenty per cent (one-fifth) of the purchase price; Madden had only two transactions with him as indicated in the books but never came into personal contact with him; Dama paid the last interest, according to the books produced by Land Agent Madden, on February 11, 1886. (See judge's manuscript notes of testimony, pages 49, 50.)

William T. Cummins testifies that he had three unfinished contracts for railroad lands with Dama for 680 acres when Dama died. (See judge's manuscript notes of testimony, page 73.) Upon the cross-examination of this witness he testified that shortly after Columbus Waterhouse was on the stand in this case in the fore part of December, 1890, witness called upon him at his office and told him that he would like to get all the light he could on the subject and called upon him for that purpose. Cummins told him that his brother Adley, then recently deceased, had said that French and Burtis having got hold of the papers Smith was afraid they might get hold of some other paper, and for that reason employed French from such fear; he did not recollect

that he said that the testimony of Waterhouse made such an impression upon him that he believed now that the Will was a forgery, nor that he said to Waterhouse at that time in December, 1890, that if that Will was a forgery they had murdered his deceased friend, but he may have said it, and he does say it now (February 19, 1891). Witness Wm. T. Cummins admitted having stated in his own house that the fact that four deeds of land which Dama did not own were included in the Will was sufficient evidence to his mind that it was a forgery, but he made this remark because of the persecution to which he had been subjected for years in his own household, to secure relief from domestic dissension. It appears that Dama had sold and assigned the original 640 acres early in 1885.

Wm. T. Cummins testified that Professor Dama did not know anything about the lands for which he had contracts; Dama depended entirely on Cummins. This would appear to be the fact from the contracts themselves and the copies of correspondence furnished by Cummins and in evidence and on file herein. The friendship of Cummins was clearly coincident with forty per cent of the profits on the land transactions into which he let his deceased friend Dama; and in this respect the contracts filed herein speak for themselves. Dama was dabbling in land speculation for years through Cummins, entirely dependent on the latter, it would appear, and if he did not possess the exact number of acres indicated in the Will at the time of its date he had at least that amount.

These points just adverted to as among the internal evidences of the character of the alleged Will are conceived by contestant's counsel to be the projecting and positive points, the natural projections that stand out as monumental manifestations of malefaction in the manufacture of this probated paper, and these points, coming from the testimony furnished by the proponent and respondent, are so convincing that the contestant's counsel think that upon them they might rest secure of success in this contest. But important as these points may be in the cogent contention of counsel for con-

testant, it is possible to explain them if otherwise they be not found inconsistent with any theory contrary to that advanced by the counsel, who contend that what they call these "extraordinary provisions" were a mistake upon the part of the alleged forger, who erred· in thinking that Dama owned the bonds and the four quarter sections of railroad land which he had long before sold and conveyed by deeds of conveyance; counsel claims that this is one of the most damning provisions of this disputed document—enough of itself to condemn it (see judge's manuscript notes, page 257)—but this censure is too strong, unless other circumstances conspire to justify it.

### The Rationale of the Bequest to Mrs. Smith.

It is claimed by contestant's counsel that the clause in the Will giving all of his property to Mrs. Sara Barker Smith "for the purpose of further study and development of her vocal organs and cultivation of her voice" is so absurd in its nature as to be itself enough to condemn that instrument; the preposterous idea of expending the assets of the estate in the vain pursuit of a voice at her age was held up to ridicule by counsel, who asserted that no one can read that clause without coming to one of two conclusions—either that Dama was an idiot or that he was the quintessence of absurdity.

I have undertaken to present·a view of Dama as described by Dorn, and it may be well here at the expense of some repetition, and in connection with the censorious comment of counsel for contestant upon the whimsical character of this clause of the alleged Will, to take another observation of the decedent, as he appeared to the witness Worcester and to some of the counsel in this case.

Counsel for respondent insist that it is not for them to account for the peculiar provisions or the eccentric conduct of the decedent in making this Will, for the contestant's counsel themselves say that Dama was an odd and eccentric man, and it is neither possible nor necessary for respondent

to account for this manifestation of his eccentricity. Dama began his experience with Wills with a bitter and painful disappointment in failing to secure the probate of his wife's Will through a trivial technicality in the omission of a date; this made him, in the language of D. S. Dorn, "a kind of a crank on the subject of Wills," and he had reason to feel embittered toward the Randalls for their taking advantage of this technical omission and disregarding the desire so solemnly expressed by his wife that the property derived by her from him should return to him. Dama evidently felt very keenly this treatment, and so frequently expressed himself (see letter of Columbus Waterhouse to Dama, Respondent's Exhibit No. 32, dated San Francisco, June 17, 1885, to Luigi Dama, East Boston, Massachusetts), and at that time his feelings toward the respondent may be judged from the letter to her dated Chicago, May 14, 1885. This does not accord with Mr. Dorn's statement that after Dama's return from the east he felt kindlier toward the Randalls. Respondent claims that it is shown here by the evidence that Dama's feelings toward the Randalls were still unchanged after his return from the east, and this inference of error on Dorn's part is borne out by the testimony of Reverend Joseph Worcester, a gentleman whose character for veracity cannot be questioned. Mr. Worcester says that when Mr. Dorn spoke to him about a Will he inferred it was one that must have been executed about two years prior—that is, in 1885. Mr. Worcester is a Swedenborgian minister, a resident·of San Francisco for upward of twenty years; he knew Luigi Dama for about fifteen years; he purchased the Jackson street property for him in 1885, at the time Dama was in the east. Dama made repeated trips to the east; the bonds he had in Boston he disposed of to pay for that property, and he sent to Mr. Worcester the full purchase price, $14,500, the proceeds of the sale of the bonds. Mr. Worcester describes Dama as a careful and particular man, a close man to the world, but liberal where he took a fancy. Mr. Worcester learned of Dama's death the day he died, about noon, Friday, January 20, 1888, from Miss Belle Harris, who told him in the professor's house, where Mr. Worcester had gone to see him when Dama was

sick, and he was there on such a visit when he was told of the professor's death. Mr. Worcester was told by D. S. Dorn that he was an executor in a Will that Dorn had drawn for Dama. Mr. Worcester went to lawyer French's office on Saturday, January 21, 1888, between 3 and 4 o'clock in the afternoon; previous to that hour Mr. Worcester went to the professor's house as a friend to see about his burial. When he went to Mr. French's office there was nobody there that he knew. He was told that Mr. French would be in later; he went out and after a while returned and found there Mr. French and Mr. Burtis. When Worcester went in French was engaged talking with some one and he motioned to Worcester to go into the inner office and he did so and found there Burtis. Worcester told French that he was informed that he (Worcester) had been named executor in a Will of Dama's that might be his last one. French then told Worcester that he had been out to the city hall and had had a special administrator appointed and that Burtis was the person so appointed. It was then suggested that they go to the safe deposit, where there might be found a Will, and the three proceeded to that place. The letters of special administration were presented, and they were conducted to Dama's box. Mr. Worcester could not recollect who applied the key to the box, whether it was Mr. Burtis or the man in charge. The papers were withdrawn from the box and taken to the light where they could be examined; this was on Saturday, January 21, 1888. The papers were taken out and opened. Mr. Worcester went there as a named executor in one or more previous Wills. He had never seen any previous Wills, not even a memorandum. His relations with Professor Dama were both social and intimate; their acquaintance came about through Mr. Worcester's previous and long acquaintance with Mrs. Wealthy B. J. Dama. He had known her and her family in the east, where she was a member of his congregation in the "Church of the New Jerusalem," and she was also a member in San Francisco. Mr. Worcester had seen Mr. Dama write frequently, but was not a close observer, he might identify it, but not with certainty sufficient to satisfy his own mind if there were no doubt thrown upon it. When the paper was taken from the safe

deposit box, the "Short Memorandum" (Respondent's Exhibit No. 1), Mr. Worcester accepted it as Dama's handwriting. The question arose at once as to who was Mrs. Smith. Mr. Worcester remarked that he did not know her, Burtis expressed ignorance of her identity, and French also. Nothing more was done or said then; the papers were done up and put back. He was not sure about the "Short Memorandum"; he had no recollection, and he could not identify Respondent's Exhibits No. 9, Deed of C. E. Royce to Dama, No. 11, Deed of Solomon Sweet, No. 12, Abstract of Title, No. 55, Agreement of Sale Phelps Real Estate; there were papers similar in appearance, but a thicker bundle. Mr. Worcester was at the safe deposit with French and Burtis but once, and that on the occasion specified. Mr. Worcester's impression was that they examined the papers by daylight; it may have been by gaslight. It was about 5 o'clock of a Saturday afternoon, on the 21st of January, 1888. Mr. Worcester was with Professor Dama when he rented the box at the safe deposit; he introduced Dama there. Worcester did not know until lately that Dama had a substitute who could go to the box. He supposed that Columbus Waterhouse was the substitute, but recently, since this trial began, Mr. Worcester had been told that he himself was the substitute, but he never had a key to the box. (Judge's manuscript notes of testimony, pages 47, 48, 86, 89.)

Witness Worcester wrote to Benjamin Randall a letter on the 23d of January, 1888 (Contestant's Exhibit G-33). He had a conversation with French after receipt of telegram from Randall on that day. He asked him who the executor was and French declined to inform him. When he went to French's office Worcester stated to him that he had been informed by Mr. Dorn that he (Worcester) was in one or more of the Wills made by Dama coexecutor with Columbus Waterhouse, and that as Waterhouse was absent from the city he must act. French said that he had obtained from the court the appointment of a special administrator and that presently they were going, he and Mr. Burtis, to the safe deposit to examine the papers. The three went there. Mr. Worcester saw no one break the seal, he saw the papers withdrawn, but recalled only one, the "Short Memorandum,"

or Respondent's Exhibit No. 1. After the reading of that paper Mr. Worcester felt himself discharged. The first time Mr. Worcester learned that Burtis was appointed special administrator was when he went to Mr. French's office; Mr. Worcester had a conversation with Mr. French at Halsted's undertaking establishment on Sunday, January 22, 1888. French told him he had seen the Will, but Worcester could not recall what he said upon that occasion. Worcester received a letter from French notifying him of the time of the funeral. He was not requested to officiate at Mr. Dama's funeral. Mr. Worcester could not recall who made the suggestion that he should officiate at the funeral. There were present Mr. French, Mr. Burtis, Dr. Brigham, the undertaker or his assistant, and the two ladies, Miss Harris and Mrs. Waterhouse. The suggestion may have proceeded from the latter or either of them. Worcester did not directly decline, but simply turned the suggestion aside. (See pages 89, 90, 91, judge's MS. notes.) There was a general conversation at the professor's house on the Friday evening in which Mr. French and Mr. Worcester took part, also Mr. Burtis, Dr. Brigham, Miss Harris, Mrs. Johnson, the undertaker, and perhaps others. Dr. Brigham said that if the body was to be embalmed, the sooner the better. Mrs. Columbus Waterhouse may have spoken of the embalming, she was present. All of his pupils and friends knew of the professor's wishes in that regard. When Mr. Dorn spoke to him about a Will, Mr. Worcester inferred that it was one that must have been executed about two years prior. (See page 48, judge's manuscript notes testimony.) When Mr. Worcester went with professor Dama to the safe deposit it was several years ago, after the death of Mrs. Dama in 1883. Mr. Worcester thinks he may have been a little precipitate in assuming at the time he was with French and Burtis at the safe deposit that he was not executor, but when no Will was found and the memorandum referring to papers in hands of a person whom he did not know, he felt that he was discharged of any duty and that he had no further business there. (See page 91, judge's manuscript notes testimony.) Mr. Worcester had no recollection of visiting the safe deposit vaults as testified to by Mr. Curtis, superintend-

ent of the safe deposit (who said that Mr. Worcester called
the next morning after Dama died between half-past 8 and
9 o'clock, just as Curtis was going off watch, Worcester called
for a special purpose according to the information received
by Curtis. See page 102, judge's MS. notes testimony).
Mr. Worcester says that it is entirely unlikely that he made
this visit, for his habit was to remain at home until 10 o'clock
in the morning, unless some especial reason exist for going
out before that hour; but this habit was not invariable and
it is possible for him to have gone out on some occasion
and then forgotten it. (Judge's manuscript notes testimony,
page 164.)

### Dama's Character and Environment.

That Luigi Dama was a quaint exotic there can be no doubt.
In the language of Counsel Russell J. Wilson, Dama was an
eccentric old Italian music master, with a vein of cynicism, yet
not altogether out of touch with nature, surrounded by self-
seekers and self-servers expectant to be made the beneficiaries
of his bounty, while he himself was always looking for a friend
and ever mourning his deceased wife, for whom he entertained
an extraordinary affection and whose nature and character he
portrayed in striking contrast to that of her relatives, the Ran-
dalls. He had no one to open his heart to; he never wrote
to any of the family to let them know, because their nature
was so different from his wife (see letter to Mrs. Gibbons,
March 7, 1884, Respondent's Exhibit 34). Two years after
this letter he wrote to Jennie Forbes (March 28, 1886, Con-
testant's Exhibit C—3), that the reason he did not write
often was that he lived in a state which nobody could realize;
he had no pleasure to live, no amusement, no friends who
could relieve his sorrow—a state of mind which he could not
tell. Sometimes he was in the mood to take his own life
and go to join his dear beloved one, the only one which he
felt the pure divine love in this world. She was everything
in this world for everybody, and the angel, and consolation,
and guide of all. His feelings did change toward Columbus
Waterhouse, as appears from his letter to Benjamin Randall,
December 25, 1886 (Contestant's Exhibit 1—9), in which he

spoke of having stopped altogether calling at his house, giving the reason therefor.

### Inception of Dama's Attachment for Mrs. Smith.

Now, it is said that at about the time that Dama underwent a change of feelings toward his deceased wife's relatives, the Randalls, he became more friendly toward Mrs. Sara Barker Smith, the respondent herein. He became attached to her and warmly interested in her welfare, and felt proper resentment toward the Randalls for having through technicality taken from him what his wife's Will devised, and there is no doubt that he suffered a change of heart toward Columbus Waterhouse, although he may have dissembled in his presence. There is ample evidence in the record that Dama was a dissimulator, and he practiced upon Columbus Waterhouse as he did upon other pupils, "most of whom were there for their health," according to the evidence of Mr. Waterhouse. What were his feelings towards Mrs. Smith at that time? The letter from Chicago, May 14, 1885, shows appreciation of her kindness toward him, and is a gauge of friendly feeling (Respondent's Exhibit No. 97); his feelings were then and remained friendly toward Mrs. Smith. In that letter he expressed a hope that she would remember to not sing at all and enjoy the summer vacation, and let the voice rest and let nature act and gain more power, so that on his return there would be no trouble at all and they would begin to work in the art of the use of the voice.

### Was Dama Sincere in Regard to Respondent?

If he was sincere in this expression it cannot be said, as counsel for contestant contend, that the purpose of the bequest was a burlesque on common sense, or that there was no basis for such a legacy, nor that this bequest alone, because of its absurdity, establishes the proposition that the alleged Will is false and fraudulent in its conception and concoction. This letter showing faith in her vocal capacity was dated May 14, 1885, and the "Altered Will" was dated November 1, 1885, so that, assuming the authenticity of the

latter, there was some reason for the bequest at that date. Counsel for the contestant deride the object of this bequest and say, with some show of sarcasm, that if we listen to the witness, Mrs. Helen Cushman, it was the great object of Professor Dama's ambition to make of Mrs. Smith the great exponent of his theory of voice culture.

### What was Dama's Theory of Voice Culture?

He was alone in his views; he had studied medicine and surgery in order to ascertain accurately the anatomy of the throat, to more thoroughly treat his pupils and enlarge their vocal power; he believed in no other system; he taught that all other teachers were impostors, and that the money they exacted for teaching was extortion; that they were not versed in the true science and art of vocal development, and that he alone knew it all. It is not reasonable to believe, urge counsel for contestant, that such a man, with so strong and invincible a prejudice against other teachers, would bestow his fortune upon a woman with a voice of so light a volume and limited a compass. for the purpose of enriching those whom he considered incapable of imparting instruction according to the only true method, his own unique system.

Mrs. Sara Barker Smith did not have the natural conditions to make a singer, nor did Professor Dama believe that she could ever make a singer, because she had natural inherent defects, as he said to Dorn and others, and so we have it, quoth counsel for contestant, that the more we study Clause Sixthly of the alleged Will, the more we view it from every side, the more absurd does it appear; it turns the whole case to ridicule, and it is too great a tax upon credulity to believe that a court accustomed to consider and construe questions of this grave character will accept seriously this absurd clause as an authentic creation. It never emanated from the hand or brain of Luigi Dama; but, say the counsel for respondent, the purpose of his bequest to Mrs. Smith was reasonable in itself and characteristic of the testator, who was inclined to give a reason, no matter how whimsical; but this was not whimsical—it was according to his theory of voice culture and progres-

sive development; and this sharp attrition of argument of opposing counsel brings us to the consideration of the testimony of Mrs. Helen M. Cushman, a witness for the proponent and respondent, who was also a witness on the original probate, March 27, 1888.

## Mrs. Helen Cushman.

Mrs. Cushman is a resident of Alameda, who confesses to half a century of life. She came to California in 1871, the year of the Chicago fire. She lived at one time for four years teaching in Janesville, Wisconsin, at Miss Scribner's Young Ladies Seminary, where Mrs. Sara Barker Smith, then Miss Sara Barker, was a pupil. She knew Julius P. Smith, who is now Sara's husband. She taught Sara piano and vocal culture. In this state Mrs. Cushman has been employèd as piano and organ teacher; taught at Benicia Seminary, and also at Mills Seminary, and has been playing the organ in different churches and is now engaged in the town of Alameda. Her first husband's name was C. C. Cushman (he is now dead), and her second was J. W. Yarndley, from whom she was divorced. Mrs. Cushman knew Professor Luigi Dama quite well; made his acquaintance in 1877 and formed the acquaintance of his wife at the same time. She had heard of him as a successful treater of clergyman's sore throat and called upon him to learn of his system, as she had a chronic sore throat trouble herself and was always ambitious to learn something more of voice culture. She took lessons of Dama for four years; her husband (Mr. Yarndley) also took lessons. Mrs. Cushman introduced Mrs. Sara Barker Smith to Professor Dama. One day Mrs. Smith said to Mrs. Cushman that she wished she knew a good teacher of vocal culture and Mrs. Cushman said that she knew just the man, and she took Mrs. Smith to the professor's house and he tried the voice of Mrs. Smith; it was a mezzo or a medium voice. He said there were great possibilities in it, more than Mrs. Cushman understood. Dama said that Mrs. Smith might become a great artist, she had a very sweet voice. Mrs. Cushman took lessons, three or four a week about that time. Mrs. Smith was also then taking lessons at a different hour. The professor and Mrs. Cush-

man had many conversations about the character and quality of Mrs. Smith's voice and the prospects of her making a singer. This was in 1884. Dama told Mrs. Cushman of Mrs. Smith's ability to become a dramatic artist and a great singer. In one conversation particularly, in which Mrs. Cushman criticised Mrs. Smith's rendering of a song, the professor said that the critic knew very little about it, that Mrs. Smith had the making of a great artist, and that if his life were prolonged they should see what he could do for her. After Mrs. Smith took lessons for a while Mrs. Cushman noticed great improvement in her voice. The professor always treated Mrs. Smith with great respect and courtesy, and in the time of flowers he always had for her a little bouquet, but not any for Mrs. Cushman. The professor sometimes dined with the Smiths; Mrs. Cushman was there often. Dama came early and they always had "a little sing" before dinner. Mrs. Cushman knew Dr. Tisdale for four years and was very well acquainted with him and his family. She recommended him to Professor Dama, because she had confidence in him as a reputable physician. Mrs. Cushman also recommended Mrs. Fannie Johnson as a nurse, because she thought her to be just the person for the purpose; she felt interested in Mrs. Johnson because she seemed to be superior to her station, and she felt sorry for her and sent her with a letter to Professor Dama and stated the amount of pay—twenty dollars per month and board for herself and little girl—and Mrs. Johnson went over to San Francisco from Alameda and was engaged by him. Mrs. Cushman attended the funeral of Professor Dama. Her first notification of his death was by a letter from Miss Harris; she had no other notice from anyone else. She was one of Professor Dama's warm friends; she was also a very dear friend of Mrs. Smith, who first told her that she was the custodian of the Will two days after it was opened. Mrs. Smith told her that she was greatly surprised by the contents of the Will, but Mrs. Cushman was not surprised, because Professor Dama was so eccentric in his ways and methods of life. Mrs. Cushman could not remember how often the professor presented Mrs. Smith with flowers, but he never gave any to Mrs. Cushman, although she was such a "warm friend," but she did

not feel aggrieved at this slight; she did not think anything about it. They were very inferior roses that grew in his garden. Mrs. Smith sometimes took them home, sometimes gave them away, or threw them away. The professor would say, "I present you a few flowers"; Mrs. Smith would say, "Thank you." Mrs. Cushman knew of no reason why the professor was more demonstrative to Mrs. Smith than to her, except that Mrs. Cushman was older and she did not look for any gallantries. Professor Dama had great hopes of Mrs. Smith that she would extend his theory, which he could not have had in Mrs. Cushman's case. When Mrs. Smith threw the roses away she said that she did not know what to do with them as they were troublesome when they were shopping.

### The Flower Bouquet Incident.

This incident counsel for contestants considers of inferential importance, and says that if Mrs. Smith should prevail in this court upon this false paper we shall see many documents of this description propounded for probate, for there are many other Mrs. Smiths in this world, millions of such women, hypocrites and traitresses, false to the memory of their friends, betrayers of benefactors, and hollow in their hearts, as she proved herself when she took his little gift of flowers plucked from his uncultivated house garden, given to her with such grace and feeling, and threw that graceful tribute on the pavement to be trampled upon by street-walkers, and footpads—trivial as this incident was, it betokened her false and hypocritical character; but it is attaching too much importance to this act to hinge upon it the issue of so grave a controversy. It illustrates the kindness and courtesy and preference of Dama when he bestowed a little faded flower, "a very inferior rose," according to Mrs. Cushman, who was not so favored, upon a lady pupil, who did not care to pack it in public, but it does not prove nor tend to prove her a felon.

### The Respondent, Sara Barker Smith.

We come, now, to the consideration of the testimony of the respondent. Mrs. Sara Barker Smith has resided in Cali-

fornia since 1874; was married in Edinboro', Erie county, Pennsylvania; born in Lewis county, New York; wife of Julius P. Smith; thirty-nine years old; studied music first in Janesville, Wisconsin, at Miss Scribner's Academy for young ladies; first lived in California at the Grand Central Hotel in Oakland, afterward at the Palace Hotel in San Francisco, then took house on Clay street; in 1881 she and her husband took a European trip, returned in 1883, visited England, Belgium, Spain, Italy, Morocco, Algiers, went over the entire country of Italy and Austria; did not study music while there; visited Scotland and Ireland, but did not kiss the Blarney Stone, although they saw it; it was her intention to take lessons in music in Paris from Madame Marchesi, but concluded that upon their return the same object could be accomplished by securing the·best vocal foreign instructors resident in San Francisco; upon returning here, through her old and warm friend, Mrs. Cushman, who had been her vocal teacher in Janesville, at Miss Scribner's school, made the acquaintance of Professor Dama, of whom. she spoke in the most enthusiastic terms; visited him together with Mrs. Cushman, he tested her voice, and said she had an exceptional voice; at that time Mrs. Smith's voice was a light soprano, an octave and a half; she probably sang not higher than A and in F, probably to C, but she had no chest tones at that time; in his method of teaching he claimed that everyone had an impediment; Mrs. Smith's he claimed to be in the musical or vocal cords and the cricoid cartilage; she took three or four lessons a week until he told her to take six until his death, with the exception of the summer months which the Smiths spent at their country home; Mrs. Smith's progress was very rapid; the lesson consisted mostly only ·of tones; Dama played accompaniment; her voice was high soprano; he praised the quality and compass of her voice; Dama went east on the 7th of May, 1885; Mrs. Smith made provision for his comfort while on the way, put up lunch for him in basket (see letter of Dama from Chicago, May 14, 1885); Mrs. Smith and the professor talked of Italy and of the places she had visited, and of his native place in Naples; Mr. Smith was eager to hear her sing and they invited Professor Dama to the house, 2120 Jackson street, and Dama frequently dined

with them; he usually came an hour or an hour and a half before dinner; he played accompaniment and Mrs. Smith sang until dinner; Dama sometimes gave Mr. Smith and herself a lesson in Italian; Mrs. Cushman was almost always present; Dama frequently in the spring-time, in his own house when she would go to take lessons, would place a little bouquet of flowers on the table in front of his piano upon a square piece of paper so that the ends might be inclosed to prevent soiling of her gloves; the lessons were three dollars each, an hour; frequently her lessons extended over an hour, but the professor made no extra charge; she had some pictures taken and the professor saw one and she gave him one (Respondent's Exhibit 95 is the one she gave him, Cabinet Photograph); this photograph was found among his effects, after his decease, and Mr. French, the attorney, gave it to her; the professor had three other pictures of Mrs. Smith, a tintype and two photographs. After Professor Dama returned in 1885 she resumed lessons with him; on Christmas, 1884, she made a present to him, a solid silver-handled umbrella; on Christmas, 1885, she gave him a gold-headed cane; on Christmas, 1886, a satin laundry list and handsome bouquet of flowers; on Christmas, 1887, a dressing gown, a double gown, long quilted gown; she had a great deal of trouble in fitting him as he was very large then on account of dropsy; she put some gores in and altered it to suit him; he presented her an ivory boat, a model in ivory, which she took home, a maid was sent for it, and put it in a box; Mrs. Smith has never looked at it since; he did not make her any present until the day he was operated on, when he said he was going to make his "toilet for death," he did not expect to live; he said if the operation proved unsuccessful in two days he would be dead—at all events he said it was only a question of a short time when he would die; he brought out a gold watch and wished her to accept it, and also a diamond pin; he said he wished her to have them as souvenirs of him, that the pin was made of a diamond ring he used to wear; he gave her three diamond studs, three pearl studs, and a cluster of diamonds, and she accepted them. A short time before the professor went east in 1887 one morning before her lesson he brought her an envelope and wished her to take charge of it; it was marked

"Will and Testament"; she said that as he had a box in the safe deposit it would be better for him to keep his Will there, but he said that he had reasons of his own for not keeping his Will there; he told her that Mr. Columbus Waterhouse had the key to his box and that was the reason he did not wish to put his Will in the safe deposit; he said that in 1885 he left the key of his safe deposit box with other papers in Mr. Waterhouse's safe, and Mrs. Smith immediately proposed his calling for the key, and the professor said that he did not wish to do so, and that he preferred her to take charge of it, and she assented to this proposition; the first thing was to put it in an envelope and mark it "Private Paper," instead of "Will"; it was already marked "Will," but she requested him to put it in another paper and mark it "Private Paper," and she then requested him to wrap it and tie it, which he did; then she took charge of the Will. At that time in front of the fireplace in the front room over the cuspidor he held a paper, it looked to her to be a paper about legal-cap size, about the size of the Will; the professor took a match, lighted this paper, and said that was good-by to the Waterhouses or Waterhouse Will; she took the Will home and placed it in her laces, in a large trunk, and locked it, for the reason that she always carried the laces with her, and it impressed her that it was the safest place to keep it; when he returned from the east in August, 1887, she carried the Will back to him and asked him if he wanted to take it back; the professor said that he was not well, was feeling wretchedly, and wanted her to retain charge of it; she took it back and replaced it among the laces; on the morning that he was operated upon, Wednesday, January 18, 1888, Mrs. Smith asked him in case anything happened to him what she should do with the Will; he said that whenever she opened it she should see that there were three witnesses present; this conversation occurred on the morning of Wednesday, January 18, 1888; Mrs. Smith remembered that date because it was the last day of lessons; when Mrs. Smith was taking lessons of the professor after practicing until she was fatigued they sometimes sat and chatted, and at other times they would devote perhaps fifteen minutes to Italian lessons; the professor usually spoke very kindly of his pupils and—she dis-

liked to say it except in self-defense—he referred to Miss Belle Harris as the one with a queer brain; it amused him to hear her talk; he would frequently lean back in his chair to listen to Miss Harris to see how long she would talk and what she would say; Mrs. Smith usually sat on a chair at the end of the piano; before Dama went east he was feeling very poorly and when he came back it was very similar; after his return he did not improve, he gradually grew larger with dropsy; the professor told Mrs. Smith that he studied medicine in Italy prior to teaching so as to understand anatomy of the throat so that he might teach comprehensively; Mrs. Smith read several books on the voice and conversed with him about their contents; he thought that the work of Charles Lunn of London was perfect in its method if the author taught as he wrote; Mrs. Smith told the professor he was a very ill man and ought not to go longer without attendance, and finally at her instance, through Mrs. Cushman, Dr. Tisdale, Senior, called to see him; she called on the professor the morning of the day he died, Friday, January 20, 1888; he was in a very weak condition, in bed, reclining on pillows in a semi-recumbent position; Mrs. Johnson, the nurse, admitted her; as Mrs. Smith entered the hall she heard the professor calling and she, not wishing to take command herself, told Mrs. Johnson that he wanted her; Mrs. Smith went in and found him in a very feeble condition, very weak; he asked her how he looked; she answered "Very well," not wishing to say, as was the fact, that he was looking very bad; he asked her to water some flowers for him; she did so; they were in moss under his wife's picture; he said that Mrs. Johnson did not know how to do it; Mrs. Smith watered the flowers and then returned to the room; she said to him "talking tires you"; he assented by a nod; he settled back, with a deep sigh, on his pillow, and Mrs. Smith asked him if he wished her to go and he nodded and she left. Mrs. Smith never saw him again alive; she first heard of his death from Miss Myers, a cousin of Miss Belle Harris; she received the announcement as she was about leaving her house, attired for the street, preparatory for her usual morning visit to the professor; her bell rang and Miss Myers appeared and made the announcement. Miss Myers testifies that at the request

of her cousin she went to Mrs. Smith's house the next morning after Professor Dama died to inform her of his death. Mrs. Smith was about going out as Miss Myers entered the house and informed her of the sad news. Mrs. Smith seemed very much affected; she asked who was the last person with him and Miss Myers said "You were." Evidently that was the first Mrs. Smith heard of the event. Mrs. Smith said when the lessons were given to her by Professor Dama when he was ill he sat by the fire and she sat on a stool near the piano; he directed her tones and she produced them. She suggested that he ought to have nourishing food; her maid prepared coffee and she took it to him. Professor Dama claimed that a woman sixty years of age might under his system obtain a fresh, sweet voice, and once obtained it would remain through life. After Miss Myers told Mrs. Smith of the professor's death she went immediately to his house, 317 Mason street. The door was opened by either Mrs. Johnson or Miss Belle Harris, she was not sure which. After some conversation between herself and Miss Harris, Mrs. Smith stated that she had the Will and asked Miss Harris if Mr. Adley Cummins was to be the attorney for the estate. Miss Harris said "no"; she also said that the professor had told her that his Will was made and was in good hands. On Sunday, the 22d, Mr. Burtis and Mr. French came to the house of Mrs. Smith and spoke of having been at the safe deposit vaults, and learning that she was in possession of the Will, and that Mr. Burtis was the special administrator; they had some general conversation about the Will, which was produced by her as she had received it in the envelopes and opened and read by Mr. French, who was finally agreed upon to take charge of it and act as attorney. The first time that Mrs. Smith saw Mr. Burtis to know him was on this Sunday, January 22, 1888, when he came to her house with Mr. French. This is the substance of the statement of Mrs. Smith on direct examination, but counsel for contestants says she appears very differently under the camera of cross-examination. On the direct examination it would appear that she was born with a silver spoon in her mouth, that her origin was of a superior sort and that she

was not of such lowly birth as most others, but it turned out on cross-examination, according to this counsel, that her pretensions were spurious and her aristocratic assumptions simply and solely shoddy. Her early years were not spent in such surroundings as she would have people believe, and her social aspirations and ambitions were founded upon a false basis. Her armor of aristocracy was pierced, and her claims to especial consideration and social caste have been proved worthless by the crucial test of cross-examination. Mrs. Smith and Burtis would have the court believe that they did not know each other originally; that until after Dama died they were not acquainted, but the evidence of Mr. Dorn is that Mrs. Sara Barker Smith and Mr. R. W. Burtis were acquainted with each other, and Mr. Dorn was not cross-examined.

### Life History of Sara Barker Smith.

Mr. Dorn testified that he knew that Mr. Burtis and Mrs. Sara Barker Smith were acquainted with each other. The history of the respondent, as given in her cross-examination, is that she was born August 11, 1851, in Collinsville, Lewis county, New York, where her father, James Barker, was a merchant; her father went to Pike's Peak during the excitement before the war; he had failed in business prior to his departure; after he went away her mother procured a divorce from him and married a Mr. Burnham, from whom she was divorced; he brought suit, but she gave occasion for it by throwing something at him to give cause of action, so the respondent had been informed by her brother; Mr. Burnham was at one time a grocer, afterward a lawyer; he died a violent death—it was not certain whether it was suicide or not; her mother is still living; her brother, George P. Barker, is now dead; he died in Canada; he left Chicago because the north was distasteful to his wife; his wife was not of a pronounced Southern type, a Creole; she had blue eyes, hair almost black, or dark hair, slender face, not round, rather sharp features; her name was Emma Hook; Mrs. Smith did not know that her brother left Chicago because he was suspected of sympathizing with the

Southerners; he settled in Canada during the war, and died there; her father died in San Rafael; he came to California for his health; it was in 1887 or 1886 that he came here; it was on the afternoon of January 22, 1888, that Mr. Burtis and Mr. French came to her house; her father and his wife were in the house but not present at the interview; her father died October 11, 1888; on the occasion when Dama gave to her his Will Mrs. Smith asked him to tie it with his peculiar knot; she had no particular reason for the remark except to say something or show that she had no curiosity to look within it; it was, perhaps, an idle remark; her idea about putting it in a second envelope was that it would not be so easy to open it, she had no other reason; when the Will was put in the second envelope it was then inclosed in some wrapping paper; Professor Dama said that it was his Will, but he did not tell her of the contents; there could be no mistake about that; Mrs. Smith knew Mrs. Anna Herbert Barker; she never stated to her and her own father—Mrs. Barker's husband— on the 22d of January, 1888, that she had his Will all the time without knowing what it was until the gentlemen called; she never said to them, "Well, pa, I am the heir to all Professor Dama's property; I have had his Will all the time without knowing what it was until the gentlemen called and read it"; she never made any such statement; there is not a particle of truth in that; nor was she commended by her father or her husband for keeping a secret so long, and they did not say it was an unusual circumstance for a woman to keep a secret; it is a fact that she did not tell her husband or Mrs. Cushman; no hand ever touched that Will but her own from the time Professor Dama gave it to her, nor did she say a single word to a soul on that subject from the time he gave it to her until the 22d of January, 1888, when it was opened and read; after the reading she told her father and his wife of the contents of the Will, and that she was the chief legatee, and also told of the present that the Professor gave her before his operation; when Mrs. Smith went to the country she took some of the papers with her; the more valuable, deeds and the like, she kept in the Safe Deposit Company; some of his letters that she thought of no particular use were destroyed; Miss Harris' letters were all returned to

her. Mrs. Smith called upon the professor the morning of his operation, and he told her he was going to make his toilet for death and that he was going to send for a barber; she asked him for a lock of his hair and he told her to take a scissors, and she cut a lock of his hair and she still retains it; he said that even though he were tapped he would fill up again and he would not live more than three days; he said he could already feel the water around his heart; he gave her then the studs and diamonds and the gold watch to retain as a souvenir; when he gave her the Will she told him that the proper place for his Will was in his safe deposit box; she could not tell how she knew that he had a safe deposit box but she did know it; she could not recollect when or whether he told her; she consented to take charge of the Will; she told him if he really wished to have her take charge of it she wished he would put it in another envelope and mark it "Private Paper"; she did not remember where he got that second envelope, the yellow one; the white envelope was closed when she saw him put it in the yellow envelope; she did not remember whether he had any trouble in getting it inside the second envelope; the professor said when he gave her the Will that he wished her to take charge of it because Mr. Columbus Waterhouse had the key of the safe deposit box and he was east; she placed the Will in her laces in her trunk and kept it there; took it with her when she went to "Olivina," the vineyards of the Smiths near Livermore; she always carried her laces with her; after the knot was tied around the papers she proceeded with her lesson and then went home; she placed the paper within the folds of her dress, which were pinned together, as her pocket was not large enough for it; in the course of time the professor asked her where she kept the Will; she told him with her laces; she did not remember how often he asked her; on the 18th of January, 1888, he told her if anything happened to him to have three witnesses to whomever she handed it; she went direct to her house with the Will; it was not raining; she put it in her laces immediately on arriving at home, placed it in the package of laces, then sewed the package up; she brought most of the laces from abroad in July, 1883, in the "Alaska"; they were not noted at the custom-house in

New York; her husband had no box in the safe deposit; he had a safe in his office; Mrs. Smith kept the Will among the laces because she thought it was safe there, that was the reason that she did not put it in her husband's safe. Professor Dama told her that Miss Belle Harris was nearing a change of voice and that she would gain flesh and good looks and that he was in hopes she would get a beau. Mrs. Smith did not repeat this to Miss Lowrey and Mrs. Cummins and Miss Harris, the ladies that were in the dining-room, because she thought it would be rude in her to say so. Professor Dama did not say so to Miss Harris, but then, said Mrs. Smith, "We do not always express our opinions of others to their faces." Miss Harris had given Mrs. Smith no occasion to love her, and Mrs. Smith had no particular liking for Miss Harris, in fact she thought she disliked her. When Mrs. Smith had a conversation with Miss Harris upstairs in the bedroom of the professor's house after his death, Mrs. Smith did express sorrow that she had not remained longer on the morning of his death, and Miss Harris said it was just as well that Mrs. Smith had not, because the Knights Templar had asked many questions concerning the professor's death; the conversation was to that import or purport; Mrs. Smith had testified that she knew that Professor Dama had trouble with Wills before, for he had told her that his wife had made a Will in his favor and for lack of a date it had been denied probate; the professor told her of his trouble in probating that Will, that his wife's relatives had prevented the Will from being admitted to probate and had probated a former Will; he said that most of the property—about half of it—was his, had been given by him to her; he had given her the Boston property and the lots in San Mateo county were his, and that when he was east they did not give him even a souvenir of hers; she kept from her husband the fact that she had possessed the Will, because she used her own judgment, which she had frequently found by events to be better than that of her husband; she never had experience of this kind before and hoped never to have it again; she had most certainly watched the progress of this trial and was interested in the result; she had not caused any articles to be published in the papers nor paid for the

publication of any articles except indirectly, when Mrs. Ella Sterling Cummins told her that a newspaper reporter had been very kind in publishing some article and she gave her for him a box of cigars. This is the story of Mrs. Sara Barker Smith as told by herself, in substance, on direct and cross-examination. She was a woman, according to counsel for contestants, reared in peculiar circumstances, with infelicitous parental surroundings, traveling two years under an assumed name until married to Mr. Julius Paul Smith; she traveled abroad, purchased laces—dutiable articles— brought them into the United States, avoiding the custom officers, defrauding the government, and necessarily committing perjury. Is such a person, asks this counsel, in a position to enforce belief in her bare statement as to the manner in which she obtained possession of that paper, the Will? It is intrinsically improbable and circumstantially incredible. The counsel for contestants discredits her testimony that she left Dama on the morning of his death after watering the flowers under his wife's portrait, and after doing other acts at his instance leaving him to rest in his feeble condition, and asks, Is this story to be believed? Is it not rather probable that she gave him the potion prepared by the nurse, Mrs. Fannie Johnson, whose knowledge of subtle poisonous essences, acquired in the apothecary shop, enabled her to concoct and compound the ingredients for the chalice presented to the lips of her revered and loved preceptor by the respondent, Mrs. Sara Barker Smith? Is this inference incredible? Counsel asks, How can counsel for respondent claim that the character of his client is such as to render improbable so monstrous a charge? Why is Mr. French so proof against assault that his connection with this case may not be attacked as founded in a criminal conspiracy? Many a man as eminent as he has fallen from high estate even in this community, after having for years posed as models of rectitude and imposed upon the public as examples of morality. Not long ago a lawyer, prominent professionally, a scholar of exceptional attainments, socially in the most exclusive circle, trusted by thousands, was suddenly found to have been for years engaged in the most extensive

peculations from the estates and trusts confided to his care, reducing many of his clients from affluence to penury and misery. And many other examples may be cited, at home and abroad, of violation of trusts and dual lives, to illustrate the text that the parties implicated in this charge were not protected from suspicion by reason of repute alone. All the circumstances surrounding this case point to the probability that Dama's death was precipitated by mysterious means, and justify the intimation that Mrs. Fannie Johnson's knowledge of the occult effect of certain drugs was made available in the emergency.

Counsel commented severely on the several and discrepant stories told by Mrs. Sara Barker Smith concerning the manner in which she obtained possession of the Will. How did she know that that Will was made in May 1887? How was she concerned as to whether or not there was a later Will? She always knew what were the contents of that Will; she helped to organize it, and was the mother of this Will; that is how she knew that it was made in May, 1887; this cannot be controverted, asserts this counsel. The evidence of Miss Belle Harris is true, he asserts; notwithstanding the acrimonious assailment of Miss Harris, her testimony is insusceptible of impeachment and stands unaffected by the acerbity of the assaults of the adverse advocates. With regard to the testimony of witnesses who are sometimes discrepant in dates or forgetful as to details, counsel for respondent remarks that no one has a perfect memory; the best memory will be confused in some particular, deficient, or defective, and it would be unfair to deny credit to a witness merely because of some error as to the date of an event, incident, or transaction, when the witness on the whole possesses the elements of credibility. Contestant claims that the court must credit the statement of Miss Belle Harris or else find her guilty of perjury. Why should she perjure herself? She had no possible motive for perjury, and her whole manner and demeanor were convincing arguments in her favor as a witness; she was precise in detail and circumstantial in narration, with no effort to impress the court, but with every appearance of truthfulness;

she is entitled to full credit, not a single contradiction in all her testimony; the evidence of Miss Belle Harris was clear, concise, consistent throughout, and was in no particular contradicted; Burtis, who was called upon to overthrow it, was one of the strongest props in its support, and shorthand reporter Knox's statements were retracted or modified by him before he left the stand and shown by Miss Belle Harris' testimony in rebuttal to have been physically impossible. Her testimony is truthful beyond peradventure, and must enforce absolute conviction in the mind of the court, according to this argument. With reference to the will, Miss Harris testified that she first learned of its contents when it came out in the papers; she did not make any search for a Will because she thought the Knights Templar would look out for everything; she did not infer from what the professor said the day before he died that he left her everything in a Will; there were others connected with that Will; she had not made a statement to Mr. Thomas R. Knox, as he testified, that Professor Dama was a "magnesia fiend" or any such conversation with him. Mr. Knox testified that he first heard of the death of Dama a few hours after the event; it was on a Friday in January, 1888; could not remember the day of the month; he related how he came to be informed of the death and what he did thereafter; he sat up all Friday night in the house of the deceased; his recollection was that the body was removed some time Saturday; he returned to Dama's house on Saturday afternoon and he thinks that he came back in the evening; he met Mr. French and Mr. Burtis there in the afternoon; Mr. Knox knew Mrs. Sara Smith, frequently saw her in the house of Mr. Dama, but not to form her acquaintance; he had met her once after that and made her acquaintance; he never knew Julius Paul Smith in Dama's lifetime; Knox met Miss Belle Harris for the first time after the professor died, that was the first time to converse with her; had some conversation with her about the professor's death; she said he was a "magnesia fiend," that he was a great indulger in magnesia, that she would frequently resort to expedients to correct this practice or

habit, as she had learned by inquiry that it was very injurious to the intestines, and she thought his intestines were ruined in that way, and that that was what brought about his death. Miss Belle Harris called at Knox's house No. 2004 Bush street on the Sunday morning following Dama's death; generally she spoke of his death, she said he was a great consumer of magnesia, that he was inordinately fond of it, and that he consumed it as opium fiends did that drug; not in the same manner, but with equal avidity; Miss Harris also spoke of the professor's liking for herself and of his dislike for the Waterhouses and others—the Rev. Joseph Worcester, among others; she spoke so much, she was the principal speaker, that it was hard for Mr. Knox, according to his own statement, to segregate portions of her remarks; she said that Mrs. Sara Barker Smith had been long a pupil of the professor's, that she was not a remarkable pupil, and that the professor did not expect to make much out of her; Miss Harris said that the object of her visit to Mr. Knox was to tell him, as he had long been an official of the courts, that she thought there was something wrong; she said she believed there must be another Will, and that the only persons who possessed his genuine confidence were herself, her sister and family, Mr. Knox's wife, and Mr. Knox himself; she said the professor had taught her gratis and that she procured pupils for him, and she told of her close intimacy with him and of his great confidence in her; she said nothing about the suddenness of his death; Mr. Knox averred in his testimony that he had no interest in the controversy; that he looked at the Will about the time it was admitted to probate, just from curiosity, to satisfy his mind, as he was acquainted with the deceased; nothing occurred to whet his appetite or curiosity; his curiosity was original in this case from the fact of there being such a Will; he had testified that he had learned of the death of Professor Dama on his way to the house of the deceased from Rev. Mr. Worcester; when Knox arrived at Dama's house the nurse opened the door. Mr. Armstrong may have informed Knox, but he had already learned of the fact; Armstrong was a relative of Knox, a third cousin, he believed. The "magnesia conversation" took place both at the professor's house and at Knox's residence; the conversation in

the house came about in talking about the professor's demise, decease or death, and the professor's theory that by pursuing his method one could live to a great age and yet Dama himself did not so live, and then the reason of that was discussed, and reference was made to his habit, and Miss Harris spoke of his being addicted to the habit of using magnesia, she did not use exactly the term "magnesia fiend," but said he had that habit; in regard to her statement that he had made another Will, Miss Harris said there was or had been another Will in the possession of the Waterhouses made in their favor while he was in their house, and she said that she knew and that Knox knew that the professor entertained a strong prejudice against Mr. Columbus Waterhouse and his family and his brother, and that therefore there must be another and a later Will; she said that in that Waterhouse Will Columbus Waterhouse was named as an executor. Mr. Knox disclaimed attempting to give the exact words of Miss Harris; in relation to the bedroom incident she said that she did not at the time quite understand what Dama wanted, but had no reason to distrust him as he had always treated her as a perfect gentleman, but as she was a young lady alone in the house, she thought she ought to be cautious in the circumstances; Mr. Knox had said when he learned of the contents of the Will that he thought he ought to have left something to William T. Cummins, and as Dama had no relatives here and did not like his wife's relatives, Knox thought he might have remembered his friends here, among others Knox himself or his daughter, and considering what Dama had said about his inability to accomplish in the case of Mrs. Sara Barker Smith what he had done for other pupils, notwithstanding her diligence and industrious efforts to succeed, Knox thought and said that the bequest to Mrs. Smith was an absurdity, a strange Will. Dama had often told Knox that Mrs. Smith and her husband were very wealthy, and that and the other circumstances made Knox remark the strangeness of the Will. Knox related in his testimony what the professor said concerning the difficulties of developing the voice of Mrs. Smith, and that by reason of those difficulties he could not "finish" her, notwithstanding her arduous endeavor and earnest anxiety to succeed; by reason of her

nature he was unable to do anything. Miss Harris says that she told Knox that she thought granulated citrate of magnesia was not good, but she said nothing to the effect testified to by him as above set forth, and denied the statements imputed to her by Mr. Knox; she declared that she made no such statements to him on that Sunday as he testifies to about the Waterhouses or others, including the Rev. Mr. Worcester; nothing of the kind occurred at that time or place; she once called at his house on Sunday morning, the 12th of February, 1888, and stated to him the object of her call, that Mr. William T. Cummins was very nervous and would like him to go and stay with him in court the next day, February 13, 1888, when the contest was coming up; she meant when the hearing of the probate of the Will was to come up; Miss Harris arrived at Knox's house at about half-past 8 and stayed until almost 10 o'clock; she had to wait there at least fifteen minutes; parts of the conversation sworn to by him as taking place at the other time occurred on this occasion, February 12, 1888, some in relation to the movements of the gentlemen on the evening of Mr. Dama's death, and that she doubted Mrs. Smith's Will of May 8th, and of Mr. Dama's liking Mr. Knox's little girl. Miss Harris did not suggest to Mrs. Smith going downstairs on the occasion of her coming to 317 Mason street after Professor Dama's death, and she denies the truth of Mrs. Smith's testimony in that regard. Mrs. Smith asked Miss Harris on that occasion who would be attorney for the estate; Miss Harris did not tell Mrs. Smith that Mrs. Waterhouse had been searching for a Will; Miss Harris did have a conversation with Mr. French but not such as he says in his testimony; French asked her to call at his office; the suggestion did not proceed from her, and she denied the truth of the testimony of Mr. French with respect to that interview. Mr. French had testified that he recollected meeting Miss Belle Harris on the street one day and telling her she might come into his office in response to her suggestion; he had entirely forgotten the circumstance of meeting her until the cross-

examining counsel mentioned the matter and then Mr. French recalled it; Miss Harris called at French's office after that accompanied by another lady, a stranger to French; Miss Harris requested this lady to withdraw from the room; the lady did so; French said to Miss Harris then and there, "I think there is no occasion for an interview between us, I do not desire to have an interview"; soon after Miss Harris arose and withdrew from French's office; French had no recollection of any such conversation as was implied in the questions of counsel for contestants; Miss Harris declared that Mr. French spoke to her about Mr. Smith being a millionaire; she denied that she said to Mr. French that she was Professor Dama's confidential friend and that she wished to be placed in charge of the house; she denied also that she said to Mr. French that Mrs. Waterhouse claimed to be Dama's best friend, but that she was not such, as the professor disliked the Waterhouses very much; Miss Harris said that she did not "rummage" about in the house on the night of the professor's death nor was she "desirous" of overhauling things there, as Mr. French testified; she did not throw herself across the professor's body when she went into his room after his death, as Mrs. Fannie Johnson testified; Miss Harris declared that Mrs. Johnson's statements as to her examining papers and rummaging drawers were false; when Miss Harris came into the house at 317 Mason street after the professor's death Mr. Burtis and Miss Lola Lowrey, a pupil of the professor's, were in there. Miss Harris testified that Mr. French said to her that he once had a housekeeper for whom he put in a claim against an estate for $2,000 for services as such housekeeper, whereas otherwise she would only get $200; this was said to Miss Harris December 11, 1888, at his office at 528 California street, San Francisco; Miss Harris was in that office at that time about half an hour and Mrs. Mary Cover was with her there; Mr. Brandon, a clerk for Mr. French, was in and out; Miss Harris had read over Mr. French's testimony in this case and also Mrs. Johnson's more than once; Miss Harris had written out some questions to be put to witnesses, Mr. French, Mrs. Smith, and Mrs. Johnson; Miss Har-

ris had read over testimony of Mr. Burtis, but did not pre-
pare questions to be propounded to him; she had been at Mr.
Kowalsky's office perhaps five times about the case; she had
also seen Mrs. Waterhouse, Mrs. Bradstreet, Miss Kate Myers,
and her sister Mrs. William T. Cummins; she had not seen
Mr. Bellini; when Miss Harris read over the testimony in
presence of Mrs. William T. Cummins they discussed the
evidence; Mrs. Cummins assisted Miss Harris in preparing
questions; she suggested questions more than once, could not
say how many times; Miss Harris did know Captain Gib-
bons, first in 1885, on the "John R. Kelly"; afterward saw
him in Mr. Dama's house on Saturday afternoon, 21st of
January, 1888; did *not* tell him that Mr. Dama had made a
Will and had left it in good hands, did *not* so remark to
Mrs. Captain Gibbons in the Lick House; Miss Harris was
at the professor's house all day Saturday, the day after his
death; she should judge it was before 4 o'clock of that day
that she saw Mr. French there; Miss Harris said that she
may have taken some writings out of Professor Dama's house
after his death and prior to his funeral, two little cases with
writing on the outside; when Miss Harris was in Mr. French's
office he was in the inner office; Mrs. Cover was with her;
Mr. Brandon, the clerk, was in the outer office; the door be-
tween the two offices was closed during their conversation;
Mr. Brandon was in and out at times.

### CIRCUMSTANCES OF THE DEATH OF DAMA.

With regard to the statement of Miss Harris in conflict
with the testimony of Mrs. Fannie Johnson, the nurse, and
Mr. French, the attorney, this may be a proper point at
which to consider the contrary testimony: Mrs. Fannie John-
son testified that her name in German is Johanson and that
she was born in Hamburg; she was engaged by Luigi Dama
as his housekeeper through Mrs. Helen Cushman of Alameda;
she went to Dama's house on the 14th of January, 1888, at
317 Mason street; nobody but he occupied that house, he was
very sick with the dropsy, almost helpless, so much so that
she had to dress and undress him; he was completely gone
in; he had both Doctors Tisdale, senior and junior, in at-
tendance upon him; Mrs. Johnson knew them in Alameda by

seeing them in various houses; she went to Dama's on Saturday and he died the following Friday; the young Doctor Tisdale was there on Tuesday, the old doctor only came on Sunday; after young Tisdale left, Dr. Brigham came Tuesday afternoon the first time to consult with him; Mrs. Johnson recommended Dr. Brigham; he tapped Dama on Wednesday; Mr. Burtis was present; they took two bucketsful of water from him, then was put to bed and bandaged up; he stayed in bed until the middle of the night of Thursday; from Thursday to Friday he had no one but the nurse to wait upon him; prior to his being tapped he said to her that if he should stand that pain and agony any longer he would rather than endure it take his own life; when Mr. Burtis went away after the tapping he left her his address so that if anything should happen she might know where to find him; Dama felt very weak Friday morning; he ate nothing; he died at twenty minutes to 12; from the time of the tapping until he died he was visited by Miss Belle Harris, she came every day, also Mrs. Sara Barker Smith; she left about twenty minutes or half an hour, perhaps, before he died; Mrs. Johnson gave him the medicine that Dr. Brigham prescribed; the medicine was cream of tartar and gin mixed, which he was to drink whenever he was thirsty, according to the Doctor's directions; shortly after Mrs. Smith went away the nurse went out of the room for a little while and when she came back she thought he had fainted and found that he was dead; she tried to revive him but could not; she sent for a messenger and sent for Mr. Burtis; he came and then he sent her with a note to his store; she returned and after she was home a little while Miss Harris came in, and when the nurse told her Dama was dead Miss Harris rushed into the room and threw herself across his body; then Miss Harris came out and said she was glad Mrs. Johnson was there; the nurse did not hear any conversation between Mr. Smith and Miss Belle Harris; they were conversing, but she did not hear the words, she did not know what was the subject matter of their talk; Mr. Burtis dined with Mr. Dama every night while the nurse was there except the night Dama was tapped; Miss Harris was not there at all on Friday morning; she did not tell her that he said that morning that he

felt so well that he could dance in the ballet, and she denied the other statements imputed to her in the testimony of Miss Belle Harris; Mrs. Johnson had some lunch spread in the dining-room on the evening of the day Dama died; Miss Harris partook of some, Mrs. Smith did not; Mrs. Smith came on Saturday for the first time after he died; Mr. Burtis told the nurse next day, Saturday, that she had better get some tea for the ladies, nobody else said anything about it. At the time Mrs. Johnson went to Professor Dama's house there was a woman there who did not stay long and she did not know her name; Mrs. Johnson remembered seeing Miss Belle Harris before the date of her testimony (March 19, 1891) at the drug store or patent medicine store of R. R. Hay, 1019 Market street, but she denied the testimony of Miss Harris as to what occurred there; Mrs. Johnson called subsequently at Miss Harris' house on Geary street and Miss Harris told her she thought the Will was a forgery, that the Knights Templars were after her (Mrs. Johnson), and that she should not go to see Mr. French and Mrs. Smith, if she were to see them she would get herself into trouble, while if she stood by her (Miss Harris) she would be all right; Mrs. Johnson contradicted in detail the statements testified to by Miss Harris in regard to their interviews; Mrs. Johnson cooked dinner for Mr. Dama the evening before he died; dinner was served in his room, he being in bed; the table stood by the side of the bed; Mr. Burtis was there; Mr. Dama ate heartily and said to Mr. Burtis that he would have a dance next week if he continued to feel so well; next morning he complained that the dinner did not seem to agree with him; he was restless during the night; he asked what he had eaten and he and the nurse counted over the things and among others was preserved apricots; he asked where they had been procured; the nurse said that Miss Belle Harris sent them; he said that that was what hurt him, the apricots; on the Sunday previous the nurse had prepared for dinner roast suckling pig sent by Mrs. Sara Barker Smith; the Rev. Mr. Worcester was at the dinner but declined to partake of the pig on account of religious scruples, as he did not eat meat on Sunday. On cross-examination Mrs. Johnson testified that she was born in Hamburg the 24th of July, 1848; her maiden

name was Johanson; she worked for her living there, taught
school at seventeen years of age, afterward worked in a lace
store, and went to London, and left there for New York on
the steamer "Canada" in 1874. She was questioned with
reference to her coming to San Francisco, where she lived
and what she did after arriving in the city, and gave many
details of her history down to the time that she left the em-
ploy of Mr. Hay, 1019 Market street, when she went to Ala-
meda and worked for various families; among others she
worked for a Mrs. Ackley, where she made the acquaintance
of Mrs. Cushman, through whom she learned of Dama's
wanting a nurse; she did not meet Mrs. Smith there; did
not know of her then, but subsequently was informed by
Mrs. Cushman that Mrs. Smith used to visit Professor Dama
every day to take lessons. Mr. Dama engaged her as his
housekeeper at twenty dollars a month and she could keep
her little girl; she was to cook his food, prepare his meals,
and render other domestic services, but after she was there
awhile she found that he was very sick and she attended
upon him; Mrs. Smith sent some articles of food, extract of
coffee, and such like things; a young girl brought them, Mrs.
Smith never brought them; after Mr. Dama's death the first
ones to be there together were Miss Harris and Mr. Burtis;
Mrs. Smith never took any tea in the house. Being ques-
tioned as to her handwriting, Mrs. Johnson said that she
signed her name "Mrs. Johnson" because she had always
gone by that name; she was not a married woman. At the
request of cross-examining counsel she wrote at his dictation
on the judge's desk the contents of the disputed Will, her
writing being marked Contestant's Exhibit D-56. After she
left Mr. Dama's house she did not have any work for quite
awhile, then she worked off and on in Mr. Hay's store, and
also opposite Mr. Dama's house for a Mrs. Murphy, and
worked for others here and in Alameda, where she worked
for Mrs. Mahoney for three months and attended her during
confinement, and then she came over and took the house
where she is now living in San Francisco; she does not re-
member to whom she took the note from Mr. Burtis at 317
Mason street to his store on the day of Mr. Dama's death;
it was raining that day; it was after 12 o'clock, but she could

not remember the hour; she did not take any note at that time; she knew Mr. Castelhun, the attorney, and did not say to him at his office, 502 Montgomery street, about two years ago, that an awful crime had been committed at Professor Dama's house on Mason street, and that if she were to tell what she knew it would make a sensation that would shake society; she did not say anything of that kind, but she had been told by counsel for contestants, in his office, that she had so said to Mr. Castelhun and she denied it, and the counsel told her that he would not believe anything she said by way of denial; she knew Mr. Astorg; she worked for him for about three weeks, taking care of the house, going there in the morning and coming back in the evening; his wife was there the first week; she is now in the east; she was a friend of hers to a certain extent; if she talked to her about the Dama case she really did not remember; Mrs. Astorg sometimes came to 317 Mason street, after Dama's death; on one occasion she was inebriated, and Mrs. Johnson told the lady who came with her that she could not come in; she never told Mrs. Astorg that she had been with a man who had died suddenly, and did not tell her that he had been poisoned or that she knew all about poisons, nor how to administer slow poison; she had no understanding of the use of medicines; never studied Latin nor chemistry; when Mr. Dama was dead Mrs. Johnson sent a note to Mr. Burtis by a messenger boy; when Burtis came he did not do anything, he walked up and down the room; she told him how it occurred; Dama was alone at the time of his death; the nurse was in the front room; when she came into his room she thought he had fainted and tried to revive him, but found he was dead; she was not in the room all the time while Burtis was there; in the note she sent to him she told him to come to the house, that it was all over with Mr. Dama, meaning that he was dead; on the night that Dama was tapped Burtis gave her his address, his business card, and said if anything happened to Dama to send for him; when she went to the drug store at the corner of Geary and Mason streets she called for a messenger; her little girl remained in the house; no one else was there with the body of Dama; when Burtis came and while she went on the message from him to his

store her daughter remained in the house with him and the body; Mrs. Johnson had not read nor seen Burtis' testimony; when Burtis came Mrs. Johnson felt bad, but she did not think she was agitated or excited; she did not say to Mr. Burtis when he came on that morning that this lady had called and when she left the professor called to her and when she reached his bedside he was dead; Burtis remained there a couple of hours, she could not say the exact time; she never wrote but one note to Burtis, and could not be mistaken about that fact; she could not tell how many times she had met Burtis since Dama's death; she met him once on the ferry-boat when she was coming over from Alameda; he had not been there to see her; she was four or five times at his office; may have spoken about Dama's affairs, but she could not remember; Burtis was very busy and they only spoke about work that he gave her; she thinks she gave him her address; it was a year after Dama's death before she began doing work for Burtis; it was in the winter that she did the work, but she could not tell the month. Mrs. Johnson, at request of counsel for contestants, wrote from dictation certain words and also the contents of "Short Memorandum" (Contestant's Exhibit E–57, F–58, G–59). Mrs. Johnson was in Mrs. Smith's house about two months before the date of her testimony (March 24, 1891); went there for no particular purpose; just went to call upon her; had not seen her for two years; she did not send a letter to her; Mrs. Johnson was there perhaps fifteen minutes to half an hour; had been to see Mr. Lloyd four or five times, he wanted to see her to know what she knew about the case; she told him all she knew; she did not go to see Mr. French. Mrs. Johnson said that she felt deeply interested in this case as she had been falsely accused. The gist of the false accusation against Mrs. Johnson seems to be that she was criminally concerned in the death of Mr. Dama, and that she had prepared a potion which was administered to him which precipitated his exit from this earth, and counsel for contestants compared her attitude with that of a recent confessor of crimes, the uxoricide Zwald, who, in such strange circumstances, overcome by the stings of conscience, confessed that he had poisoned his first wife and strangled a second, and yet no one ever suspected

that by arsenic he consummated the death of one and by strangulation the other, and counsel read from a daily journal an article on "Crimes that Lie Hidden," taking for a text the case of Zwald: Why did Mrs. Johnson weep if she was innocent? Why shed tears and ask for forgiveness? Forgiveness for what? Was it because conscience forced tears from her eyes? Why could she not contain herself in presence of that dead body? Was it because of the crime that lay hidden in her breast, and which if she had unbosomed and unburdened herself would have exposed the criminal conspiracy and bring to light the criminal conspirators? The counsel for contestant says that she told the story of her shame coldly and callously.

Mrs. Johnson is a woman of unusual intelligence and good education, the revelation of the misfortune of whose life came involuntarily as a result of cross-examination rather than as a callous confession of shame; she may be the possessor of a guilty secret, and, if so, it is to be hoped that it will become evident in time for the reparation of any wrong her concealment may have caused; but the impression her demeanor on the stand made upon the mind of the court was that she thought she was entitled to more consideration than she had received in a pecuniary sense from those whose interests her evidence was calculated to advance. Mr. Kelly, for contestant, dilated graphically upon the facts that occurred just prior to the death of Dama, the employment of the nurse, Mrs. Johnson, suggested by Mrs. Cushman, the lifelong friend of Mrs. Smith, and the engagement of the Dr. Tisdale, senior, through the direct agency of the same Mrs. Cushman; the refusal of Tisdale to tap Dama on the ground that he did not want to have Dama's death on his hands; the employment of Dr. Brigham and the operation; the subsequent visit of Mrs. Smith; Dama's elation immediately after the tapping, afterward his statement that he was preparing his toilet for death; the testimony of Dr. Brigham—to which a considerable degree of discredit must attach, notwithstanding his high professional reputation, because he testified without invoking the protection of the law as to those confidential matters. Who was the last person with the deceased prior to his death? Mrs. Smith, the respondent in this case. That is the evidence, argued Mr.

Kelly, and yet Mrs. Smith has sworn that she first learned of his decease on Saturday when Miss Myers called at her house to inform her.

### WHAT OCCURRED IMMEDIATELY AFTER DEATH OF DAMA.

As soon as Professor Dama dies Mr. Burtis is there within a few minutes after, on that very Friday morning; the utter improbability of Mrs. Johnson's statements that she sent a messenger boy with a note to Mr. Burtis' store is apparent, for Mr. Bjolstad and Mr. O'Connell, who were employed there, testify that Mr. Burtis was not at the store that morning. Mr. Burtis must have received secret information, argued this counsel, because he was one of the conspirators in that combination; when Mr. John T. Harris went to Dama's house there he met Burtis, who said, the very first thing, "Here are two notes I want you to deliver." The meeting of Mr. Burtis and Mr. French, their sending for Mr. Booth and Mr. Sumner, and the refusal of Mr. Booth to act as attorney, and the conference in which this occurred counsel considered as remarkable in several aspects; the example set by Mr. Booth in refusing to act as attorney was approved, and Mr. French's conduct in consenting to act as attorney criticised and denounced as a preconceived plan; the consent of Burtis to act as special administrator was also criticised; the visit of French and Burtis to the house of the deceased professor, the rifling of the drawers and conduct at the house and the circumstances of that occasion were called to the especial attention of the court. Mr. Burtis testified that Exhibit No. 3 was found in that drawer; that is the "Altered Will." How was it, asked Mr. Kelly, that Mr. Burtis and Mr. French testified that they had never heard of Mrs. Sara Barker Smith, when her name is in this very paper, Exhibit No. 3, which they swore they had looked over with the other papers which they found in the drawer? This is a fact in itself, he argued, which shows that the Will was forged; and, in this connection, this counsel called the court's attention to the very peculiar manner in which Mr. Burtis testified in regard to that matter (see page 189, judge's manuscript notes argument; also page 70 of the official reporter's transcript of testi-

mony): "Q. Did you make a search for a Will before you applied for special letters? A. No, sir; because I did not care to; I did not feel sufficient interest, I never heard anything about a Will; I did not know anything of the existence of a Will." Now, the petition of R. W. Burtis for special letters contains the recital that the petitioner had made due search and inquiry for a Will but had found none, and had reason to believe there was one in the safe deposit vaults. What further took place there that day, their actions and conduct were enough to make Miss Belle Harris suspicious that there was something wrong, claims the counsel; their actions showed that they were actuated by some sinister purpose that could only be accomplished by securing possession of all the effects and papers of deceased. What is Mr. French's testimony? As to Mr. French's connection with this case he testifies that he knew Luigi Dama very slightly; met him in Golden Gate Commandery; did not know him previously, what his business was or where his house was. Dama died January 20, 1888; on Friday afternoon of that day, while sitting in his office at 528 California street, French received a note from R. W. Burtis informing him that a member of their Commandery died at 317 Mason street; French was the Commander, and in such case it was the custom for the Commander to attend to the matter; French could not leave his office at the time, being engaged with a client, and he sent word to Mr. Burtis that he might see him in his office at half-past 4 of that day; French also sent word to F. W. Sumner and A. G. Booth, of the Commandery, to confer as to what he should do; about half-past 5 or 6 o'clock French went to Dama's house with Burtis and Sumner and found there a Miss Belle Harris, Rev. Joseph Worcester, Dr. Brigham, Mrs. Columbus Waterhouse, and the undertaker, Mr. Halsted; the body was taken charge of by Mr. Halsted and his assistant; Mrs. Waterhouse said that Dama had left instructions to have his body embalmed and sent east to be buried by the side of his deceased wife, in Bath, Maine; this was said also by Miss Harris and Rev. Mr. Worcester and several others present; French gave no directions; Miss Belle Harris said that she was Dama's confidential friend and wished to be placed in charge of the house; she said that

Mrs. Waterhouse claimed to be his best friend but that she was not such, as Professor Dama disliked the Waterhouses very much; French told Miss Belle Harris that she might be in charge of the house. and he asked Mr. Burtis to remain there that night and see that no one interfered with the house or the effects; French did this in pursuance of the custom of the Commandery and so informed Miss Harris; French did not know at the time that the deceased Professor Dama was a member of the "Blue Lodge," and he believed at the time that Dama was not a member of any lodge in San Francisco; French subsequently discovered that Dama was a member of a lodge here, the Mission lodge, and called upon the Master of that lodge, Dr. W. E. Price, and the Master declined to act because he preferred the funeral ceremonies to be in charge of the Commandery; after French told Miss Harris that she might have charge of the house, and at his suggestion Mr. Burtis went to Professor Dama's clothing and took out and laid on the desk what he found in his pockets; French made a list of the articles and had it in court; this is the list: Cash two ten-dollar pieces, silver coin, watch chain, Templar cross, Neapolitan charm, locket, two bunches keys, eye-glasses, medicine envelope Drs. T. P. & C. L. Tisdale. French noticed the keys because of what Miss Harris told him of Dama's having a box in the California Safe Deposit Company; there was a key similar to one for French's own box in that deposit company; French said if Dama had any valuable papers or effects there was where they would be found; Miss Harris said that the professor had some money in a cigar box and she was suspicious some one might take it; Burtis searched a cigar box, several boxes, but found nothing; French asked Miss Belle Harris to give him a list of the names of Dama's relatives so that he might telegraph to them; she said that she knew where all his papers were and she took out a slip of paper and wrote down some names: Mrs. E. Randall, 59 Blackstone street, Boston, Massachusetts; Mrs. Benj. Randall, 31 Monmouth street, East Boston, Massachusetts, daughters of Mrs. Benj. Randall, Miss Emily Randall, Miss Anna Randall, Miss Jennie Randall, Mrs. A. W. Forbes. French noticed two ordinary deposit books in the desk and told Mr. Burtis to take them out and he would take

the numbers and then he might replace them, as French did not wish to touch anything himself; when French was asking Miss Harris if there were any other names she said yes, and Mr. Burtis took down the name of Captain Gibbons, care of J. F. Chapman & Co., 22 California street, San Francisco, Captain Edward Randall, send all in care of John Ballou. French had never been in Dama's house before and never knew where he had lived until this time; French never told Miss Harris that he had been there before, and he contradicted her testimony as to what passed between them upon this occasion; there was no occasion for any winking between Burtis and him; the next day, Saturday, at about 10 o'clock, his clerk, F. D. Brandon, was instructed by him to prepare petition for special letters of administration in the estate, French had previously requested Mr. A. G. Booth to act as attorney, but he declined, and so French acted in the matter; Mr. Brandon, his clerk, got up the form, except the clause about a Will, which he told him to put in the petition for special letters; French sent Mr. Brandon down to the store of Mr. Burtis, 41 Second street, to have it signed; he had not seen Mr. Burtis that morning; when it was returned signed French took it out to the New City Hall with an order of appointment which the judge signed, January 21, 1888; French came out to the courtroom and found Mr. E. J. Casey, the courtroom clerk, at his desk writing up the minutes; he inquired for Judge Coffey, but he was not in; this was about 11 o'clock, and French waited until nearly 1 o'clock, then French went to lunch and returned at about half-past 1 o'clock, but the judge was not in and he waited about one hour before he came, and then the judge signed the order; then he telephoned to Mr. Burtis to come out and he arrived a little before 4 o'clock; Burtis gave his bond, got special letters; by that time it was after 4 o'clock; Burtis and French came, took the cars, rode down to Mason street, and went to 317 Mason street, thinking they might find the Rev. Mr. Worcester there, but did not find him there; found Mr. Thomas R. Knox outside the house; they went to French's office at 528 California street, and after they came in the Rev. Mr. Worcester came in; French was in the outer office and asked Mr. Worcester to step inside to his private

office where Mr. Burtis was; French then went in, and after some conversation the three went to the Safe Deposit Company and produced the special letters and examined the box; it was for that purpose that they got the special letters; French narrated the proceedings at the safe deposit office when the box was opened; Burtis carried the box out to the outer room where Mr. Worcester and French were and there in their presence the box was opened and the papers were taken out and examined in presence of the four—Mr. Burtis, Mr. Worcester, French, and Mr. Curtis, the manager of the Safe Deposit Company; they first looked to see if there was a will, but found none; they found an envelope marked "Private Paper," and Burtis cut the edge open with his knife; French watched closely for he expected it would contain a Will; they found there Respondent's Exhibit 1, "the Short Memorandum," also the paper called "the Long Memorandum," Respondent's Exhibit 2; Mr. French did not then know Mrs. Sara Barker Smith and never had heard of her; Burtis then put back all the papers without further examination; it was then after 5 o'clock, the gas was lit; French inquired of both Mr. Worcester and Burtis if they knew of a Mrs. Smith and they both said "No," had never heard of her; they then separated and French went home; the next morning Burtis and himself met at his office and examined the City Directory but found no name of Sara Barker Smith nor clue to her identity; they went to 317 Mason street and the nurse, Mrs. Johnson, told them that Mrs. Smith had been there and said that there was a package of papers at her house, 2505 Washington street, and that she was prepared to deliver it to the proper party representing the estate of Luigi Dama, deceased; they went there and met Mrs. Smith, and announcing their errand, she, after some conversation, produced a package encased in brown wrapping paper and tied with a knot which was difficult to untie, and Mrs. Smith said that Mr. Burtis would find it hard to unloose as Professor Dama told her at the time that he tied it with his peculiar knot; Burtis finally cut the string with his knife, and there was taken out the paper in the yellow envelope marked "Private Paper" (marked Plaintiff's Exhibit 28), which was then in the same condition as it was at the time

it was exhibited to the witness upon the trial (February 10, 1891), except the opening at the edge where Burtis slit it open; in that yellow envelope was inclosed a white envelope (Respondent's Exhibit 29, marked "Will and Testament"), and that was slit open by Burtis and out of it was taken the Will which was read aloud in presence of them all; after the reading Mrs. Smith said, "This Will is a surprise to me, I had no need of it, as we have enough without it, and I wish he had left it to somebody needing it more," and Mr. Smith said he was sorry that it had ever been made; Mrs. Smith said she did not know what to do, as she had no experience in such matters; French told her she should have to file it within thirty days and with it a petition for probate, and that she ought to consult her attorney; she said she had no attorney as she had no occasion for one, and asked if he, French, would not act; he told her he had a delicacy on account of his official position in the Commandery, but finally he consented to take charge of the papers for the time; after reading the Will they considered the clause about testator's wishing to have his body embalmed, and at the request of Mrs. Smith, French and Burtis consented to attend to that; Burtis and French then went to the residence at 317 Mason street and reached there about 2 o'clock in the afternoon, stopped there but a moment, and then went to the undertakers on Mission street, Halsted & Co., arriving there about half-past 2 or 3 o'clock, and inquiry being made for a professional embalmer, Halsted mentioned Dr. Lyford and Dr. Kenyon; he telephoned for the latter and they waited, and Dr. Kenyon came in in about fifteen minutes and undertook the work of embalming; French told him that the remains were to be shipped east for interment: Burtis and French then went to the telegraph office and sent telegrams to the east, one to Benjamin Randall and one to John W. Ballou, Bath, Maine; French sent his telegram to Ballou signing his name as "Commander Golden Gate Commandery," because Ballou was occupying a similar position in Bath, and French assumed that the remains would be consigned to the care of the Commandery at Bath, Maine, and they were so shipped; French received no response from Randall, but a letter came from Ballou; French wrote to Randall on the 31st of Jan-

uary, 1888; he also sent other telegrams; French thinks he received a letter from Ballou; French had nothing more to do with the body until the Sunday subsequent, when with his Commandery he went to the undertakers and they escorted the body to the First Congregational Church, Rev. Dr. Barrows, Mason and Post streets, where the funeral took place; French sent another telegram to Bath, Maine, to Frank A. Palmer, Eminent Commander, Dunlap Commandery, Knights Templar, on January 31, 1888, announcing that the body had been sent east by express on Sunday evening and to notify the Randalls.

Mr. French contradicted certain statements of John T. Harris, a witness whose evidence is here given substantially in full: Mr. Harris is a real estate dealer; the father of Miss Belle Harris, Mrs. Ida Cummins and Mrs. Lillian P. McElroy; he knew Luigi Dama; last saw him alive on the evening of Thursday, January 19, 1888; Dama had an operation performed a few days previous; on the 20th of January, when Harris saw Dama again, he was dead; at that time Harris was selling merchandise for R. W. Burtis, 41-43 Second street, San Francisco; Harris saw Burtis between 11 and 12 o'clock in the morning at Dama's house; Harris went there because the nurse, Mrs. Johnson, came to him at the store, stopped on the threshold, beckoned to him and said, "The Doctor (Dama) is dead"; Harris went to the house and saw there R. W. Burtis; he was the first and only person Harris saw there at the time; Burtis said, "Well, Mr. Harris, the professor is gone, I suppose in Heaven with his wife, one that he much loved"; Burtis was walking the floor at the time with his hands in his pockets; after a little while Burtis said, "Mr. Harris, I would like you to deliver two notes for me, one to Mr. French, an attorney on California street, and one to Mr. Knox, a reporter in Judge Sullivan's court"; Harris delivered the note to French in person and to a man in Mr. Knox's office, Knox being absent, a Mr. Armstrong, who volunteered to give it to Knox; Harris frequently dined with the professor at the house of his daughter, Mrs. W. T. Cummins; Professor Dama was a very careful man; in stature he was medium in height, about one hundred and seventy-five or one hundred and eighty pounds in weight; Harris met French

again two or three days previous to Professor Dama's funeral; Harris went there to inquire as to the time of funeral; French wished Harris to say to his daughter Belle to be as quiet as possible and if asked any questions to say nothing; Harris delivered the message to his daughter; Harris had a talk with Burtis about the same time; Burtis made the same request as coming from French; a short time afterward Harris asked Burtis what he meant, and he said he thought that Mrs. Smith would remember Belle kindly out of her legacies from the professor; Harris left Mr. Burtis' employ January 30, 1889; it was after that when he entered another employment; he ceased to be an employee of Mr. Burtis on that date, although he was in and out for some time thereafter; Harris did not profess to know anything about the handwriting of Dama; he was on fairly friendly terms with Mr. Burtis; had had no disagreement with him; the conversations with him were mostly before Harris left his employ; one was at about the time of the probate of the Will (February 27, 1888), something about receiving his pay—Harris could not recollect distinctly. Mr. French testified that he had heard on the Friday night when he went to the house of Dama some talk about a Will from which he inferred that there was a Will; it was distinctly stated that Dama had left instructions as to embalming his body and French inferred therefrom that there was a Will, but it was not said in tenor or in terms; French inferred also that Columbus Waterhouse and Rev. Joseph Worcester were coexecutors because of their intimacy with Dama; French professed to have always felt kindly toward Professor Dama and always treated him courteously; never had any conversation with Dorn or Waterhouse in which either said that Dama disliked French; French came out to the New City Hall on Saturday, January 21, 1888; he could not recollect who were the bondsmen without referring to the bond itself, and upon that being produced and examined by him he said he could then tell all about it; that bond was prepared by him before he came out to the New City Hall at 10 o'clock in the morning of Saturday, January 21, 1888; and was acknowledged by him before Notary George T. Knox; the bond was prepared in advance and in anticipation of its approval by the judge; French said

that when they went to the safe deposit there was a seal on the box; Mr. Curtis, the manager, took the seal off; French received the $100 mentioned in his account of the special administrator settled June 8, 1888, for services rendered as attorney for Special Administrator Burtis; French declared that he was interested in the outcome of this controversy only as to the proper disposition of the property of the estate, and such reasonable attorney fees as might be allowed him by the court; he had no contract with the proponents of the Will; never told anybody that he was to receive $5,000 if the Will should be sustained; at the time that the Will was probated, French declares that he did not hear of its being a forgery; Mr. Naphtaly was then present in court; ex-Judge M. A. Edmonds was there also and engaged in interrogating the witnesses, but French did not know that Edmonds was prevented by his illness from undertaking the contest; French did not counsel or advise with Mrs. Smith or Mr. Burtis as to the production of the alleged Will which is charged to be a forgery, nor with regard to the memoranda found in the safe deposit box; he was present in court when the Will was offered for probate on February 13, 1888, when Mr. Naphtaly was there, but he could not at the time of testifying upon the contest state from memory what occurred at the original probate; he remembered being angry when the witness Antonio Bellini refused to swear that he had signed the instrument, because Bellini's refusal was at variance with a statement he had made to French on the Saturday before; French had no recollection of having heard on the day of probate in the courtroom that the will was a forgery; subsequently he heard some rumors to that effect and saw something in the newspapers to that effect; he heard the witness Antonio Bellini testify on that occasion of the hearing in this court on February 13, 1888, and believed the official report of the testimony which was read to him to be correct. The counsel for contestants animadverted strongly upon the circumstances connected with the execution of the bond of the special administrator, and referred to the testimony of Mr. Jellison, one of the sureties, as to the visit of Mr. Burtis and Mr. French to his place of business on the morning that the bond was signed, and the counsel also called attention to Mr. Bur-

tis' evidence as to his visit to the Safe Deposit Company's office, and his first statement that he visited that office at 2 o'clock upon that day, which statement corresponded with the memorandum made by Mr. Kowalsky from information received by him from Mr. Niss, clerk at the safe deposit office (Contestant's Exhibit R–44 "Jan. 21, '88, Burtis 2 P. M."). Burtis started in to tell the truth about this visit, according to the theory of counsel for contestant, but he afterward varied his statement and contradicted himself over and over again.

### TWO WITNESSES COMPARED.

Counsel for contestant compared Burtis' statements with the testimony of Rev. Mr. Worcester in relation to the same matter. Mr. Worcester, said the counsel, stands head and shoulders over any witness here produced; no man can question his veracity; if he have any fault it is that of underestimating the force of the fact testified to by himself; there can be no doubt, according to the argument of counsel for contestant, that the visit of Burtis was made at 2 o'clock, as he testified at first. The testimony of Burtis is not trustworthy as a whole; it is a mass of contradictions; the insertion of the "Short Memorandum" in the safe deposit box is claimed to have been effected through his agency; as soon as this paper was discovered they asked each other, "Who is Mrs. Sara B. Smith?" They all responded each to the other that they had never known nor heard of her; Mr. Worcester did not, neither did Mr. French, nor Mr. Burtis, but how was this professed ignorance of Burtis and French reconcilable with the finding of the "Altered Will," Exhibit 3, in the drawer of decedent when they were looking over his papers? Burtis is the solitary exception of the old pupils of the professor who had never heard of Mrs. Sara Barker Smith, but she confessed that on one occasion she had heard Dama mention the name of Burtis at the time the professor gave her the ivory boat. Dama's last visit to the safe deposit was May 20, 1887; this was before he went east. The last date of a visit before the date of the alleged Will (May 8, 1887) was May 3, 1887. Between May 3 and May 20, 1887, there is no record of a visit to the Safe Deposit Company. The "Long Memorandum" is dated Novem-

ber 1, 1885, and that is the date of the "Altered Will." The counsel for contestant contends that this goes to show that the forger intended to have these two go together to bolster up each other; so the alleged Will and the "Short Memorandum" were dated the same day and intended by the forger to support each other; this was doubtless the design of the forger. Counsel asks the court to read and compare the testimony of Mrs. Sara Barker Smith at the original probate of the Will and upon this contest. At the probate she testified that she did not see what was on the envelope inclosed in the other marked "Private Paper," and yet here, only a short time prior to the submission of the case, she swore that. she did know what was on it. Counsel for contestant claims that this is a most material variance. The words "Private Paper" is an emanation of her own; it is not an expression of Dama; it was her peculiar phrase; she testified that she gave the expression to him; it is by these little things that forgeries are detected; it is such "trifles light as air" that aid in the detection of crime and contribute to the conviction of the criminal. (See Article "Forgery as a Fine Art," San Francisco "Law Journal," Wednesday, January 6, 1892.) To show that everything was not straight, as it should be, counsel calls attention further to the testimony of Burtis. (See page 108, official reporter's transcript of testimony concerning the letter dated at San Jose, February 4, 1888, to Benjamin Randall from O. A. Hale, the brother in law of Burtis.) What prompted Mr. Hale "in the interest of justice" to write to Benjamin Randall? Why was this letter written, if there were nothing sinuous in the conduct of these persons and nothing crooked in the circumstances of the case? Was the conscience of Burtis beginning to smite him, or was he growing weak-kneed because of his connection with this crime? Why otherwise inspire such a letter? Reverting to the circumstances and incidents connected with

### THE FUNERAL ARRANGEMENTS FOR DAMA.

the counsel considered the embalming especially significant, the extraordinary desire for unusual embalming methods, the employment of Dr. Kenyon to do work ordinarily and efficiently done by undertakers at a smaller cost, and he asks, What was

the reason for this precaution, and particularity, and eagerness even before the certificate of death was obtained? Counsel returns for a moment to regard the behavior of Mrs. Johnson, the nurse, her curious demeanor, and her imploration to Miss Belle Harris for forgiveness, her shedding tears, and her dolorous deportment generally as indicative of a guilty knowledge that would haunt her to her dying day. Where did Mrs. Johnson come from? At whose instance did she come upon the scene? Through Mrs. Helen Cushman, the lifelong and warm friend of Mrs. Sara Barker Smith. And Dr. Tisdale comes in, likewise as the others, introduced on the commendation of Mrs. Cushman.

### DOCTOR TISDALE'S TESTIMONY.

Thomas Price Tisdale is a physician by profession who has practiced over thirty-five years—for over five years in Alameda; he knew Luigi Dama and attended him in 1887 at 317 Mason street, on December 25, 1887, and January 1, 8, and 15, 1888; he has a son practicing medicine with him as partner, Dr. Charles L. Tisdale; Dama was suffering with general dropsy complicated with heart disease, and as in all such cases his kidneys sympathized; Dama asked Dr. Tisdale to tap him, and the doctor told Dama that it would not benefit him and it might hasten his death; the doctor asked Dama upon the third visit if he had settled his affairs, and Dama said he had made a Will and placed it in the hands of Mrs. Sara Barker Smith, in whose favor it was made, and that he left a memorandum and other papers concerning it in the safe deposit box; Dama said that Mrs. Smith had been very kind to him, and in fact if it were not for her he did not know what he should do, as she had cooked his food and attended to him, and he felt grateful to her. The doctor had more conversation with Dama; felt interested in him as Dama was very intelligent; he seemed to understand the medical terms, and the doctor conversed with Dama about his general condition. Dr. Tisdale testified that at the time of giving his testimony he was about sixty years old; a married man with four children; he had made a little memorandum from his books, knowing that he was to come over here to San Francisco to testify, to give the exact dates; his first visit to Dama was on December 25, 1887, his last one was

on January 15, 1888; he was not then practicing in San Francisco, but in Alameda; the doctor prescribed for Dama but performed no operation upon him; in prescribing the doctor asked Dama to whom he was to give his directions in reference to the medicine and Dama said, "Give them to me; there is nobody else to take them; I have no family; there is nobody in this house but me." On the last visit of Dr. Tisdale he saw a housekeeper or nurse there; he told Dama what he thought of his condition; he said to him upon his first visit that while he was not sure he could do him any good he would try to and hoped that he might; on the next visit the doctor said to Dama, "Professor, you are no better, and I am afraid you are not going to be any better; you don't seem to yield to treatment"; the doctor found Dama an unusually intelligent gentleman and understanding technical terms, medical terms, so the doctor became interested in him and talked with him quite a good deal. Upon the third visit the doctor asked him if he had made any disposition of his business, if he had settled his business as a man would who might not recover; Dama told the doctor he had made a Will; the doctor then said, "Where is your Will?" Dama answered, "It is in the hands of Mrs. Smith, in whose favor it is made"; that was on January 8, 1888, on his third visit to Dama. Dama said then that he had put all his papers in the safe deposit accompanied by a memorandum of all his business and a Will. Dama then spoke of the kindness of Mrs. Smith to him. Tisdale had no social relations with the deceased Dama; never knew him until he was called in to see him professionally; knew him only in that capacity. Dr. Tisdale testified upon cross-examination that he was born in Norfolk, Simcoe county, Upper Canada, June 30, 1830; his father was a farmer and lumber dealer. Tisdale was about twenty-five years old when he permanently left there, but he returned from time to time; he did not remember when he began going to school; he went to Oberlin College, Ohio, when he was fourteen years old, about the year 1845; he was there four academic years; afterward he traveled for some time with Dr. Dio Lewis, the celebrated physiculturist, who was delivering lectures on physiology and anatomy, illustrated by the use of papier maché manikins.

Tisdale used to take tickets and assist him that way. He also studied medicine in the Western College, Cleveland, Ohio, and graduated when he was about twenty-eight years old, and afterward practiced at different places in the United States and in Canada; he came to California fourteen years ago; arrived first at Sacramento, stayed there one day and came to Oakland; after staying there six months went to the Sandwich Islands. Dr. Tisdale could not remember when he had last seen Mrs. Cushman prior to testifying (March 9, 1891); he had not seen her in some time, could not approximate the time; had not seen her recently, for he had no cause to see her; she lives probably four blocks from his house; she is friendly with his family; the doctor had never known her to visit his wife; his son, Dr. Charles L. Tisdale, is married; he lives in his own house in Alameda and has an office hour in the senior doctor's house in the morning. To the best of the senior Dr. Tisdale's remembrance he first met Mrs. Sara B. Smith at Professor Dama's house when she was visiting there; he met her there but did not think he was introduced by anyone. Dr. Tisdale moved to Alameda on May 1, 1886; he prescribed for Dama cannabis indica, Indian hemp, prepared by himself, and he gave it to the patient on the last occasion of his visit to him; it was probably the usual dose in such cases; the doctor administered to Dama the usual remedies in such cases as his; he charged from five to eight dollars per visit in this case and sent the bill to Dama before his death; the doctor did not remember what he said to Mrs. Smith or she to him on his first seeing her in Professor Dama's house; he thinks he saw her on the second visit; met her in the hall but could not remember the particulars of her personal appearance.

### DAMA IN A CRITICAL CONDITION.

Dr. Tisdale told Professor Dama upon his first visit that he was in a critical condition and that he did not know whether he could help him, but he would try; the doctor did not say anything to Dama about making a Will; upon the second visit the doctor told Dama in substance that he had not improved any; upon the first visit the doctor saw Mrs. Smith in the hall after he got through; upon the second visit the same way; cannot

remember what she said to him or he to her; upon the third visit the doctor said, after declining to tap Dama, to perform the operation of parasentesis abdominalis, "Professor, I hope you will get well, but I fear you will not; it is wise for every man to have his business settled; have you got your business settled?" Dama replied, "I have made my Will; it is in the hands of Mrs. Smith, in whose favor it is made, and a memorandum of all my business is in the safe deposit," and Dama went on to say that she had been very kind to him, in fact he did not know what he would have done for food except for her. Dama said "a memorandum of his Will and all his business" was in the safe deposit; "she had not only cooked his food, but had sent it and brought it to him"; that is all that the doctor remembered; the doctor asked Dama nothing further about his business; the fourth and last visit made by the doctor to Dama was on January 15, 1888; he was no better—in fact worse; the doctor told Dama as much in substance; Dama wanted the doctor to tap him but he refused, giving him the same reasons as before, that it was not wise for him to do so; the doctor and Dama discussed it pro and con, and the doctor declined as already stated, and made his prescription and went away. Mr. French paid the doctor his bill. Contestant's counsel, Kelly, says that it is utterly improbable that any such conversation occurred between the doctor and the decedent Dama as this physician testifies; and the zeal with which Tisdale vouchsafed this information was enough to condemn it as untruthful. The counsel commented severely on the unprofessional manner in which the doctor testified as to knowledge acquired only in his office and character as a physician; and alluded to the doctor's marvelous feat of memory in recalling these details that occurred years ago, and yet failing to recollect matters which took place in his testimony only a few days before. Counsel contended that the conversation Tisdale testified to never took place, but was a scheme concocted to bolster up the case of respondent, and the counsel asks, Why did Professor Dama confide solely in Dr. Tisdale the making of the Will and yet never have alluded to such a fact to any of his intimate friends, not one of whom was made the recipient of his confidence, and yet so important a revelation

was imparted to this Dr. Tisdale, an acquaintance of a few weeks' duration, called in only as a doctor and in no sense a friend, his employment purely professional and no social relations existing between them?

### THE CONDUCT OF DR. TISDALE,

according to the counsel, is explicable only on the theory that he had his part to play in this conspiracy and combination and he was anxious to fulfill it; his remark to a young man in the apartment adjoining the courtroom, while he was excluded from the court during the argument on the motion to strike out his testimony, that it made no difference anyhow, even if the motion prevailed, that his evidence was before the court and would have its effect, illustrates the character of the man.

Reverting to the testimony of Mrs. Sara Barker Smith about the incident of Dama giving her the Will, counsel declares that her statement is inherently improbable, her remarks, attributed by her to Dama, about Waterhouse having the key of the safe deposit box could not have been made, as they were not in accordance with the fact as has been proved in this case. Counsel claims that Mrs. Smith is contradicted as to the whereabouts of the Will and its having been continuously kept among her laces, never having been taken out, by her own statements and by the testimony of her husband, who said she told him it was kept between the mattresses. Julius Paul Smith, the husband of Sara Barker Smith, the respondent in this case, had been also a pupil of the deceased Professor Luigi Dama, with whom he became acquainted in 1884 at Mr. Smith's house on Jackson street in the summer of that year; Smith was introduced to Dama at his house by his wife; the object of the professor's coming was to let Smith become familiar with his method and to illustrate it, and Smith began to take instructions shortly after and continued for a few months; the last time that Smith was at Professor Dama's house was in that summer he attended Dama's funeral, the second Sunday after his death, about eight days after his death, with his wife; Smith followed the procession as far as the ferry, and after the remains were sent by express east, returned home; he first

learned of Dama's death on January 21, 1888, at his office in the Nevada block; it was Saturday, the 21st of January, 1888, that he learned of it from his wife, who called at his office and informed him; Smith became acquainted with Mr. French on the succeeding day, about 1 or 2 o'clock, Sunday, January 22, 1888; a gentleman named Burtis was with him— they came together to his house; there were present these gentlemen, his wife and himself; it was between 12 and 2 o'clock; they remained about one hour; Mr. French introduced himself as the Commander of the Commandery to which Dama belonged, French then introduced Burtis as special administrator of the estate of Dama; it was Mr. French who stated that they had learned from an examination of the papers at the safe deposit that his wife was the custodian of the Will of deceased; she then left the room, was absent about a minute and returned with the Will wrapped up in wrapping paper, tied with a cord, saying she was glad to surrender it; then Burtis cut the cord and found a package within it and Mr. French told him to cut it; he did so and found within it another envelope marked "Will and Testament"; Burtis cut it open as he had done the other and there was therein disclosed the Will which Burtis proceeded to read; the first envelope was indorsed in ink "Private Paper," lengthwise, according to the recollection of Smith; the envelope was cut lengthwise, he thinks, but he might be mistaken; Smith's impression was that the paper in the white envelope contained about four pages or two sheets; he thinks the writing terminated on the fourth page; that was a mere matter of detail that did not interest him, but his memory was that it was foolscap; it seemed now to him as though the signatures of the witnesses were on the fifth page, and he recognized and identified the alleged Will as the paper found within the envelope; Burtis read it first aloud and then French read it also aloud; then French or Burtis took possession of it; French said he had a box at the safe deposit in which there were several Wills and he could put it in there; Smith appealed to his wife that that might be done until it could be brought out to the court for probate, and he never saw it in court until it came up for probate; Smith denied that he made any such statement as was im-

puted to him in the deposition of Benjamin Randall, and said that it was only under very earnest solicitations that he had the interview therein adverted to; he was requested to make a statement of all his knowledge of Luigi Dama and what he knew about his affairs; Mr. Russ made the request, Benjamin Randall being then and there present; Smith related to them all the circumstances of Dama's death as he had been first apprised of it and told them that he was sorry when he learned of the contents of the Will; Randall said something about "the alleged Will," that there were some suspicious circumstances about it and that it was forged; Smith then became indignant and irritated and arose and said that he would not listen to what was an imputation upon him and his wife, and he left, the interview terminated; this interview may have lasted fifteen or twenty minutes, possibly longer; since that time he had not seen Benjamin Randall. Mr. Smith recalled that it was Mrs. Helen Cushman who accompanied himself and wife to the funeral ceremonies at Dr. Barrow's Church on Sunday, January 29, 1888, and he also recalled that when at his house the professor used to spend an hour or an hour and a half in giving instructions and imparting a knowledge of his method to himself and his wife.

### WHEN MRS. SMITH TOLD HER HUSBAND ABOUT THE WILL.

His wife first told Smith that she possessed the Will on Saturday, January 21, 1888; she came in and told him at his office; he was at home during that week; his wife told him that she had just come from the professor's residence where she learned of his death; if she had any other information she did not impart it to him; he was in the house with her the night before and every other night that week; she told him she had just learned of the professor's death and came to tell him about it; Smith was in his office when she came; he thought she was a little discomposed in manner; she did not shed any tears so far as he could recall; his wife informed him that she had the last Will of Dama and asked him what she should do; he said to her that he supposed the proper party would call for it; Smith remembers reading in the newspaper reports of the evidence given in this case that Miss Belle Harris called at his house on that Saturday morn-

ing; when his wife called at his office she remained but three
or four minutes; she did not take a seat but went away when
he told her that he could not see what she had to do except
to wait until the Will was called for; she told him that when
the professor gave the paper to her to keep she expressed
surprise and asked why he did not deposit it in his safe
deposit box, but the professor told her that there was another
person who had a key to the box and it was just as well that
it should be in her custody; she told her husband that Dama
gave it to her just prior to his going to Boston the last time;
she put it between two mattresses of her bed; Smith saw it
on the morning she produced it and showed it to French and
Burtis; she then said she had kept it there between the mat-
tresses; it was about May, 1887, that she obtained custody
of the document, and from that time until January 21, 1888,
she never disclosed her possession of the Will to her husband;
he should not have favored her keeping custody of that Will
had he known it; the reason of her not disclosing her custody
of the Will had never been the subject of discussion between
Smith and his wife, and they did not discuss the subject on
Saturday evening; on the next morning, Sunday, they had a
conversation about the matter; she told how she came into
possession of it, how she had declined to accept the custody
and Dama insisted and then she took it—he said he thought
it would be safer in her hands; she said that she did not want
the responsibility and it resulted in her retaining the package;
the name of the party who he said had the key of the box
was Columbus Waterhouse; Smith would not be positive that
his wife told him that that was the name, but that was his
impression, and he had never understood since as a fact that
the Rev. Joseph Worcester was the gentleman who had the
box key; his wife told Smith that Dama said that if she went
east, as she contemplated, to take the package with her; this
conversation occurred on Sunday morning, not on Saturday
at his office; Smith recalled that he said at the time of the
conversation between them and French and Burtis that he
did not want any publicity about any bequest of that kind,
and that French said that it would be more seemly not to
have the Will probated until after the funeral; French spoke
of the reasons why special letters of administration had been

obtained because in the absence of any known relatives the Commandery took charge; Smith went east in the early part of May, 1888, after the Will was probated in San Francisco; when he went to Boston he called upon the acting probate officer and presented his papers of authorization from the executrix here, his wife, and made a demand on the Safe Deposit Company for effects, but did not succeed in obtaining them; Smith met Mr. Russ in his office in Boston; he went there at the instance of Mr. Tisdale; Russ desired him to make himself known and give references and show who he was, but Smith declined to acquiesce (see page 35, judge's manuscript notes deposition of Augustus Russ, attorney at law); his attorney in Boston, Joseph R. Smith, advised him to do so; he was employed by him in that matter only; Mr. Tisdale and his attorney, Mr. Smith, advised him that it would be policy to have an interview with Randall and his attorney, Russ; Smith went there and made a statement as has been already narrated; it was a foolish interview in his opinion, and has been misrepresented; Mr. Smith had always been very much interested in the cultivation of his wife's voice; the lessons were for the cultivation of her voice, for her own delectation and the pleasure of her friends and the benefit of her health; he did not recall that he ever paid directly for her lessons, but he was cognizant of the fact that she paid, from her statements, but he did not know how much she paid; all he knew was that he gave her money to pay and she told him that she did pay; the period of her taking lessons from Dama covered an interim of four years to a day. Smith's wife's maiden name was Sara Barker; she was temporarily living with her mother, on a visit, when he married her; she had resided with her sister in Janesville, Wisconsin, who was in prosperous circumstances. Smith could not recall the material on which the Will was drawn or written, he had only seen it on two occasions; the matter of the paper cut but little figure with him; it was the characteristic handwriting and the signatures; he did not recall the scroll or rubric under the words "Private Paper"; Smith was thoroughly familiar with that writing and said that there was an individuality about it that would make it very difficult to imitate; it impressed him that way. Smith declared

himself decidedly interested in the result of this trial with respect to the aspersions and defamation, but with regard to the monetary consideration, no; he repeatedly said that he looked at it as a mistake that Dama should have made that bequest. Smith denied that he had advanced any money directly or indirectly for the witness Godard, but he had advanced money, but did not know to what purpose it was applied; he had had conversations with some of the witnesses connected with the case; he had spoken to Mr. William T. Cummins in the corridor of the courtroom but not about the case, only about the peculiarities of Dama; Smith knew Mrs. Helen Cushman in Janesville, Wisconsin; her maiden name was Wilson; she had been twice married, and was a warm personal friend of his wife.

### JULIUS PAUL SMITH'S RECORD.

Smith was married to his wife in 1870 in Edinboro', Pennsylvania; he went to college when he was thirteen years of age, remained there at Milton College until he was seventeen or eighteen, when, during vacation, he volunteered in the Union army and served for three years; he was afterward engaged in merchandising in the south and elsewhere until he came to the state of Nevada in 1873; he went to Europe in the autumn of 1881, remained there until near the summer of 1883; was in England on two occasions, but not long on either; the first time late in the autumn of 1881, when he remained about a week; the second time, prior to his return to this country, possibly for a month, as he recalls. Smith brought his account books into court containing the Dama account in this case, and it appeared therefrom that his disbursements, exclusive of counsel fees in the case, had been up to this date (April 1, 1891) $1,350, of which $1,000 were paid, as he was informed, for expert witnesses; Gumpel he had known for years; he knew Mrs. Johnson only by sight; he had seen her in the courtroom; he heard from his wife that Mrs. Johnson had visited their house; in regard to what his wife said about placing the package containing the Will between the two mattresses, that was merely temporary—the usual place was among her laces in her trunk.

Counsel for contestant contended that the testimony of Miss Belle Harris is truthful, and, in contrast to that of Mrs. Smith, must have favorably impressed the court, that Miss Harris was a disinterested witness, and her statements were made in a manner that inspired confidence and compelled credence; her testimony should be noticed with regard to the demeanor of Mrs. Smith when the latter called at the professor's house after his death; and he also directed the court's attention to the transaction at the house of Mrs. Smith when the attorney French and the Special Administrator Burtis called on Sunday after Dama's death, her singular conduct in delivering up the Will and taking no receipt nor any copy nor doing anything else to preserve inviolate the document; this he considered a curious mode of dealing with the document, if Mrs. Smith's testimony be true. In speaking of the meeting that took place at French's office the counsel said it had the appearance of preconcert, and he glanced at the testimony of Burtis concerning the way in which that meeting was brought about. This counsel claimed that Burtis and French had a thorough understanding before they called up the convocation of the members of the Commandery as to what they should do; their plan was already perfected; they had no doubt that Mr. F. W. Sumner and Mr. A. G. Booth would decline to act either as administrator or attorney, and French and Burtis were then prepared to execute their project; this, in the opinion of the counsel, is clearly the way in which they co-operated.

#### DAMA PREJUDICED AGAINST OLOGRAPHIC WILLS.

There was another reason, in the opinion of counsel, to show that Professor Dama never made this Will; Dama had a prejudice against olographic Wills, because of the failure, on account of the omission of a date, to secure the probate of his wife's Will, and the consequent deprivation of what he was entitled to under that instrument. It does not seem probable or possible to counsel for contestant, in view of this, that Dama would have adopted such a form of

testament for himself. And again, consider his change of sentiment toward the Randalls after his visit to the east, according to the testimony of Dorn. It is necessary to make a brief reference to the testimony of Henri Wigger, the notary, a witness for respondent, who drew up a Will for Dama, a fragment of which is here (Respondent's Exhibit 78), written by Wigger in 1882 in his office. Wigger testified that he knew Luigi Dama, and the paper marked Respondent's Exhibit 78 was written by him in 1882 for Dama in his office at 240 Montgomery street; that is a part of the Will drawn by him for Dama. Dama was in a great hurry and John C. Hall, the attorney, told Wigger to draw up a Will for the old gentleman. Mr. Dama gave him the ideas for the Will and he made the rough draft which is the Exhibit 78, then he made a clean copy of it. Mr. Columbus Waterhouse came with Dama and when Waterhouse left Wigger was alone with Dama. Another fact of vital importance, in the estimation of this counsel, was the disappearance of the paper which Mr. D. S. Dorn testified he saw in the courtroom and which was drawn by him as a Will for the decedent Dama. Counsel concedes that there is no doubt that there was a Will drawn or executed by Dama. This was in May, 1887, but that Will so executed and attested was a different instrument from the one here in question.

CHARACTERISTICS OF THIS WILL.

This alleged Will is clothed in all the conceivable habiliments of crime; it bears upon its face the stamp of falsehood and the impress of fraud and all the indicia of forgery, and those who forged it, who conceived, concocted, and consummated this crime, were in possession of the Will actually executed in May, 1887, attested in presence of Dellasanta, who did not sign as a subscribing witness, as Dama told him it was not necessary, as three were enough, Mathieu, Godard, and Bellini having already attested, and the conspirators and forgers used that document as a pattern in the execution of their pernicious purpose.

### AN ALLEGED CONSPIRACY.

Counsel for contestant contended that the evidence would show that the statements of Mr. French were not to be relied upon; his own confrère, Mr. Burtis, unconsciously revealed in his testimony that there was a gigantic conspiracy in this case of which he and French were the main manipulators. French and Burtis had a thorough understanding as to what should be done about taking possession of the property of decedent Dama before they called up Sumner and Booth for the star chamber convocation at French's office; there is every element of preconcert here; French is contradicted by his colleague in this conspiracy, Burtis, and he is also contradicted flatly by the witness Jellison; he is also contradicted by Miss Belle Harris in regard to what she told of his having said about magnifying a claim of a nurse from $200 to $2,000 against an estate. There is another fact to which William T. Cummins testified, that the employment of French was caused by the fear that he would use some papers which he possessed; there was no need of another attorney's service, for Adley Cummins was competent and sufficient, but Adley told William T. Cummins that Mrs. Smith was afraid that if she did not employ French the latter would use to her damage certain papers that he held in terrorem over her. What were those papers? Wherein could they have imperiled the interests of Mrs. Sara Barker Smith? This is another evidence, asserts this counsel, that there was here an outrageous conspiracy and combination to secure possession of this property. This testimony came from one of the respondent's own witnesses, for William T. Cummins was a witness for the respondent's side, and a very zealous witness, although he said he was not a partisan; he was a witness impeached by his own wife, a lady who came upon the stand at what must have been so great a sacrifice of feeling in response to a sense of duty.

Counsel also dealt with shorthand reporter Thomas R. Knox, who was so completely broken up on cross-examination, and was compelled to confess that he had, when he first heard of the Will, expressed incredulity because of the absurdity of its "perfectly ridiculous" provisions with respect to the development of Mrs. Smith's vocal organs; and counsel also reverted

to the testimony of the respondent, Mrs. Sara Barker Smith, to expose its inherent improbability, inconsistencies, incongruities, contrarieties and contradictions. Counsel, in summing up the case, adverted to the promise in his opening statement that he would prove that this alleged Will was false, forged and fraudulent, and said that the question for the court to consider was whether he had kept his promise, and if the answer be in the affirmative, he should expect a judgment in favor of the contestant, and if in the negative, he would submit with respect to an adverse decision, and his colleague and himself would try to reflect and study and learn wherein they had been blinded for three years and a half.

He said that before coming into the case he took it on probation for more than thirty days until he was fully convinced of all the facts alleged, and he realized the importance of the issue and the

### SERIOUSNESS OF THE ACCUSATIONS

and implications upon the integrity of persons of hitherto high standing in social and professional life, and no consideration of self-interest moved him to action—nothing but the conviction that here there was a great crime committed which it was his duty to disclose to the court and to wrest from its perpetrators the fruits of their act and to restore to the rightful heirs their estate. The case made by the evidence, in his opinion, more than justified the promise, and the defense attempted fully substantiated by its weakness the incapacity of respondent to answer the allegations and to account for the circumstances so incriminatory which surrounded the entire transaction from its inception to the time and to the termination of this trial. Truth is never a coward; it can be told at all times, but a falsehood can never be told with safety, and that is the trouble, counsel claimed, with the excuse given by Mr. French, the Eminent Commander, for not having communicated the facts in his possession concerning this Will to the relatives of decedent; his conduct and that of those concerned with him at the time immediately subsequent to the death of Dama savor strongly of suspicion, and afford ground for inference of iniquity and infamy and moral and legal turpitude in the transaction. The circumstances all tend to the same conclusion, and lead as by demonstration to the de-

duction that crime was committed. Who was among the first to suggest sinister methods in this matter? William T. Cummins, respondent's own witness, who stated that his deceased brother, Adley H. Cummins, had said that the Smiths were forced to employ the attorney French because they were in fear of him and that he had them in his power, and Adley Cummins was finally taken in as an attorney of record to silence him in his speech consequent on chagrin at first being set aside for French, but the Cumminses were not the only ones to set an alarm. The nurse, Mrs. Fannie Johnson, and Burtis also struck the alarm, as is shown by the letter of O. A. Hale to the Boston relative, Benjamin Randall. The conduct of the nurse, and the declaration of her counsel, Castelhun, which was excluded under objection of professional privilege, was significant. Why should respondent's attorneys have shut out that conversation, if they were conscious of their client's innocence? What have they to fear, if innocent? Why close the door to truth by the plea of privilege, if they had nothing to fear from disclosure? The same counsel adverted to the haste on the part of the conspirators, as he called them, to obtain possession of the property of decedent, the rush for special letters. It was a part of their scheme to possess themselves of Dama's papers and effects, so that they could cull out what they wanted and dispose of what they did not care to retain to serve their purpose; he called particular attention to the statement of French in his letter to Rev. Joseph Worcester that the friends of Mr. Dama desired a Templar funeral and that the Rev. Mr. Worcester would not be expected to officiate. (Contestant's Exhibit H-34, letter of F. J. French to Joseph Worcester, January 26, 1888.) Who were the friends that desired a Templar funeral? Was it Mr. Waterhouse? No; the Knoxes, or any of those who had been the friends or familiars of the deceased? Not one of them made such a request or was called into counsel. The counsel claims that this was a part of the conspiracy to gain possession, not only of Dama's property, but of his very remains. The calling in of the Past Eminent Commanders at the office of Mr. French was a part of the plan of the perpetrators of this crime, a contrivance by the conspirators to connect with their conduct the names of respectable men like F. W. Sumner and A. G. Booth, men of

irreproachable character in the community and exalted rank in Masonry, so by association with them the conspirators French and Burtis could claim credit for honesty and uprightness of motive; but it was a shallow scheme, as counsel claims to have shown, and too transparent to withstand intelligent scrutiny; their plot was too patent to be aided by such device. Mr. Kowalsky criticised Mr. French's conduct particularly. Mr. French is an attorney, was once the attorney for the public administrator, and knew very well what was his duty in regard to the property and effects of the decedent in the absence of kin resident here. French had no excuse for honestly evading this duty, but to carry out this scheme, this counsel asserted that it was essential that French obtain and retain charge of the custody of the effects of the deceased. If French had been consistent as a lawyer and as an honest man he would have no care for criticism nor have need to shun slander, which never harms an innocent man. The counsel for contestant asked, Why was French in such haste to obtain special letters? Was it a mere mistake of judgment? Did he not know that if the Rev. Joseph Worcester were in time advised of his duty as one named as executor in a Will he would, if he acted as a sensible man, apply for special letters? Was it a mere mistake again for Mr. French to act as attorney for the special administrator? No, answers this counsel, these were not mistakes of judgment; they were acts of design in conformity with the conspiracy already concocted. Every act of French shows deliberation and design. Why was he lurking all day, that Saturday, a short business day, around the New City Hall? Why such haste to reach the safe deposit office, to which he and Burtis repaired at 2 o'clock? Counsel claims that the visit of Burtis to the safe deposit office at 2 o'clock in the afternoon of Saturday, 21st of January, 1888, is clearly established, and says that if there be a fact in this case proved, it is that Burtis was there at that very hour, and in this connection the counsel criticised the testimony of Curtis, the manager of the safe deposit, and said that the explanation that the first memorandum made of Burtis' visit at 2 o'clock and given to him, the counsel, was the result of a mistake made by Curtis in "calling off" to the bookkeeper, is absurd; and the counsel says that Manager

Curtis, in furtherance of this "accidental" error, had to make another "mistake," and had to have a seal on the safe deposit box, and for that purpose information should have been received of the owner Dama's death, and therefore they had to make it appear that Rev. Mr. Worcester called early on that Saturday morning and talked to old ex-Chief Whitney, then the nominal superintendent, not to Curtis; but Worcester's testimony is that he never leaves his home at that time in the morning, and that he has no recollection of visiting the safe deposit vaults as testified to by Curtis, and that it is entirely unlikely that he did so visit. The fact and truth is, claims the counsel, that Curtis' first information came from Burtis at the 2 o'clock visit of the latter to the safe deposit vaults, and then when the conspirators had their plan perfected they notified the Rev. Mr. Worcester to go down with them to see if there was a "bird in the box," and so they took Worcester down and took him in to see what they already knew was there.

THE VISIT TO THE SAFE DEPOSIT.

This is a severe reflection upon Mr. Curtis, the superintendent of the Safe Deposit Company, who has been connected with that concern for over ten years, and who in his testimony described the modus operandi of obtaining access to the boxes and vaults of the Safe Deposit Company, and produced the books of record of which he had control, including the original agreement (May 5, 1885) with Luigi Dama at the time when ex-Chief Whitney was superintendent and Curtis assistant. These books show that Dama visited safe 1638 on May 3, 1887, at 9:02 A. M., and on May 20, 1887, at 8:45 A. M., and that Burtis visited the same safe January 21, 1888, at 5 P. M. Curtis said that Burtis called the day after Dama died. Mr. Worcester called the next morning after Dama died between 8:30 and 9 o'clock, just as Curtis was going off watch; Worcester came there for a special purpose according to the information received by Curtis. When Burtis came he produced a certified copy of the letters of administration as special administrator; Mr. French and Mr. Worcester were with him. When they hear in the safe deposit of the death of a box-holder they put a seal on his box, and that seal remains until they receive an

order from the probate court. It was just about getting dusk when French, Burtis and Worcester called; no one else called for that box that day to his knowledge. Curtis recollected when Mr. Kowalsky brought an order to him from the court (Contestant's Exhibit T–46) to furnish information, and the paper (Contestant's Exhibit Q–43) was furnished by the safe deposit bookkeeper. (Mem. on paper: May 3–87 Dama 9:02 A. M.; Jan. 21–88, Burtis 2:00 P. M.; Jan. 21–88, Burtis 5 P. M.; May 20–87, Dama 8:46 A. M.) Curtis did not remember who was with Mr. Kowalsky at the time he brought the order; it was about a week after that paper (Contestant's Exhibit Q–43) was sent to the counsel that Curtis saw him; counsel was passing by the office and Curtis saw him and called him down into the office and told him that the bookkeeper had made a mistake in the memorandum in calling off the numbers. Curtis said that he was calling and called off the wrong number, he was at the time doing two men's work in opening safes, entering in his own book, and calling off to the bookkeeper, and thus the mistake occurred. Curtis did not see the memorandum when it went out and so did not discover the error in time to correct it before they received it. The witness Curtis was examined closely with reference to alterations in his record books of visits to the safe. Mr. Whitney was not present when the gentlemen, Rev. Mr. Worcester, Mr. French, and Mr. Burtis, called on the 21st of January, 1888. Curtis was on watch all day that day except about two hours in the morning; all the day except from about 9 o'clock until 10:35 A. M. The witness Niss, the safe deposit bookkeeper, testified that the entry on Contestant's Exhibit Q—43 was an error.

### THE WITNESS BURTIS CRITICISED.

The counsel desired the court to carefully examine the testimony of Burtis and to consider his demeanor on the witness-stand; the counsel said that the appearance and demeanor of the witness Burtis was as important as his words—nay, more, for words are often used to conceal thoughts, but the secret and sensitive nerves unconsciously reveal the thoughts, and the novice in crime vainly strives to dissemble, and the lie on his lips is discovered in the countenance of the criminal neophyte, who is unable to master his emotion or disguise his

duplicity. Burtis' whole behavior as a witness, his hesitating and halting answers, his expression and shuffling in examination, all tend to discredit his testimony. Mrs. Johnson's visit to the store of Burtis on the day of Dama's death was a mere subterfuge, and her story was false. What was it that occurred in Dama's house on the day of his death to require the manufacturing of so many fabrications? Why pile falsehood upon falsehood, unless there was crime to conceal? Honesty requires no prevarication to support it, but crime and dishonesty demand to be sustained by falsehood and equivocation. Who were in that house on the morning of the day of the death of Dama, that very sudden death—so sudden that the old professor had no time to turn his thoughts heavenward or look once more upon the picture of that wife whom he loved so well? Who were there? Mrs. Fannie Johnson, nurse, Burtis, and Mrs. Sara Barker Smith; these three and no more. Why should these persons prevaricate and equivocate concerning what transpired that morning, if there were no crime to cover? Burtis was there, and the counsel asserts that he proceeded to rifle the pockets of the deceased Dama immediately after his death and to ransack the drawers and examine the effects. Consider in this connection the recitals in the petition for special letters drawn by Mr. French and subscribed by Burtis with the denials of the latter. The petition for special letters was written at length by Mr. F. D. Brandon, then engaged in the office of F. J. French, and contains a recital that deceased had a box in the safe deposit office, and this petition was signed by Burtis, and yet he swore on the stand in this trial that he did not know that Dama had a safe deposit box. That due search and inquiry had been made for a Will, and that the petitioner believed there was one in the box of the Safe Deposit Company, is a recital in the petition for special letters. How did Burtis obtain that information? Counsel says that it was from his fraternal friend French, from Sara Barker Smith, and from Fannie Johnson; these were the informants of Burtis, according to the theory of contestants.

### POSSIBILITY OF CRIMINAL COMBINATION.

The counsel for the respondent claimed that it is impossible that such a combination could have been formed or existed,

but counsel for contestant assert that there is now, as a part of the history of juridical contests in California, an instance of a greater combination, the Sharon case, supported as it was in court in the very courtroom in which this trial was in progress, at the very bar at which counsel were standing, by numberless forged documents and papers, by perjuries some of which were disclosed only by deathbed confessions, and other retractions and revelations of conscience-smitten witnesses, and counsel said that that case was curiously coincident with this one in many particulars, which the counsel undertook to point out. Both cases had many points of contact, according to counsel for contestant, but as that case is shattered into fragments, ground into dust, and is another example of justice finally triumphant, and is a proof of the maxim that truth is great and will ultimately prevail, so it will be here. The conduct of French and Burtis in connection with the funeral arrangements for Dama was severely censured by counsel for contestant as contrary to Masonic obligations. It was their duty to communicate first with the local lodge of which the deceased was a member, the Commandery being no part of Masonry proper, and the counsel contends that this action of French and Burtis is an additional proof of their criminal complicity, and that the earmarks of conspiracy are present from the time of its conception; from the moment they conceived the idea the conspirators closed in on the decedent and made their corporation so close that no one else had opportunity of access to him, and so they contrived to exclude everyone from viewing his body after it was hurried to the undertaker's rooms.

### TRACES OF COMBINATION AND CONSPIRACY.

They refused to Mrs. Columbus Waterhouse, herself a physician, the privilege of looking at the body during the time it was in the rooms of the undertaker—all through are traces of combination and conspiracy unmistakable and ineffaceable. Mrs. Amelia A. Waterhouse testified that she was the wife of Columbus Waterhouse, was a doctor by profession, and had lived with her husband in California about thirty years and in the city of San Francisco twenty-five years before the date of her testimony, which was December 16, 1890; she knew Professor Luigi Dama very well and her acquaint-

ance began with him about the year 1880. He first lived at O'Farrell and Powell streets; after his return from the east he boarded opposite, and subsequently he moved to 317 Mason street about 1882, at the time her daughter married. Dama was a very careful man, very precise; he was very particular about his money matters. Mrs. Waterhouse saw him the Tuesday before he died; she was there on Friday after he died, saw there Mr. Burtis, also the nurse Mrs. Johnson, Miss Harris, Dr. Brigham, Mr. French, and several other gentlemen and a group of ladies. Mrs. Waterhouse had a conversation with Mr. Burtis, who asked her to come in and see the professor. Burtis said the professor died at 10 that morning. Mrs. Waterhouse went to the undertaker at the time the body was being embalmed and she asked permission to see the body, which permission was not granted; Halsted, on Mission street, was the undertaker; she saw the body after it was embalmed and in the coffin. Mrs. Waterhouse was a graduate of the Hahnemann Homeopathic Medical College; graduated in October, 1890. Mrs. Waterhouse visited Mr. French's office the day after Mr. Dama's death. Mr. French was out but she saw Mr. Burtis there, and he said that Mr. French had gone to see Judge Coffey, to procure permission to examine the safe deposit box; this was on Saturday noon, at about 1 o'clock; she left word with Mr. Burtis for Mr. French that Mr. Waterhouse and Mr. Worcester were executors of the Will that she knew was drawn up. Mrs. Waterhouse recollected that on the night of the day of Mr. Dama's death at his house, in the presence of Mr. French, she said in her usual tone of voice that Mr. Dama had left a Will in which Mr. Waterhouse was named as executor; it was on the next day that she visited Mr. French's office; he was not in; his clerk was in the outer office; she went into the inner office to write a note to him; she found there Mr. Burtis sitting behind the door; she asked him why he did not tell her he was there. Mrs. Waterhouse made a memorandum of what she did so that she could write to her husband, who was then in Mexico; she kept a sort of diary for that purpose; it was between 1 and 2 o'clock on Saturday, January 22, 1888, in the afternoon, when she visited Mr. French's office; she remained perhaps ten or fifteen

minutes in the office; Mr. Burtis was in plain sight all the time.

### THE FUNERAL ARRANGEMENTS.

Concerning the funeral arrangements, undertaker J. L. Halsted testified that he remembered the funeral of Luigi Dama and the time when Burtis and French came to his establishment about the embalming and when they sent for Dr. Kenyon; Halsted was engaged for a part of two separate days; Dr. Kenyon was also engaged for the same time in the process of embalming; no one was excluded except one day when Mrs. Waterhouse called and Halsted told her that the body was not then in a presentable condition; no one gave Halsted instructions to exclude anybody; the body of Dama remained in Halsted's place during a week longer, and very many persons visited the place to view the body while it lay there; Halsted's firm embalms bodies; Dr. Kenyon may have embalmed other bodies there, but Halsted's son was the regular embalmer for the firm and is considered a good embalmer.

William Augustus Halsted, the son of James L. Halsted, corroborated his father, and said that he did not know Sara Barker Smith and never saw her to his knowledge; the father was a member of the Golden Gate Commandery, but the son was not; William A. Halsted was an embalmer and had had very good success; thought he could have made a good job in this case, but Mr. French put so much stress upon its being a "first-class job," and seemed to be so very particular, that Halsted wished to shift responsibility and suggested Dr. Curtis G. Kenyon, who was then making a specialty of embalming; the junior Halsted charged, according to the character of the case, from $150 to $400 for embalming. Dr. Curtis G. Kenyon, the physician, described the operation of embalming the deceased. Dr. Charles B. Brigham testified that he performed an operation upon Luigi Dama to relieve him from dropsy. Dama was far gone with Bright's disease; it was impossible to cure him of that; he was an old man and his heart was very weak; he probably died of heart failure; there was a great deal of pus and much albumen in the urine; this was on the 17th of January, 1888, at 317 Mason street; Dr. Brigham continued to visit Dama until he

died; Dama seemed very much pleased after the operation and Dr. Brigham left him comfortable in his bed; Dr. Brigham first saw Dama the day before he performed the operation. Dama was a feeble old man; his pulse was intermittent and feeble; he was instructed to stay quietly in bed; when Dr. Brigham returned he saw Dama sitting up in a chair by the fire; the doctor did not see him on Friday—Dama was dead before he got there; in the doctor's opinion, the result of Dama's disregard of Dr. Brigham's directions was that he died. So far as the conduct of the nurse, Mrs. Fannie Johnson, in engaging the services of Dr. Brigham is concerned, it is not blameworthy, because when Tisdale refused to tap Dama and the latter desired another doctor, a better selection could not have been made than the choice of Dr. Brigham, a gentleman foremost in the ranks of his profession, entirely competent to deal with the most complicated case of bodily disease, and doubtless he did all possible for his patient, skillfully and conscientiously, although the disease was beyond the reach of human science or skill, according to his testimony.

## WAS THE CONDUCT OF FRENCH AND BURTIS CONTRARY TO MASONIC CUSTOM?

It is charged that in assuming control of the funeral arrangements, French and Burtis acted contrary to Masonic customs; but, although both contending counsel and some of the witnesses are well advanced in Masonry, it is not quite clear to the court from their arguments or from the evidence whether there was a culpable breach or a strict observance of custom on this occasion. Counsel for contestant asks, Why did Burtis send for French? Counsel for respondent says this is easy to answer—simply because French was the Commander of the Commandery to which both belonged and it was his duty to attend to the matter. Counsel Kelly in speaking of the conversation at Mr. French's office, where were assembled Burtis, French, F. W. Sumner and Booth, says, "French was eager to snatch the plum," and asks, Why did he not go to the public administrator's office? It was said in reply that this was because there was an aversion to go to a public administrator, for it is as much as to say that the deceased has no friends, and in such a case as this, where the decedent was a member of a Commandery, it was or

seemed to be proper to do as French did, and it is claimed that Mr. French's evidence explains fully and fairly his conduct, and that his testimony in regard to the funeral arrangements is corroborated by Frank W. Sumner and Andrew G. Booth. Booth made, he thinks, the suggestion of a special administrator and declined himself to act because he thought it was the duty of French, as Commander, to act, and Booth "was glad to shift the burden upon him." It is said that French acted with unseemly haste in taking control of the affairs, but it appears in evidence that Mr. Sumner called up the undertaker, Mr. Halsted, and that the expedition evinced in embalming the corpse was due to the advice of Dr. Brigham, who said that if the body was to be embalmed, the sooner the better. It does not appear that Mr. French had anything to do with the employment of the undertaker or the securing of the services of Dr. Kenyon as embalmer. French had nothing to to do with either except generally to suggest the propriety and necessity of having the operation performed in the most skillful and scientific manner—"a first-class job." It was necessary that the body should be treated as speedily as possible, because the deceased was a victim of "Bright's disease," and it was essential that the process should be perfect, as the corpse had to be transported to the Atlantic states and no risk could be run as to inadequate treatment—therefore French was solicitous on the subject; the condition of the corpse demanded instant attention, as it was in danger of decomposition, and that had to be arrested at once. What was it that these "conspirators" who constituted the "convocation" convened in the office of French did in consummation of their conspiracy? Counsel for respondent argued that they went about the business in a manner that was free from suspicion of irregularity. The testimony of Frank W. Sumner was that he recollected receiving a telephone message about Dama's death late in the afternoon, just before dark, and went to French's office and found there French, Burtis, and Booth. Sumner had known Mr. Dama, he was a member of his Commandery of Knights Templar, and he had also taken lessons of Dama about a year before his death for about a month; he did not see French go to the desk or table in the room where Dama's body was laid out and get some papers and show them to a

lady and then put them back; Sumner was there all the time; he was a military officer at the funeral at Dr. Barrows' Church; Sumner knew the customs of the Commandery in regard to burial of deceased members and was especially familiar with reference to the details in connection with the deceased Dama. During the year that Sumner was Commander no funerals were conducted by the Commandery; Dama was a member of the Commandery and had joined at the earnest solicitation of Columbus Waterhouse, who was more his friend than anyone else in the Commandery; Sumner was requested by French to act as special administrator, but refused; Burtis was requested to act in that capacity; Sumner did not remember who made the request, but it was in the course of a general conversation; Sumner was not aware at the time of Professor Dama's funeral that he had belonged to any local lodge, the "Blue Lodge" at the Mission, or any other, and said that Dama's petition did not show his "Blue Lodge," nor did it show to what lodge he belonged; they believed at the time that the deceased Dama belonged to a lodge east, and that he had no relatives or friends in San Francisco to take charge of his remains; afterward Sumner learned that he was a member of the Mission "Blue Lodge"; Sumner was not particularly interested in the event of this case, but was an especial friend of Frank J. French, and had been so for several years, and he was not interested otherwise than in a friendly way. Andrew George Booth testified that he was a member of Golden Gate Commandery, knew there was such a person as Luigi Dama, a member of that body, but was not personally acquainted with him; he had been consulted with reference to the details of arrangements for the funeral of Dama; he did not know that Dama had any relatives here, or that he was a member of any local lodge, and in such case it was the duty of the Commandery to take charge of the remains and conduct the funeral ceremonies; Booth thought that *he* made the suggestion of a special administrator at the meeting where French, Sumner, Burtis, and himself were present discussing the situation, it was simply a meeting of members of the Commandery to discuss as to what should be done about the burial of the deceased brother member who died in the circum-

stances related; Booth was then second officer—Generalissimo of the Commandery; Booth was not requested to act as special administrator; he did not recollect anything of that kind; he was requested to draw up the papers, but not for himself; but he declined and said that French might more appropriately act, he being the Commander, and Booth was glad to shift the burden upon French; during the time Booth was Commander he did not act as attorney for the estates of deceased members. William Edmund Price testified that he was a member of Mission Lodge, No. 169, F. and A. M., he did not know Luigi Dama, was not aware that he was a member of that lodge until after his death, he identified the application of Dama for admission to that lodge, dated January 2, 1882; Dama was admitted by affiliation and had the same standing as other members; Dr. Price thinks he first learned of Dama's death from the secretary of the lodge, James R. Buscelle; after that Mr. French waited upon Price and told him that he had supposed Dama was a member of an eastern lodge, and upon that assumption had undertaken for the Commandery to conduct the funeral, but having afterward learned that deceased was a member of a local lodge, of which Price was Master, French desired him to take charge, but Price urgently solicited French to do so, as the Mission Lodge had had several funerals then recently and Price assured him that they all should be pleased to have the Commandery conduct the ceremonies and assume or continue control of the obsequies—moreover, as Price had never witnessed a funeral under the auspices of the Templars, he would be glad of the opportunity of participating upon this occasion; Mr. French acquiesced finally, and at the time of the funeral Price walked with French to the church at the head of the procession. Columbus Waterhouse testified that he was Commander of Golden Gate Commandery for one year and knew the custom of that Commandery in reference to the burial of deceased brethren, and it was *not* the custom to take charge of the body and effects of deceased members, and Dama could not become a member unless his petition showed that he was a member of a "Blue Lodge," and Professor Dama's petition did show that he was a member of Mission Lodge 169, located in San Francisco. At that time Mr. French was not an officer of

the Commandery nor a member; W. O. Gould was then the Commander but he was absent, and Tristam Burges, now deceased, was acting in his absence. Mr. Waterhouse had been a ''Blue Lodge'' Mason since 1856; he took all his three degrees at that time—that is the first, second and third degrees, entitling him to become a member of the ''Blue'' Lodge, and that was the time that Waterhouse became initiated as a Mason. Dama was made a member of the Commandery during Mr. Burges' term in 1883 and Gould presided in absence of Mr. Burges. Columbus Waterhouse was Commander in 1884; elected in December, 1883; during his term General George W. Deitzler was buried by the Commandery, which was the only burial during his term; the Commandery has a burial service; General Deitzler was the first burial in that Commandery; Theodore F. Tracy was buried by Commandery during Waterhouse's absence; Waterhouse had never seen a Knights Templar funeral until that of General Deitzler, although he had been a Knight Templar then about twelve years, having joined in Sacramento in 1872. Charles F. Brown, a resident of San Francisco for upward of forty years, a Mason of high degree, thirty-third degree, Scottish Rite, R. A. M., F. and A. M., and other branches, testified that there was a Masonic custom where there is no expressed desire to the contrary by the decedent, in the absence of any immediate family of the deceased or any relatives, for the Master of his lodge to take charge of the effects of the deceased brother and if necessary to apply for letters of administration and to look after the funeral; Mr. Brown was speaking of the ''Blue Lodge.''

### DIVERSITY OF OPINION AS TO MASONIC CUSTOM.

There seems to be a diversity of opinion between these eminent Masons as to the custom of the Commandery, but upon the whole, while, in the light of the present controversy, it would have been wiser on the part of Mr. French to have gone to the public administrator, the chosen instrument of the law, in cases where there were no resident relatives, or to have obtained a special permit from the court to have examined the safe deposit box with reference to the existence of a Will, as has been the custom for many years including the time of Dama's death, yet

French's conduct had sanction in the circumstances existing and the apparent necessity of immediate action and the relation of decedent to himself, as a member and Commander of the Golden Gate Commandery. The evidence of Dr. Price, the Master of the Mission Lodge, also tends to corroborate the testimony of French, showing that as soon as he ascertained the local Masonic relation of the decedent he applied to the Master of his lodge to take charge of the ceremonies, and it was only upon the latter's insistence that French proceeded with the management of the affair.

### THE APPLICATION FOR SPECIAL ADMINISTRATION CONSIDERED.

The proceedings in connection with the application for letters of special administration, while informal in their character, were such as had been justified by a practice of long existence, but which the present judge of this court has materially modified by requiring all such applications to be made in open court and upon notice, and if illustration or example were necessary to show the propriety of such modification, it could not be more strongly supplied than in this instance, although the judge who made the modification is the same who made the order in the case which furnishes the example. Had that application been made in open court, and the order granting it been inscribed upon the minutes, and the time of such action noted therein, as it should have been, there could now be no confusion of recollection as to the circumstance or the point of time of the transaction which has been so important and perplexing an item of dispute in this controversy. I am satisfied from the evidence that that order was made after 2 o'clock on Saturday, January 21, 1888. The visit to the safe deposit vaults occurred on the same day after the order was granted. This is verified by the little memorandum-book of Curtis, the superintendent, notwithstanding the apparent alteration in that book upon which counsel for contestant lays so much stress, and which is explained by the testimony of Niss and Curtis as having occurred through a mistake in "calling off the wrong number."

### NO REASON TO DISCREDIT CURTIS.

I know of no reason why the court should reject the testimony of Curtis except that he has confessedly made a mistake which

undoubtedly misled the counsel for contestant in the first instance, but, so far as the court can judge from the evidence, Curtis is entirely disinterested, responsible, upright and trustworthy, and occupying a position which requires for its successful administration the possession of all of these qualities, and in addition to this the court's own knowledge of the custom of the company is in conformity with Curtis' testimony, for it is an every-day experience that prior to granting permission to open or examine the box or vault of any deceased person the company requires the written order or permission of the judge or letters of administration, and within the knowledge of the judge this order has been so strictly adhered to that in the case of the death of the manager of the corporation itself, the late General Washington L. Elliott, the company refused permission to his relatives to examine his box until they had obtained the written sanction of the court. That being the custom of that company, the court cannot conceive of any reason arising from an examination of the evidence why, in the particular instance in question, it should have been departed from. The testimony of Curtis has already been abbreviated in the course of this opinion in connection with the evidence of the Rev. Mr. Worcester. Among other things, Curtis testified that the Rev. Mr. Worcester visited the Safe Deposit Company vaults early on the morning of Saturday, January 21, 1888, and the book of records shows this, although Rev. Mr. Worcester has totally forgotten it. It was after that visit and the information of the death of Dama that Curtis put the seal on the safe according to the custom in such cases; it is not strange that Mr. Worcester forgot these matters after his interest had ceased in making any further inquiry. When Mr. Worcester found that another person was named in the memorandum taken from the box he considered that he was discharged from any duty that might have devolved upon him in any former Will; then his interest ceased in the subject matter of that paper and in the contents of the box. Mr. Worcester's character is entitled to the highest commendation; there is no doubt that his testimony is given in good faith, but his recollection is infirm, indeed lacking with reference to the particular visit on the morning of that day, and his testimony

upon that point is based upon a habit which he thinks it utterly unlikely he should have departed from on that occasion, although he says it is possible he did so depart, and the testimony of Curtis is clear, positive and precise to that fact. of that visit.

### THE "SHORT MEMORANDUM."

I take it, therefore, that the testimony of Curtis as to the occurrences at the Safe Deposit Company is truthful, and that so far as the contents of that box were concerned they were first exposed subsequent to the death of Dama at the time when Worcester, French and Burtis were present, and that no opportunity had existed prior thereto by any sleight-of-hand process to introduce the "Short Memorandum" or any other paper into that box. This is a very important item of evidence, for, if the theory of contestant be sustainable by the record, that the visit of Burtis was made at 2 o'clock on that day, Saturday, January 21, 1888, and that then the "Short Memorandum" (Respondent's Exhibit 1) was surreptitiously inserted in the box, there is an end of the case. This "Short Memorandum," a crude tracing of which is inserted in this opinion, is one of the most puzzling papers in this case, and, if a forgery, has been aptly described by counsel for contestant as the "most vicious forgery of them all." It has been subjected by me to the severest scrutiny that I am capable of exercising. Its authenticity must be determined by comparison and by circumstances. The reason of its existence is difficult to understand, its necessity by no means clear, and its authenticity not readily determinable on its face, for its countenance is most uncanny. Counsel for respondent says that the letter to Miss S. Buhne (Respondent's Exhibit 89) compared with the "Long Memorandum" (Respondent's Exhibit 2) are exactly alike, on the same paper, identical water-mark, line for line, mark for mark. This is not so; they are both on sheets of note paper; they tally line for line, but the appearance of the paper, to an almost imperceptible degree, differs in size and superficial quality, and while there is a water-mark in the Buhne letter (Respondent's Exhibit 89) there is none discernible in the "Long Memorandum" (Respondent's Exhibit 2) except the longitudinal water lines which, although they are the same number—ten—in each paper, do not cor-

respond when superposed; but the "Short Memorandum" is on paper identical with that of Contestant's Exhibit M–13, an undoubtedly genuine document written by Luigi Dama, the copy of Mrs. Dama's Will attached to the Randall deposition; both these documents are on foolscap, the pages exactly the same length and breadth, no water-mark in either except the stamp on the upper left-hand corner "Congress" with the figure of a building "Niantic Mills." Counsel for contestant contended that they had met the proposition as to the physical paper upon which the Will was written and had shown the fallacy of the adverse counsel's contention that it was the same as the ordinary "legal cap" to be found in any stationer's shop and used for a score or more of years in the courts and law offices, and directed the attention of the court to the water-mark "Niantic" in the sample of common and ordinary legal cap (Respondent's Exhibit 96) introduced to show the identity of the quality or kind of paper, whereas, in the "Altered Will" and in the alleged Will there is no water-mark at all; hold up to the light and examine and compare both and observe the difference; this the court has done, and considers, as counsel contends, that it is remarkable that Dama should have departed from his usual habit of using foolscap, for the "Altered Will" of November, 1885, and the alleged Will of May 8, 1887, were written on the same kind and quality of paper, and these are the only two instances in which we have examples of his using legal cap, and neither is identical with Respondent's Exhibit 2 either in quality, kind or water-mark. This "Short Memorandum" is a peculiar paper, and its claim to acceptance by the court is largely dependent upon the improbability of its having been placed in the safe deposit box by anyone but the decedent Dama. The preponderance of positive proof is that no one visited that box except Dama on May 3, 1887, and again on May 20, 1887, his last visit, until January 21, 1888, when the box was opened and its contents exposed and examined in presence of Worcester, French, Burtis, and Curtis; therefore, whatever the perplexities arising from an examination of the paper itself, and an endeavor to account for its contents, it would seem to be established that that paper was placed in the box prior to the death of Dama and by him.

### THE "LONG MEMORANDUM."

The draft of the "Long Memorandum" (Respondent's Exhibit 31), a paper of two pages, half-sheet note paper, has been pronounced genuine by the experts Piper and Young and also by Columbus Waterhouse, all witnesses for contestant, and both the experts Piper and Young say that the man who wrote the Will wrote this "Draft of Long Memorandum" (Respondent's Exhibit 31), and, after a very careful examination, I am prepared to accept this opinion, coming from a hostile source, as correct. I have, in compliance with the strenuous request of the counsel for the contestant, compared this draft (Respondent's Exhibit 31) with the "Long Memorandum" (Respondent's Exhibit 2), without being able to agree with him in the conclusion that it is "another of the decoys" furnished by the respondent. The counsel desired the court to note the second page of the draft, and asked, What is the word "acre's" doing there, and why is the word "Memorandum" at the bottom instead of at the top? He admits that it is true that some of the experts upon a casual inspection said it was genuine, or rather that it looked like Dama's writing, which, of course, it did upon superficial view, but the momentary deception could not alter the fact that this paper is a decoy; it only more strongly established that fact; and the hurried opinion extorted from the expert Dr. Piper on the stand should not weigh against it or against him as an expert; but, notwithstanding this contention of counsel, I am unable to conform my views to his conclusion, and feel obliged upon the evidence to pronounce this paper, "Draft of Long Memorandum" (Respondent's Exhibit 31), to be in the handwriting of Dama, and I believe that the same hand wrote the "Long Memorandum" (Respondent's Exhibit 2). Among the items of identity between the disputed and undisputed papers should be particularly noticed the mistakes of spelling and of grammar that are common to all; take, for instance, his spelling of valuable, "valueable," influence, "influece," "a ring with a large solitaire diamonds," "acre's," his use of the sign of the possessive case in plural words, for example, "acre's" for "acres"; this is conspicuous in all his compositions; and notice the word "market" for "marked" in the "Short Memorandum"

(Respondent's Exhibit 1); and other coincidental peculiarities might be pointed out in controversion of the contention of counsel for contestant. Some of the exhibits illustrating these peculiarities came from the custody of, or have been introduced in evidence by, contestant. A noteworthy example of this may be found by comparing the word "influece" in line 18 of Contestant's Exhibit L–12 with the same word "influece" at the end of line 83 of the alleged Will. The peculiar use of the apostrophe in plural words has numerous examples in authentic documents.

### THE "F" IN THE WILL.

The *J�ild* in the alleged Will is always in one form in that paper, and is a remarkable departure from his usual authentic writing, although as a part of the capital

*J⸤* it commonly occurs in the same instrument. The only examples I have found in the writings assumed to be authentic are in Respondent's Exhibit 27, (memorandum of amounts to be received from Benjamin Randall), and in Respondent's Exhibit 128, one of the many copies in Dama's handwriting of his circular, a very carefully written copy, evidently prepared for the printer.

This exhibit 128 merits minute inspection in connection with the respondent's theory of the testator's manner of constructing the Will. It is well to note here that Contestant's Exhibit H–60, a copy of the same circular, is written on exactly the same kind of note paper, same trademark, "Live Oak," impressed on an oak leaf, and this is also true of Respondent's Exhibit 128,—all these exhibits are identical in characteristics, excepting the

one letter *J⸤* in the Will form, at the end of the tenth line of the second page of Respondent's Exhibit 128. This point seems to have escaped the attention of experts and counsel on both sides.

It is plain from an examination of these several circulars that Dama was very slow in English composition, and always made drafts of every paper he considered important, and

his process of preparation from the initial draft to the completed document is nowhere better illustrated than in these undisputed writings, from Respondent's Exhibit 20 through Contestant's Exhibit H–60 to Respondent's Exhibit 128, the final copy for the printer, which should be closely compared with the Will in dispute.

### DAMA'S METHOD OF COMPOSITION AND WRITING.

This shows that Dama was careful and painfully laborious in his methods of composing and writing in a language that was foreign to him.  There are several instances of his method.  See draft of his answer to Miss Buhne's letter of September 3, 1883, on the back of that letter, Respondent's Exhibit 44, in which he alludes to his "great effort to write english," and in which also occurs a sentence significant in connection with the "Second Draft Will," Respondent's Exhibit 4, "I will try to do my best to make you indipented [independent] from everybody else."  This sentence is significant to my mind because in this "Second Draft Will" he seemed to contemplate bestowing the bulk of his fortune upon Miss S. B. (Sophie Buhne), his "dear friend"; thus making her, according to my inference and interpretation, "independent from everybody else."  His habit is also observable in the draft of his letter to his "sincere friend," Martha E. Chase, Respondent's Exhibit 43, written on the inside blank pages of that letter; and the letter as received by his "dear friend," Mrs. Chase, shows the fastidious care with which he produced his perfected work, Respondent's Exhibit 73.

The earlier processes applied and pursued by the fabricator of the disputed document may be traced by comparison with the Will of Wealthy B. J. Dama (the paper refused probate by this court for want of a complete date), and the fragment of the Will drawn by the Notary Wigger in 1882, Respondent's Exhibit 78.  This fragment is most important to illustrate the mode in which the disputed document was wrought out, and it undoubtedly served as a model for the form of the Will in question.  The first, second and third clauses are almost identical, even the word "desease" was so originally spelled in the Wigger Will, third clause, and the correction so made as to leave the "c" over the orig-

inal "s" in "decease" difficult to distinguish. The Notary Wigger calls this a "rough draft of the Will." (Respondent's Exhibit 78; another paper, apparently a fragment of an engrossed copy of the Wigger Will, Respondent's Exhibit 48, was not admitted in evidence and has not been considered by the court.) The peculiar misspelling of the word *decease,* "desease," is found in clause "Thirdly" of the "Altered Will" and of the alleged Will.

The introductory clause of the disputed Will is copied literally from the unprobated Will of Wealthy B. J. Dama, except the word "expenses" in the latter is spelled with a "c" in the former—thus, "expences." (See Contestant's Exhibit M–13, the Randall Will, and Respondent's Exhibit 23, the "Blue Will.")

The First Draft Will and the Second Draft Will, both on opposite sides of one-half sheet of foolscap paper, "Congress Niantic Mills" (Respondent's Exhibit 4), are plainly studies in testator's preparation for the Will finally drawn and executed.

#### WHY DID DAMA HAVE THREE SUBSCRIBING WITNESSES?

The Second Draft suggests the vagrant fancy of testator with respect to the beneficiary of his bounty; he leaves a sum of $15,000 to be paid to a "dear friend" in San Diego and all the rest to his "dear friend, Miss S. B.," and he appoints that same "dear friend S. B." executrix, and requests that this "beloved friend" be not required to give bonds; and at the end is the instruction—"sign 3 witnesses for the law of California." Mr. Lloyd, of counsel, in commenting upon this unusual instruction, says that D. S. Dorn's testimony about having drawn a *Will* could not have referred to this instrument and cannot be applied to any original from which this instrument was imitated, because that instruction as to the necessity of three witnesses could not have emanated from Dorn, as he is a lawyer, and Dama must have imbibed the idea from some other source, since no lawyer would give such erroneous instruction. Perhaps not; yet on the very day that I am writing this page (Monday, January 25, 1892), a Will was admitted to probate by me in the Estate of Alonzo Newell, No. 11,848, to which there were three subscribing witnesses, the form being copied by a layman from a book called

"Every Man His Own Lawyer"; and the legal firm of Mastick, Belcher & Mastick, with exceptionally long and large experience in this jurisdiction, habitually secure the attestation of three witnesses, not because it is the law of California, but as a measure of wise precaution in the event of the inability to prove by two, the testimony of the third may be most probably accessible. (See the probated will in Estate of George F. Bening, No. 11,743.) This was the reason given to me by Mr. George H. Mastick upon inquiry as to the cause in the last-named matter. But Dama may have imbibed his idea while he was resident in the New England states, for it appears that in Maine three subscribing witnesses are required, also in Massachusetts, and in Connecticut, New Hampshire and Vermont, and formerly in Rhode Island: 3 Jarman on Wills, 5th Am. ed., note on pages 771, 772.

### HOW THE WILL WAS DEVELOPED.

I have dealt so extensively with the expert evidence in the first part of this opinion that I do not care to revert to it, except in connection with a few points which impressed me originally against the genuineness of these disputed documents. I viewed with distrust at first the testimony concerning the large yellow envelope marked "Private Paper," Respondent's Exhibit 28, and the large white envelope marked "Will and Testament," Respondent's Exhibit 29, but, on comparing these two papers respectively, Respondent's Exhibit 28 with the yellow envelopes, Respondent's Exhibits 61 and 21, the first containing contract between Luigi Dama and William T. Cummins and the second the lease from Luigi Dama to Owen McMullen, March 23, 1887, and the large white envelope, Respondent's Exhibit 29, with Respondent's Exhibit 22, also large white envelope marked on the outside "Contract and Deed Horace Davis to Luigi Dama, May 26, 1885," all superscriptions assumed to be authentic, have found them to be identical, and so conclude that the testimony that he had these envelopes, the yellow one marked "Private Paper" and the white one marked "Will and Testament," is at least credible.

The paper called the "Altered Will," Respondent's Exhibit 3, was undoubtedly the last paper used in the preparatory process of fabricating the alleged Will. Counsel for

the contestant has adjured the court to consider with caution this "decoy," which, he declares, in itself furnishes ample internal evidence of the scheme of forgery of which the alleged Will was the ultimate sequence, and it is asserted that if the court examine with care and circumspection this "cripple," this "decoy," the "Altered Will" of pretended date November 1, 1885, and compare and construe it clause by clause, it affords indubitable proof that the alleged Will was the culmination of a series of forgeries, the crown and apex of the structure of fraud. I have perused this paper again and again with no prepossession in its favor, but, on the contrary, with a doubt of its honesty so far as superficial indications afforded basis for opinion, yet, notwithstanding my many misgivings, the result of repeated examinations and comparisons is in its favor. The form of the capital letter $\mathcal{D}$ common to both the Altered Will and the alleged Will occasioned as much perplexity as the form of the capital $\mathcal{J}$, but I have found sufficient similarity in some of the papers produced in evidence, the authenticity of which is either assumed or not assailed, to warrant me in saying that this form was not unknown to or unused by Dama. See Respondent's Exhibit 68, Story receipt, where it occurs in the initial letter of D. W. C. Story, and also in the signature "Luigi Dama," and perhaps less palpably in two or three other of these receipts, and also in Respondent's Exhibit 6, lease from Luigi Dama to Owen McMullen of Redwood City lots. It seems to me that this alleged Will was developed in very much the same manner as the circulars, Contestant's Exhibit H–60 and Respondent's Exhibit 128, the last named being an absolutely perfect manuscript, and H–60 being scarcely less so, and both seem to be the culmination of the incipient draft, Respondent's Exhibit 20. It is worth while critically to compare this exhibit 20 with the "Altered Will" and the alleged Will, particularly with respect to the alterations in the "Altered Will" and in the exhibit 20. There are, it seems to me, many peculiarities common to both.

## PECULIARITIES OF DAMA'S WRITING.

The expert Professor Young claimed that the crowning characteristic and prominent peculiarity in the writing was "the lifting of the pen," but, in taking selections from the alleged Will, the "Altered Will," the "Blue Will," Respondent's Exhibit 23, and the Randall Will, Contestant's Exhibit M–13, we find, by comparing them one with another, out of sixty-nine words, forty-five are exactly alike and twenty-four different. As to the slope, a peculiarity testified to by Professor Young, and the stroke at·the end of the signature of Dama, the flourish or rubric, the first loop of the rubric, to which Professor Young attaches definitive importance, and which both experts Piper and Young say is sufficient in and of itself to condemn the disputed documents, because, according to their theory, it was not Dama's habit to make loops, it seems to be sufficient to allude to a few instances which appear to negative and nullify their conclusion. The slope is illustrated in the Story receipts and in various other exhibits, Respondent's Exhibits 104, 105, 106, and the yellow envelopes, exhibits 21 and 61, and the large white envelope, exhibit 22, and the Contestant's Exhibit H–60, all show the slope of the Will, the change of slope is to be seen in all the papers. Observe the envelope on Contestant's Exhibit M-13, the formation of the word "Boston" in "East Boston," and notice the dashes ⧬ before and after and under the word

⧬ *Mass* ⧬ and the hook at the end of the first

dash under that word ⟶ . In connection with Professor Young's deductions may be examined the signatures brought from the German Bank, where will be found the formation of the circle or loop, the first, in the rubric or flourish under Dama's signature, and we may observe particularly in Respondent's Exhibit 12, where the first circle or loop is much larger than the second, thus showing the incorrectness of this expert's universal inference; this also appears notably in Respondent's Exhibit 36, Cummins Contract. Much discussion was expended by the experts upon Dama's habit of making loops, but it would seem that this habit increased according to the care which he bestowed upon his writings; in other words,

the more care he took the more loops he made. The First Draft Will appears to have been written with rapidity, very few loops; a like observation applies to the Second Draft Will; the "Randall Will," Contestant's Exhibit M–13, appears to have been written with more care, and shows an increased proportion of loops, the "Blue Will," Respondent's Exhibit 23, with still more care and a larger ratio of loops; and so with others, showing a gradual increase of care and a proportionate increase of loops until the alleged

Will is produced ; the small *hs* and *ls* may be taken as illustrations which serve to show that as the writer of the Will went on progressively he made more and more loops until he finished the final paper, in the writing of which he exercised the greatest care, bestowing unusual pains upon every letter, large and small. It is not written in Dama's usual hand, and that gives force to the proposition that if a man wanted to forge the Will, he would have taken the ordinary and every-day hand of the writer, so that it would not attract especial attention. If this Will were copied from some original, then its main provisions, as presented in this disputed document, must have been in that original instrument.

### DAMA'S PERSONAL PECULIARITIES.

It cannot be doubted from the evidence that Dama was a very singular and curious man and did many odd and peculiar acts, and one knowing the facts and not knowing the man would find it difficult to account for his conduct, and we have an illustration in his treatment of the Rev. Mr. Worcester, who never did aught but kindness for him, and who really troubled himself greatly to serve him, particularly in the purchase of the Jackson street property, wherein Worcester's part in the transaction was productive of great pecuniary profit to Dama and of no advantage to Worcester, and yet Dama became suspicious and acquired an aversion apparently toward Worcester, and also, without ostensible reason, toward Columbus Waterhouse, although in their presence he concealed his sentiments. The Rev. Joseph Worcester described Dama, not inaptly, as a "preposterous man," and he marveled not that he should have made a "pre-

posterous" Will. Dama was a notional man; he had no stability of mind; he took notions to persons and then changed them without cause; took a fancy to Waterhouse and changed, and so with others, and gave them the impression that he would leave to them his property, and finally he fixed his mind on Mrs. Sara Barker Smith and made his Will in her favor, but, had he lived much longer, he might have forsaken this fancy for some other object of his capricious choice. I think this judgment of his character is fairly inferable from an examination, not only of his correspondence, but of the First Draft Will, Respondent's Exhibit 4, wherein he leaves to his "beloved ———," and of the Second Draft Will in which he names "his beloved friend, Miss S. B.," and of Respondent's Exhibit 78, and of the many expectations which he seemed to have inspired in the breast of nearly every one of his pupils, including Miss Belle Harris, who testified that she had a conversation with Professor Dama, in which he told her that those people who expected to get his money would be disappointed, and that he was now a poor man and would have to depend on her, as he had left her all his fortune; although she did not infer from what he said that he left her everything in a Will, for she thought there were others connected with that Will. In my examination of the evidence in this case I fail to find any example of abnegation among the friends and pupils of Professor Dama; even Thomas R. Knox expected, as Dama had no relatives here and did not like his wife's relatives, that he would have remembered his friends, among others Knox or his daughter. It would seem that he had as good reason to select Mrs. Smith as his beneficiary as any other of his friends, or so-called friends; she was very friendly with him; there were many elements of sympathy between them; he taught her Italian; they had both been abroad and were accustomed to converse about many places in which they had been, and it seemed to be natural in so notional a man that he should have chosen her as his legatee, as it would have been natural, had he lived long enough, to have substituted someone else who had usurped her place in his fancy. It is claimed that his bequest to her was absurd, because of her age and his inability to accomplish, through his method, in her case what he had

done for other pupils, but, so far as I can gather from his circulars and from the evidence of the pupils, his method was principally, if not purely, hygienic; as Mr. Thomas R. Knox said, Dama's theory was that by pursuing his method one could live to a great age.

### DAMA NOT MERELY A MUSIC MASTER.

Dama was not merely a music master, but a physician and a hygienist, whose business it was "to know the arrangement of these modifiable conditions, such as are capable of being indefinitely modified by our own actions, and how to influence them toward the maintenance of health and the prolongation of life " (Professor Huxley in *Popular Science Monthly*, Volume XI, page 669) and, according to this theory of voice culture and progressive development, there is no reason to doubt the evidence of another of his "warm friends," Mrs. Helen Cushman, that notwithstanding her mature years, his system would find in Mrs. Smith an example and an exponent, hygienically if not artistically, and that in the process of development she would extend and perpetuate his theory of voice culture. The reason of Dama's bequest to Mrs. Smith would seem, therefore, to have had some basis in his system, which, according to the testimony of Mrs. Cushman, recognized the validity of the proposition that while life remained hope would survive, and that through the use of his legacy to her, "for the pur pose of further study and development of her vocal organs and cultivation of the voice," Mrs. Smith might be greatly benefited; and to justify this view of the subject matter I think it not out of place to here insert a copy of the circular of the decedent, which succinctly states his theory of voice culture. The one I choose to copy herein is Respondent's Exhibit 128, which is identical in terms with Contestant's Exhibit H–60, as follows:

"Prof$^r$. Luigi Dama, graduate of the Royal Conservatory of Naples, Italy, a resident of this City for the last eight years, but recently returned from a visit East, again offers his services to the Public.

"Prof$^r$. Dama has made the cultivation of the voice the study and practice of his life both physiologically and in vocal training, and feels assured that he understands and

can overcome the difficulties which obstruct the free use of the voice by public and private singers and speakers and by all who are compelled to prolonged vocal expression. He has satisfied many of our intelligent citizens through their experience that the right use of the voice is the free use of it, and that the sound properly formed, can be made in any required volume and as tirelessly as the birds sings. Prof$^r$. Dama has also traced many of the most obstinate and baffling disease, not only of the throat and lungs but of the liver, stomach, and other organs closely connected with them to the misuse of the voice. For the right use of the voice is the right and active use of the lungs, and the full and complete action of the lungs involves the right action of all the organs of the chest and abdomen, but especially does it involve the proper aëration of the blood, its lively circulation, and the ample supply of pure blood to the vital organs and prompt removal of the waste particles. Cases of chronic disease of the throat, even malformation through misuse, also of long impaired digestion and assimilation, of obstinate headache and nervous prostration have been cured or so greatly helped by Prof$^r$. Dama as to win for him the warm gratitude of his pupils.

"Prof$^r$. Dama has observed what all thoughtful travelers are familiar with, the extraordinary prevalence of all diseases incident to the wrong use of the voice and imperfect action of the lungs in our own country.

"He finds it to be due in part to the practice of lingering upon the consonants notably upon the r, and the incomplete enunciation of the vowels, he knows that he can correct this to the great and delightful increase of life and activity to all.

"There are many in this vicinity who would be glad to be referred to for the substantiation of this from their own experience.

"Prof$^r$. Dama's residence is No. 317 Mason Street, just below Geary, where he may be found."

I have said all that seems to be necessary concerning Clause Sixthly of the alleged Will.

#### THE SIGNATURES OF THE SUBSCRIBING WITNESSES.

Now, as to the signatures of the subscribing witnesses to the Will: Jules Mathieu made oath in this court, on the

original probate of this Will, that that was his signature, but, apart from that, a comparison with his writings herein proved shows the genuineness of the signature attached to the Will, and of these writings there are numerous examples which I do not deem it necessary to recount. In the strong light of the adverse criticism expended upon the testimony of the witness Henri Godard, I can see no reason to reject his evidence that he witnessed and subscribed the alleged Will in the manner and circumstances sworn to by him on February 13, 1888, and on November 21, 1890. The witness Antonio Bellini was the occasion of more dispute and doubt than perhaps any other, but I think now, as I thought at the time when he first appeared and testified in this court, that, either through ignorance or design, he did not in his testimony state the facts as they existed at the time of the execution of the Will, May 8, 1887. It was difficult, indeed, to bind this witness to any intelligible statement; he was evasive and contradictory in his manner, and it was apparent to the court, as was stated on February 13, 1888, that while this witness Bellini can talk English well enough to make himself understood, yet, when the court told him, on that last-mentioned date, to tell all he knew about the making of the Will, and asked him if he talked English in his business, he answered, "Yes, sometimes I talk something that is no good, and nobody knows what I talk but myself." I think now, as I thought and said then, that when Bellini wanted to make himself understood he was capable of doing so in English. On the examination here on November 20, 1890, it was quite plain that he was determined to deny, and to adhere to the denial, that he had signed the paper presented to him, and that he had never seen it before that day, and that it was not the paper the judge showed him on February 13, 1888, that his signature was not on the same paper; that it was nearer the bottom of the page, about four fingers from the bottom, although, of course, it was the same paper; and upon redirect examination he affirmed again that it was not the same paper (indicating the Will admitted to probate February 27, 1888), although, when an interpreter was called in, he corrected his statement and said that it was the paper but with one difference, that at the former hearing, February 13, 1888,

it was fresher and newer than at the time of his testimony, November 20, 1890. Bellini swore that the paper he signed in Dama's house had a stamp on it, but the color he could not remember, whether it was black, or red, or blue, and again he said that he did not know that paper, the alleged Will, never saw it before the day of testifying, November 20, 1890; the paper he signed was a similar paper; and then again he affirmed that this probated paper was the one shown to him by the judge on February 13, 1888. Upon the same day in his testimony he swore positively that the word "Antonio" and the words "222 Ofarrelle" were in his handwriting, and he also added, voluntarily and impressively, "I swear it," but the next day he explained this by saying that he was excited and did not clearly understand it and subsequently he understood it better. It has been stated here, in the course of argument, that this witness swore that there was a red seal in the paper to which he subscribed after the signature of Luigi Dama; but this is an error, as appears from the official report of his original testimony, February 13, 1888, in which he swore that the paper that he signed had a stamp on it, "it was evening and he did not look very well but he knew it was stamped paper," and in answer to the question, "Was it a seal, or an impression without a seal?" he said, "It was an impression"; and to the further question, "Was it a wafer, or a paper seal, or just some impression made by a press in the paper?" he made answer, "It was an impression on the paper itself." The troublesome feature of this signature is the unique mode of writing "Bellini," but it is extraordinary, if a forgery were attempted to be perpetrated in this signature, that so remarkable a departure from the common hand of the witness should have been taken. It is more reasonable to believe that the witness himself wrote this for some reason unaccountable to anyone else, and there are certain characteristics of the letters in that word which are reproduced in the specimens of the witness' handwriting given on page 3 of the judge's manuscript notes, written Thursday, November 20, 1890, and on the paper marked Respondent's Exhibit 30, written in court, at the instance of the judge, on February 13, 1888. Reference is here made to the figures "222" in the alleged Will, in the judge's notes,

and in Respondent's Exhibit 30, to the "rr" in "O'farrell" in these papers, and it seems to me that those specimens of the writing show similarities with the Will signature, and when we take the photographic enlargement (Respondent's Exhibit 115) of portions of those specimens and compare with the photographic enlargement of the Will signature (Respondent's Exhibit 116), we find identities in literal formation.

### WHAT THE LAW REQUIRES IN ATTESTED WILLS.

Now, assuming that the evidence of this witness is in itself uncontradictory and contains no inherent element of improbability, it is at variance with the positive testimony of the two other witnesses, and the probate of a Will is not to be denied or revoked upon such testimony, nor is the action of the court dependent on the recollection or the veracity of a subscribing witness. The law, for wise and obvious reasons, requires such instruments to be executed and attested with such precautions as will usually guard against fraud; but, if the forgetfulness or falsehood of a subscribing witness can invalidate a Will, it would be easy, in many cases, to use such artifices or corruption as would render the best Will nugatory. The evidence of a subscribing witness is not conclusive either way, nor does the law presume that he is either more or less truthful than others; it does presume that he had, when he signed, full knowledge of what he was doing, and, in case he is dead, his attestation, when proved, is prima facie evidence that all was done as it should have been; but in all contested Will cases the case is open for general witnesses, and when the testimony is all in, each witness is credited according to the impression he leaves of candor and intelligence, and not according to his being, or not being, an attesting witness: Abbott v. Abbott, 41 Mich. 540, 2 N. W. 810. Neither failure of memory nor the corrupt or false swearing of attesting witnesses will be allowed to defeat a Will if its due execution can be shown by other testimony. Mere failure of the attesting witnesses or their denial of the facts will not defeat it if it can be established by other evidence: Haynes v. Haynes, 33 Ohio St. 598, 31 Am. Rep. 579; 3 Redfield on Wills, c. 3, sec. 3, p. 9, and 1 American Probate Reports, p. 271, and cases there cited.

Other evidence of a valuable character as to what occurred at the moment of the execution of the Will is supplied by the testimony of Gaetano Dellasanta, who seemed to me to be a fair witness, and who told the story of how he came to be present, upon the occasion and what took place at the time, and why his signature was not required or given, in a plain and straightforward manner. Dama told him he need not sign, because three witnesses were enough, and they had already signed. Dellasanta said that after Bellini wrote his name everybody made a remark, because of the way he signed his name, and the paper signed then and there the witness believed to be the same paper here in question, although "he was not judge enough to swear that no man could imitate the paper, and would not swear positively that it was the same paper," but it appeared to him to be the same.

### UPON WHOM RESTS THE BURDEN OF PROOF.

Counsel for contestant in his opening statement said that he would show that this alleged Will was forged, and if he should not succeed in identifying the forger in person or place his finger upon him, the burden would rest upon those who caused the instrument to be probated. I do not understand this last proposition to be the law. The burden of proof is not upon the defense, but upon the prosecution.

While the contestant is not called upon to indicate the forger, he is compelled in a civil contest to establish by a preponderance of proof the charge laid in his complaint.

It is certainly not incumbent upon the respondent to do more than hold the balance. "The party holding the affirmative of the issue must produce the evidence to prove it; therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side": Code Civ. Proc., sec. 1981. "Each party must prove his own affirmative allegations": Code Civ. Proc., sec. 1869.

I do not think that either Henri Godard or Mrs. Fannie Johnson had the capacity to execute, even had they the talent to conceive, the concatenation of forgeries which must have preceded the culmination of this crime, if the alleged Will were forged.

## Conclusion.

I have striven in the preceding pages to present a full and a fair view of the evidence on both sides and of the opposing views of counsel, desiring by process of redaction to compress the mass of matter into manageable dimensions without eliminating an atom necessary to a just judgment. It may be that I have not succeeded in my earnest endeavor. Some witnesses may have received too much attention, some not enough, other some none at all. Mrs. Ann Herbert Barker and Mrs. Anna B. Bradstreet have been passed by, not through discourtesy, but because treatment of their testimony was hardly justified by its tenor. This remark may apply also to others. But I am conscious of no omission or oversight that was necessary to a correct conclusion, and so far as human judgment applied to human testimony can secure a right result, I think it has been reached.

The importance of this controversy is not to be measured by the magnitude of the estate. It matters not whether that be large or small, the crime here charged to have been committed is great; it involves forgery and implies murder; and if the court have erred in judgment, and that error should be perpetuated or remain uncorrected, it will be an error of grave character and grievous consequence. One of the counsel has said that this case is one of importance paralleled only by the famous Broderick Will Case (No. 1079 old Probate Court), and many circumstances conspire to raise it beyond that in importance. It is important, also, because of the number and character of the persons implicated in the criminal conspiracy alleged, for at least a dozen persons of hitherto high standing in this community are concerned in complicity, and if they be guilty as charged, the penitentiary should be their portion, if not the gallows. I have appreciated its importance intensely, and have felt an unusually acute sense of responsibility because of the frequency of forgery asserted or attempted, and perhaps sometimes successful, in courts of probate, and because of the experience that has been my fortune to endure in this class of cases. It is not necessary to enumerate or specify the cases that in the

course of now nearly ten years it has been my lot to investigate and decide; I am certain that in one case at least this court was constrained by testimony of experts and others to admit a false and fabricated paper to probate, although the well-grounded distrust and unreserved expression of the court in that case prevented the successful issue of a fraud by the same parties in another cause tried in a co-ordinate department.

I have deemed it, therefore, my duty to bestow the greatest pains and most rigorous analysis in the examination of the evidence in this case; and yet it may be that, after all, the court has, because of the fallibility of human judgment, aided in fastening a fraud upon the record and assisted in the dishonest diversion of the estate of decedent. But as I have reviewed the premises, line by line and letter by letter, I can perceive no reason upon all the facts in evidence to sustain the contest, and, therefore, order judgment for defendant.